IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,     )
                              )
              Plaintiff,      )     CASE NO. 13 CR 515
                              )
       v.                     )
                              )     JUDGE REBECCA R. PALLMEYER
DMITRY FIRTASH and            )
ANDRAS KNOPP,                 )
                              )
              Defendants.     )

## JOINT REPLY OF DMITRY FIRTASH AND ANDRAS KNOPP TO THE GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT FIRTASH'S AND KNOPP'S MOTIONS TO DISMISS INDICTMENT

# TABLE OF CONTENTS

**Page**

ARGUMENT .................................................................................................................. 1

I.    The Motion To Dismiss The Indictment Is Ripe For Adjudication. ................................... 1

    A.    Defendants' Motion To Dismiss Does Not Risk Dual Proceedings. ..................... 2
    B.    The Austrian Extradition Decision Is Final. .................................................. 3
    C.    Defendants Need A Determination On Their Motion To Dismiss. ...................... 4

II.   Dismissal Is Warranted Because Venue In The Northern District Of Illinois Is
    Improper ...................................................................................................... 5

    A.    The Indictment's Use Of The Words "Northern District of Illinois" Does
        Not Alone Establish Venue ........................................................................ 7
    B.    The Government's Effects Argument Misconstrues The Case Law. ................... 8
    C.    The Acts Charged In The Indictment Do Not Support Venue ......................... 10
    D.    Neither The Continuing Offense Provisions In 18 U.S.C. § 3237(a) Nor
        The Venue Provisions In The Money Laundering Statute Establish Venue. ....... 11
    E.    Applicable Precedent Does Not Require A Trial Before The Court Can
        Make A Venue Determination. ................................................................... 12

III.  The RICO Conspiracy Charged In The Indictment Does Not Apply
    Extraterritorially And This Court Should Dismiss It. ................................................. 13

    A.    *RJR Nabisco* Reaffirmed The Presumption Against Extraterritoriality ............... 14
    B.    Under The *RJR Nabisco* Test, The Charges In The Indictment Are
        Impermissibly Extraterritorial. ................................................................. 16

        1.    The Alleged RICO Enterprise Does Not Significantly Affect U.S.
            Commerce. .................................................................................. 17
        2.    The Predicate Act Of Money Laundering Does Not Apply
            Extraterritorially ........................................................................... 18
        3.    The Predicate Travel Act Statute Does Not Apply Extraterritorially
            And Is Not A Permissible Domestic Application Of The Statute. ........... 22

IV.   The Court Should Dismiss The FCPA Charge Because Defendants Are Not
    Subject To Jurisdiction In The United States. ........................................................... 26

    A.    Defendants Do Not Fall Within Any Category Enumerated In The FCPA
        As A Permissible Prosecution .................................................................. 26
    B.    There Is No Basis To Charge Defendants With A Conspiracy To Violate
        The FCPA When Congress Has Specifically Exempted Them From FCPA
        Coverage. ............................................................................................... 27
    C.    The Government's Arguments Against Strict Construction Of FCPA
        Applicability Should Be Rejected By The Court ........................................... 31

V.    Defendants Have Fifth Amendment Due Process Rights And This Case Violates
    Those Rights. ............................................................................................... 35

    A.    Defendants Have Fifth Amendment Due Process Rights. ............................... 36

B.    Prosecuting These Defendants In The United States Does Not Comport With Due Process..................................................................................... 37

    1.    The Indictment Does Not Allege Substantial Criminal Activity In The United States....................................................................... 38

    2.    The Alleged Activity Did Not Have And Was Not Intended To Have A Substantial Effect Within The United States............................. 39

    3.    The Alleged Activity Was Not Directed Against Significant United States Interests. ...................................................................... 40

    4.    This Prosecution Is Not Reasonable. ...................................... 40

C.    The Government's Cited Authority Does Not Show That This Prosecution Satisfies Due Process. ............................................................ 41

CONCLUSION.................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andrews v. United States*,
817 F.2d 1277 (7th Cir. 1987) .............................................................................12

*Casey v. United States Department of State*,
980 F.2d 1472 (D.C. Cir. 1992) ...............................................................................2

*Cedeno v. Intech Group, Inc.*,
733 F. Supp. 2d 471 (S.D.N.Y. 2010).....................................................................24

*Chevron Corp. v. Donziger*,
871 F. Supp. 2d 229 (S.D.N.Y. 2010).....................................................................15

*EEOC v. Arabian American Oil Co.*,
499 U.S. 244 (1991)................................................................................................16

*Elsevier, Inc., v. Grossman*,
199 F. Supp. 3d 768 (S.D.N.Y. 2016)...............................................................23, 24

*Gebardi v. United States*,
287 U.S. 112 (1932)...................................................................................... *passim*

*In re Hijazi*,
589 F.3d 401 (7th Cir. 2009) ........................................................................ *passim*

*Johnson v. Eisentrager*,
339 U.S. 763 (1950)................................................................................................37

*In re Kashamu*,
769 F.3d 490 (7th Cir. 2014) ..................................................................................37

*Laydon v. Mizuho Bank, Ltd.*,
2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ........................................................25

*Loginovskaya v. Batratchenko*,
764 F.3d 266 (2d Cir. 2014)....................................................................................25

*Norex Petroleum Ltd. v. Access Indus. Inc.*,
631 F.3d 29 (2d Cir. 2010)......................................................................................23

*Ocasio v. United States*,
136 S. Ct. 1423 (2016).............................................................................................34

*Petroleos Mexicanus v. SK Eng'g & Constr. Co.*,
    572 F. App'x 60 (2d Cir. 2014) ....................................................24

*RJR Nabisco, Inc. v. European Community*,
    136 S. Ct. 2090 (2016) ................................................. *passim*

*Salinas v. United States*,
    522 U.S. 52 (1997)......................................................14

*United States v. All Assets Held At Bank Julius*,
    2017 WL 1508608 (D.D.C. Apr. 27, 2017) ......................... *passim*

*United States v. Amen*,
    831 F.2d 373 (2d Cir. 1987)......................................33, 35

*United States v. Benabe*,
    654 F.3d 773 (7th Cir. 2011) .......................................14

*United States v. Bodmer*,
    342 F. Supp. 2d 176 (S.D.N.Y. 2004).............................27

*United States v. Bokhari*,
    757 F.3d 664 (7th Cir. 2014) ....................................36, 37

*United States v. Bowens*,
    224 F.3d 302 (4th Cir. 2000) ........................................9

*United States v. Briggs*,
    700 F.2d 408 (7th Cir. 1983) .......................................23

*United States v. Campbell*,
    798 F. Supp. 2d 293 (D.D.C. 2011) ...........................41, 43

*United States v. Casamento*,
    887 F.2d 1141 (2d Cir. 1989).......................................15

*United States v. Castle*,
    925 F.2d 831 (5th Cir. 1991) .........................28, 32, 34, 35

*United States v. Clark*,
    728 F.3d 622 (7th Cir. 2013) ........................................8

*United States v. Cores*,
    356 U.S. 405 (1958)....................................................12

*United States v. Craig*,
    573 F.2d 513 (7th Cir. 1978) .........................................9

iv

*United States v. Falletta*,
  523 F.2d 1198 (5th Cir. 1975) ...........................................................29

*United States v. Frederick*,
  835 F.2d 1211 (7th Cir. 1987) .......................................................9, 13

*United States v. Garavito-Garcia*,
  827 F.3d 242 (2d Cir. 2016)...............................................................2

*United States v. Glecier*,
  923 F.2d 496 (7th Cir. 1991) .......................................................14, 19

*United States v. Gotti*,
  457 F. Supp. 2d 411 (S.D.N.Y. 2006)..............................................20

*United States v. Hawit*,
  2017 WL 663542 (E.D.N.Y. Feb. 17, 2017).........................22, 23, 24

*United States v. Hayes*,
  2015 WL 1740830 (S.D.N.Y. Mar. 20. 2015) ...............................36, 37

*United States v. Henson*,
  848 F.2d 1374 (6th Cir. 1988) ...........................................................32

*United States v. Hijazi*,
  845 F. Supp. 2d 874 (C.D. Ill. 2011) .................................................41

*United States v. Hoskins*,
  123 F. Supp. 3d 316 (D. Conn. 2015).......................................... *passim*

*United States v. Jang*,
  2007 WL 4616927 (S.D. Ind. Dec. 27, 2007)...............................12, 13

*United States v. Johnson*,
  323 U.S. 273 (1944).....................................................................12, 37

*United States v. Johnson*,
  510 F.3d 521 (4th Cir. 2007) .............................................................13

*United States v. Kay*,
  359 F.3d 738 (5th Cir. 2004) .............................................................29

*United States v. Leija-Sanchez*,
  602 F.3d 797 (7th Cir. 2010).........................................................41, 42

*United States v. Lewis*,
  797 F.2d 358 (7th Cir. 1986) ...............................................................9

*United States v. Merit*,
962 F.2d 917 (9th Cir. 1992) ..................................................3

*United States v. Muhammad*,
502 F.3d 646 (7th Cir. 2007) ........................................ *passim*

*United States v. Nippon Paper Indus. Co., Ltd.*,
109 F.3d 1 (1st Cir. 1997)............................................41, 42

*United States v. Noriega*,
683 F. Supp. 1373 (S.D. Fl. 1988) ........................................36

*United States v. Ochoa*,
229 F.3d 631 (7th Cir. 2000) ........................................11

*United States v. Pearson*,
340 F.3d 459 (7th Cir. 2003) ........................................11

*United States v. Pino-Perez*,
870 F.2d 1230 (7th Cir. 1989) ........................................ *passim*

*United States v. Prevezon Holdings, Ltd.*,
122 F. Supp. 3d 57 (S.D.N.Y. 2015)........................................24

*United States v. Prevezon Holdings, Ltd.*,
2017 WL 1951142 (S.D.N.Y. May 10, 2017) ..........................21, 25

*United States v. Radley*,
558 F. Supp. 2d 865 (N.D. Ill. 2008) ........................7, 8, 12, 13

*United States v. Ringer*,
300 F.3d 788 (7th Cir. 2002) ........................................8, 11

*United States v. Schmucker–Bula*,
609 F.2d 399 (7th Cir. 1980) ........................................41, 42

*United States v. Sensi*,
879 F.2d 888 (D.C. Cir. 1989) ........................................3

*United States v. Sidorenko*,
102 F. Supp. 3d 1124 (N.D. Cal. 2015) ........................................43

*United States v. Tello*,
687 F.3d 785 (7th Cir. 2010) ........................................14

*United States v. Tingle*,
183 F.3d 719 (7th Cir. 1999) ........................................8, 10

*United States v. Vanichromanee*,
742 F.2d 340 (7th Cir. 1984) ...................................................................23

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) ......................................................................................37

*United States v. Volpendesto*,
746 F.3d 273 (7th Cir. 2014) ...................................................................14

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ......................................................................................37

**Statutes**

21 U.S.C.A. § 848 ..............................................................................................32

15 U.S.C. § 77dd-1(a) .......................................................................................27

15 U.S.C. § 77dd-2(a) .......................................................................................27

15 U.S.C. § 78dd-1(a) .................................................................................26, 34

15 U.S.C. § 78dd-2 ............................................................................................29

15 U.S.C. § 78dd-2(i) ..................................................................................26, 34

15 U.S.C. § 78dd-2(i)(1) ..................................................................................29

15 U.S.C. § 78dd-2(a) .................................................................................26, 34

15 U.S.C. § 78dd-2(h)(2) ..................................................................................10

15 U.S.C. § 78dd-3 .......................................................................................27, 34

15 U.S.C. § 78dd-3(a) .......................................................................................29

15 U.S.C. § 78dd-3(f)(2) ...................................................................................10

18 U.S.C. § 1952 ..................................................................................10, 21, 23

18 U.S.C. § 1956 ................................................................................................10

18 U.S.C. § 1956(i)(2) .......................................................................................11

18 U.S.C. § 1956(f) ............................................................................................20

18 U.S.C. § 1956(f)(1) .................................................................................18, 19

18 U.S.C. § 1956(h) .....................................................................................10, 18

18 U.S.C. § 1962(2) ...........................................................................................................10

18 U.S.C. § 1962(d) .....................................................................................................14, 19

18 U.S.C. § 2314 ........................................................................................................21, 25

18 U.S.C. § 3237(a) .......................................................................................................6, 11

**Other Authorities**

Restatement (Third) of Foreign Relations Law, Sections 402 and 403 ........................................37

Rule 12(b) ......................................................................................................................1, 2

U.S. Const., amend. IV .........................................................................................................37

U.S. Const., amend. V..............................................................................................1, 35, 36, 37

U.S. Const., amend. VI ....................................................................................................7, 37

Defendant Dmitry Firtash ("Firtash") and defendant Andras Knopp ("Knopp"), (collectively hereinafter, "Defendants"), hereby reply to the Government's Consolidated Response to Defendants' Motions to Dismiss the Indictment. The government's suggestion that this Court should defer ruling on the Defendants' Motions to Dismiss the Indictment is meritless and rests on a misreading of case law. The argument that a conspiracy charge and verbal subterfuge in the Indictment can manufacture venue is incorrect. The government misconstrues case law to analyze extraterritorial jurisdiction under RICO by appeal to domestic conspiracy cases and ignores the legal standards that the Supreme Court directed apply in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). The argument that a conspiracy charge should override Congressional intent in enacting the Foreign Corrupt Practices Act is incorrect. Defendants have Fifth Amendment due process rights which are violated by this prosecution in that the alleged actions in the United States are minimal, incidental, and not criminal.

**ARGUMENT**

**I.      The Motion To Dismiss The Indictment Is Ripe For Adjudication.**

This Court's resolution of the Motion to Dismiss the Indictment is ripe for adjudication and would not create "dueling proceedings" with the Austrian Court. (Government Response ("Resp.") at 16-21.) First, and unlike the cases the government relies on, Firtash's Motion to Dismiss is not a challenge to extradition. Instead, it is a challenge to the permissibility of prosecuting foreign defendants for foreign activities in this Court. This threshold Rule 12(b) challenge has nothing to do with proceedings in Austria and falls within the exclusive province of this Court (which can decide the matter now).

Second, the Austrian court proceedings regarding extradition are closed. As the government recognized (Resp. at 18), the Vienna Higher Regional Court ordered Firtash's extradition on February 21, 2017. There is no appeal as a matter of right to the Austrian

Supreme Court and the ruling of the Vienna Higher Regional Court is effectively final. Indeed, although Defendants could have appropriately filed their Motion to Dismiss immediately, they chose to wait until Austrian proceedings were completed to foreclose the argument that there was any interference with those proceedings.

### A. Defendants' Motion To Dismiss Does Not Risk Dual Proceedings.

The government argues that this Court should not decide the Motion to Dismiss because of a risk of dueling proceedings in Austria and the United States. The government is incorrect. In *Casey v. United States Department of State*, 980 F.2d 1472, 1476 (D.C. Cir. 1992), a case cited by the government (Resp. at 17-18), the defendant was not pursuing a Rule 12(b) motion to dismiss (unlike Defendants here). Instead, the defendant was arguing that his extradition from Costa Rica would violate the dual criminality provision of the extradition treaty between the United States and Costa Rica.

The defendant's claim in *Casey* would have necessitated an inquiry by a United States court into the Costa Rican court's rationale regarding extradition while the litigation was still ongoing in Costa Rica. In light of that, *Casey* expressed concern over principles of international comity, while also citing *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) for the principle that international comity argues against extraterritorial application of United States law. This case is nothing like *Casey* because Defendants here are arguing for dismissal on legal grounds wholly separate and distinct from the concluded proceedings in Austria.

Similarly, in *United States v. Garavito-Garcia*, 827 F.3d 242 (2d Cir. 2016), the defendant attempted to argue that his extradition violated the treaty between the United States and Colombia when Colombia had already determined that his extradition was proper under that treaty. Again, this case is different. Firtash is not raising any challenge to the Austrian extradition proceedings or the U.S./Austrian extradition treaty before this Court.

Defendants are aware of no case, and the government cites none, in which a motion to dismiss an indictment for lack of jurisdiction and venue was deemed to interfere with extradition proceedings. In this case, Austria specifically declined to make any determination as to the legal validity of this Indictment, reasoning that Mr. Firtash would have access to those arguments in this Court. Simply put, this motion does not create dueling proceedings.

Furthermore, United States courts actually have entertained substantive legal claims on the merits in situations in which the defendant argued that extradition was improper because the extraditing state violated an extradition treaty (cases unlike this one). *See, e.g., United States v. Sensi*, 879 F.2d 888, 893 (D.C. Cir. 1989); *United States v. Merit,* 962 F.2d 917, 921-922 & n. 4 (9th Cir. 1992). If international comity did not bar jurisdiction in those cases, it should not here either.

### B.     The Austrian Extradition Decision Is Final.

The second error is the government's suggestion that this Court defer ruling on Defendants' Motion to Dismiss until "conclusion of extradition proceedings" is the assertion that the Austrian extradition decision is not final. (Resp. at 18, 20.) Firtash has no right to any further court proceedings in Austria. The government suggests that a competing Spanish extradition request affects the finality of the Austrian extradition proceedings.

Austrian authorities denied the Spanish extradition request on August 29, 2017, after determining that Spanish authorities never provided the factual basis for the charges they were pursuing (despite multiple requests). It is Defendants' understanding that the Spanish case against Firtash was based on much of the same information as the Indictment (and may have been pursued in coordination with the United States government).

In any event, Austria will ultimately determine whether to allow Firtash's extradition to the United States. Resolving the legal viability of the Indictment here is thus of tremendous

import to Firtash's personal liberty, his business interests, and his future. Thus, it makes no sense to delay a determination of the legal issues raised based on further proceedings in Austria (to which Firtash has no right), or on a Spanish extradition request (which was denied).

The government argues that this Court's decision on the Motion to Dismiss might have an effect on whether the Austrian Supreme Court would agree to hear the case or the Austrian Ministry of Justice would extradite Firtash to Spain or the United States. But the decisions are separate. The Austrian court system has already ordered Firtash's extradition to the United States. This Court's ruling on the instant motion does not concern the extradition treaty between the United States and Austria or the extradition proceedings in Austria. Instead, it will concern issues of jurisdiction and venue in the United States and the Northern District of Illinois. If the Court determines there is no jurisdiction or venue in the United States and/or the Northern District of Illinois, all parties should know that as soon as possible and Austrian authorities should be allowed to end any further extradition efforts and proceedings.

### C.      Defendants Need A Determination On Their Motion To Dismiss.

The government unfairly describes Knopp as a "fugitive" (Resp. at 5) by reference to *In re Hijazi,* 589 F.3d 401 (7th Cir. 2009). That case, though, definitively establishes that Knopp is *not* a fugitive. In *Hijazi,* the District Court refused to rule on a defendant's motion to dismiss because the defendant, a foreign national, did not appear in Illinois for arraignment, but remained in a jurisdiction outside the United States that did not have an extradition treaty with the United States. *Id.* at 406. The Seventh Circuit took the unusual step of issuing a writ of mandamus under the All Writs Act directing the District Court to rule on the defendant's motion to dismiss the indictment for lack of jurisdiction in the United States. *Id.* at 414.

The government claims that Knopp is a "fugitive" (Resp. at 5) who brings this motion to dismiss only to remedy the "inconvenience . . . he feels that he is not able to travel at his whim to

other countries." (Resp. at 20.) This is incorrect and it is callous. Mr. Knopp is close to 80 years old. He is a Hungarian citizen who has maintained a home in Hungary throughout his adult life. His son and one granddaughter reside in Hungary. Another granddaughter resides in London. Doctors who treated him for bladder cancer are in Hungary.

Since the advent of this case, Knopp has not travelled outside of Russia and is separated from his family, his friends, and his home. That he has established an address in Moscow rather than, one supposes, to be homeless, or that he obtained a residency permit rather than violate Russian law, does not alter the devastating effects of this case on his life.

Furthermore, the government's claim that "[n]either defendant in this case finds himself in Hijazi's predicament" (Resp. at 20), is also incorrect. Knopp is in Moscow. Hijazi was in Kuwait. Neither country has an extradition treaty with the United States. Both were citizens of a third country: Knopp of Hungary and Hijazi of Lebanon. Neither travelled outside of that third country because of concerns over an Interpol Red Notice. Both sought District Court review over the permissibility of a case brought against them in the United States based on concerns of extraterritoriality and due process. Knopp is in precisely the same "predicament" as Hijazi.

With respect to Firtash, the situation is worse. Firtash is weeks or months away from extradition to stand trial here because Austria has already made a final decision that extradition is permissible. The Court should determine now whether it has jurisdiction and venue over his case.

## II.    Dismissal Is Warranted Because Venue In The Northern District Of Illinois Is Improper.

The Seventh Circuit held that when courts are asked to make venue determinations:

> The object…is to secure the party accused from being dragged to a trial in some distant state, away from his friends, witnesses and neighborhood; and thus subjected to the verdict of mere strangers, who may feel no common sympathy, or who may even cherish animosity or prejudice against him.

*United States v. Muhammad*, 502 F.3d 646, 652 (7th Cir. 2007). Firtash has never been in the United States, much less the Northern District of Illinois; has no business interests, friends, or relatives in this district; and does not speak English. He took no action in the Northern District of Illinois.

To avoid the above, the government argues that Firtash is responsible in this district for various incidental acts of alleged coconspirators. Moreover, the government has wrongly claimed that Firtash is an "upper-echelon associate[] of Russian organized crime." (Resp. at 15, 101.) This claim is particularly prejudicial considering that this allegation was not part of the government's Indictment.

The government raises five arguments to justify venue in the Northern District of Illinois. First, the government claims that the Indictment's use of the words "Northern District of Illinois" is enough to justify venue. No Seventh Circuit precedent stands for that unsound proposition and the Court should reject it. Second, the government argues that venue is justified because the conduct charged in the Indictment was intended to have an effect in this District. But that argument rests on an incorrect interpretation of the case law and is invalid.

Third, the government claims that it has alleged specific acts in the Indictment that support venue. This argument, though, rests on verbal sleight of hand and does not establish venue when considered in light of what the Indictment actually alleges. Fourth, the government argues that the Indictment satisfies the specific statutory requirement of the money laundering statute and that the continuing offense provisions in 18 U.S.C. § 3237(a) justify venue. This argument is meritless because it misapplies the facts to applicable statutory provisions and case law.

Fifth and finally, the government argues that it is too early for the Court to make a decision on venue and that Firtash and this Court should endure a lengthy court proceeding before deciphering whether the entire proceeding violated Firtash's constitutional rights. That is not the law.

**A.    The Indictment's Use Of The Words "Northern District of Illinois" Does Not Alone Establish Venue.**

The government cites cases from outside this district for the principle that if an Indictment uses the words "Northern District of Illinois," venue is automatic. That is not the law of this district.

In *United States v. Radley*, 558 F. Supp. 2d 865 (N.D. Ill. 2008), the court undertook a detailed analysis of the law of venue in the Northern District of Illinois based on the Seventh Circuit's decision in *United States v. Muhammad*, 502 F.3d 646 (7th Cir. 2007). The *Radley* case arose, as does this case, from a defendant's motion to dismiss the Indictment and not on a post-trial motion. The Court in *Radley* first traced the constitutional and Sixth Amendment sources of defendants' protections against improper venue, observing that "[t]hese constitutional venue guarantees are more than just procedural technicalities; they 'touch closely the fair administration of criminal justice and public confidence in it' and 'raise deep issues of public policy.'" *Radley*, 558 F. Supp. 2d at 872-73[1] (quoting *United States v. Muhammad*, 502 F.3d at 652).

In determining whether constitutional venue requirements are satisfied, the Seventh Circuit has directed courts to first determine whether there is a statutory directive on venue. *Muhammad*, 502 F.3d at 652. In the absence of a statutory directive, courts are to consider: (1)

---

[1] In *Radley*, the Court determined that there was venue in a price manipulation case when numerous trades and millions of dollars in wire transfers took place in the district. *Radley*, 558 F. Supp. 2d at 876.

the nature of the crime alleged; and (2) the location of the act or acts constituting it. *Id.* In conducting this analysis, courts are directed to examine the "key verbs" in the statute defining the criminal offense. *Id.* at 652-53. *See also United States v. Clark*, 728 F.3d 622, 623-24 (7th Cir. 2013) (endorsing the approach of analyzing the key verbs in the statute defining the criminal offense in making venue determinations).

The Seventh Circuit has made clear that there is no mechanical test on venue. The test is best described as a substantial contacts rule that takes into account the site of the defendants' acts, the elements and nature of the criminal conduct, and the suitability of the district for fact finding. *Muhammad*, 502 F.3d at 652. Also critical to this analysis is that when a defendant is charged with more than one count, venue must be proper with respect to each count. *United States v. Tingle*, 183 F.3d 719, 726-27 (7th Cir. 1999) (reversing defendant's conviction for improper venue when none of the acts necessary for the crime occurred in the district where the case was tried).

As *Radley* and *Muhammad* show, courts in the Northern District of Illinois do not restrict the venue analysis to words used in an Indictment and this Court should reject the government's argument otherwise.[2]

### B. The Government's Effects Argument Misconstrues The Case Law.

The government argues that venue is proper in the Northern District of Illinois because of the unfulfilled possibility of a sale of titanium sponge to a company with its headquarters in this district. (Resp. at 29.) None of the cases cited by the government support this argument.

---

[2] *United States v. Ringer*, 300 F.3d 788, 790 (7th Cir. 2002) is not to the contrary. *Ringer*'s holding that improper venue was not apparent from the face of the Indictment was made in the context of the Court's determination that the defendant had not waived his argument against venue by not raising it prior to trial.

In *Muhammad*, the Seventh Circuit analyzed venue in terms of the location of the key verbs in the statutes with which the defendant was charged within the district. Only after determining that venue was proper based on that test did the Court comment that the effects of the conduct also were directed exclusively to the district where charges were brought. *Muhammad*, 502 F.3d at 655.

And, in *United States v. Frederick*, 835 F.2d 1211, 1213 (7th Cir. 1987), the Court held that venue for a witness tampering charge was proper in the jurisdiction of the affected court proceeding. *Frederick* does not stand for the principle that venue is appropriate in every case where the effects of the conduct are allegedly felt.[3] Instead, it stands for the principle that in cases where the statute itself defines the prohibited conduct in terms of the effect or the harm, such as a Hobbs Act violation or a witness tampering violation, venue is appropriate in an affected district. *See, e.g., United States v. Bowens*, 224 F.3d 302, 312-13 (4th Cir. 2000) (district court erred in considering the effects of the charges of harboring a person in analyzing venue because Congress did not define the essential elements of that crime in terms of the effects); *United States v. Craig*, 573 F.2d 513, 517 (7th Cir. 1978) (in a Hobbs Act prosecution, venue is proper in the affected district because an essential element of the Hobbs Act is the effect on interstate commerce); *United States v. Lewis*, 797 F.2d 358, 366-69 (7th Cir. 1986) (in a Hobbs Act prosecution, venue will only lie in district where effects of conduct were felt).

---

[3] The *Frederick* case was not a conspiracy case, but a witness tampering case. When the court commented about effects in the context of conspiracy, it was in citing *United States v. Brown*, 739 F.2d 1136 (7th Cir. 1984), where the court found venue proper when the victims of the fraud scheme sent money to the relevant district and when calls were placed to victims in the district.

This case does not charge a Hobbs Act violation or witness tampering. The effects of the charged crime are not essential elements of any of the charged offenses. Resort to the effects test is thus improper.[4]

## C. The Acts Charged In The Indictment Do Not Support Venue.

Venue does not lie against Defendants in the Northern District of Illinois based on the allegations in the Indictment. The only information in the Indictment about "the Northern District of Illinois" was that on two occasions, Defendant Lal traveled from Chicago to Greensboro, North Carolina and, *after arriving in North Carolina*, took some alleged action, (Indictment at 17-18, ¶¶ 16(iv), (vii)); and that a cell phone with no specified use in any illegal act was "located in Chicago." (Indictment at 19, ¶ 16(h).)

There is no allegation in the Indictment that Lal or anyone else took any action in furtherance of the alleged conspiracy in Chicago. The key verbs in the statutes under which Defendants were charged, based on the test in *Muhammad*, do not correspond to any alleged actions in this district.[5] There is no allegation, under the Seventh Circuit's formulation in *Tingle*, 183 F.3d at 727, that any act "necessary" for the crime occurred in the Northern District of

---

[4] Even if the law of this district supported use of the effects test, which it does not here, the possibility that a company headquartered in this district *might* buy titanium from Defendants does not necessarily support venue. There is zero information in the Indictment about possible excess charges to the company for titanium that was never sold to it and zero information that the titanium that the company might have purchased was going to end up in this district.

[5] Count One charges Defendants with a racketeering conspiracy under 18 U.S.C. § 1962(2) based on acts indicted under the Travel Act, 18 U.S.C. § 1952, and the Money Laundering Statute, 18 U.S.C. § 1956. (Indictment at 10-11, ¶¶ 14(a), (b).) Verbs in 18 U.S.C. § 1956(h) include "transport," "transmit," and "transfer." (Indictment at 20, ¶ 2.) Verbs in 18 U.S.C. § 1952 include "travel" to "promote," "manage," "establish," and "carry-on," "transport," "transmit," and "transfer." (Indictment at 22-23.) Count Five charges Defendants with conspiracy to violate the FCPA, 15 U.S.C. § 78dd-2(h)(2) and § 78dd-3(f)(2), based on overt acts set forth at Indictment ¶¶ 16(b)(i)-(xvii) and ¶¶ 16(f)(i)-(vii) of Count One. These acts are money transfers (Indictment ¶¶ 16(b)(i)-(xvii)) and Lal's travel (Indictment ¶¶ 16(f)(i)-(vii)).

Illinois. Nor is there any contact with the Northern District of Illinois, much less a substantial one.

The cases the government cites finding venue through the use of a cell phone are all cases in which a call made to or from the relevant district was part of the charged conspiracy. None of these cases stands for the government's argument that a cell phone "located in Chicago," in the absence of any allegation of any call made to or from that phone in furtherance of the conspiracy, can establish venue. The allegations in the Indictment do not establish venue.

**D. Neither The Continuing Offense Provisions In 18 U.S.C. § 3237(a) Nor The Venue Provisions In The Money Laundering Statute Establish Venue.**

The government's appeal to the continuing offense provision in 18 U.S.C. § 3237(a) does not rescue its venue argument. The Seventh Circuit has held that in a continuing offense, venue is *improper* when the "government ha[s] failed to demonstrate that any activity involving that particular count occurred" in the charging district. *Muhammad*, 502 F.3d at 654; *see also United States v. Pearson*, 340 F.3d 459 (7th Cir. 2003) (even in analyzing continuing offenses in 18 U.S.C. § 3237(a), venue is improper if the only acts that occurred in that district do not provide evidence of the elements of the charge); *United States v. Ringer*, 300 F.3d 788, 792 (7th Cir. 2002) (same); *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000) (venue is improper "if the only acts that occurred in the district do not provide evidence of the charged crime") (citing *United States v. Cabrales,* 524 U.S. 1, 6-7 (1998)). For the same reason, venue is improper here.

The government's appeal to the venue provisions of the money laundering statute is likewise unavailing. 18 U.S.C. § 1956(i)(2) provides that in a money laundering conspiracy, venue is proper in any district where an act in furtherance of the conspiracy took place. But the Indictment does not allege a single act in furtherance of the alleged money laundering conspiracy

in the Northern District of Illinois. Lal's presence in Chicago (with no specified act in Chicago) does not do it. Nor does the mere location of a phone in Chicago.

Furthermore, despite Congress' power to define continuing offenses (like conspiracies) as having the potential for multiple venues, the Supreme Court has repeatedly recognized that a cautious approach to venue is "more consonant with the considerations of historic experience and policy which underlie [the venue] safeguards in the Constitution." *United States v. Johnson,* 323 U.S. 273, 275 (1944), *see also United States v. Cores*, 356 U.S. 405, 407 (1958) ("The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place. Provided its language permits, the Act in question should be given that construction which will respect such considerations.") That caution is warranted here.

### E. Applicable Precedent Does Not Require A Trial Before The Court Can Make A Venue Determination.

In *Radley*, 558 F. Supp. 2d 865 (N.D. Ill. 2008), the Court analyzed the existence of venue on a motion to dismiss the Indictment with no suggestion that the exercise was premature. *United States v. Jang*, 2007 WL 4616927 (S.D. Ind. Dec. 27, 2007), the case cited by the government, is not to the contrary. (Resp. at 35.) The Court in *Jang* decided that it could not finally decide venue against the defendant because the issue rested on the actions of another party and the Indictment did not allege or deny defendant's knowledge of the actions of that party.[6] *Jang*, 2007 WL 4616927, at *8. In that limited circumstance, the Court decided not to determine venue absent trial on the merits.

---

[6] The holding in *Jang* also refutes the government's contention that foreseeability to the defendant is not an issue in venue determinations. Indeed, the Court in *Jang* noted that the law of venue in a conspiracy case marks the "outer limits of venue in criminal cases" and stated both that the Seventh Circuit *Muhammad* case and the concurring opinion in *Andrews v. United States*, 817 F.2d 1277 (7th Cir. 1987) suggested that the venue requirement in a criminal case required some connection to the forum state that

*Jang* does not stand for the principle that this Court should refuse to analyze venue until after conducting a trial on the merits, and other courts have made pretrial venue determinations. *See, e.g., Radley*, 558 F. Supp. 2d at 869; *Frederick*, 835 F.2d at 1215, *United States v. Johnson*, 510 F.3d 521 (4th Cir. 2007). The Indictment in this case makes specific statements about Defendants' supposed connections to this district that are capable of analysis on the merits now. There is no need to risk violation of Defendants' constitutional rights and a major expenditure of Court trial time and effort prior to reaching a determination of whether the Indictment establishes venue under controlling law.

## III. The RICO Conspiracy Charged In The Indictment Does Not Apply Extraterritorially And This Court Should Dismiss It.

The real issue before this Court is whether the RICO Count alleged in Count One of the Indictment can properly lie against Defendants. It is *not* whether RICO is an effective or important law or whether it has assisted the United States in fulfilling treaty obligations. (*See* Resp. at 36-44, 68.) The real issue is thus a legal one; whether application of RICO to the allegations in the Indictment is a permissible extraterritorial application of the statutes in question.

The government's Response initially recognizes that fact in accepting that the appropriate test for evaluating RICO's reach to events outside of the United States is set forth in the Supreme Court's decision in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). From there, however, the government's Response discusses a number of cases that have nothing to do with extraterritoriality and invites this Court to substitute principles governing domestic RICO

---

would make venue foreseeable to the defendant. *Jang* also noted that those cases suggested that the common thread in conspiracy cases in which venue is premised on someone acting on behalf of the defendant is some degree of foreseeability to the defendant.

conspiracies[7] for the principles set forth in *RJR Nabisco* related to extraterritoriality. The Court should decline the government's invitation.

There is no reason to look beyond *RJR Nabisco* for insight into the analysis of extraterritoriality in a RICO conspiracy case. While the government does not acknowledge it,[8] *RJR Nabisco* concerned RICO conspiracy charges under 18 U.S.C. § 1962(d) – precisely the statute referenced in Count One of the Indictment here. The Supreme Court stated that the Court would "assume without deciding that § 1962(d)'s extraterritoriality tracks that of the provision underlying the alleged conspiracy." *RJR Nabisco*, 136 S. Ct. at 2103. Defendants are unaware of any case, and the government cites none, that suggests that courts should analyze a RICO conspiracy using a methodology different than that set forth in *RJR Nabisco*.

### A. *RJR Nabisco* Reaffirmed The Presumption Against Extraterritoriality.

Contrary to the government's repeated claim, this case is not a "textbook example of a transnational criminal enterprise" and Defendants are not "upper-echelon associates of Russian organized crime." (Resp. at 10, 15, 46-47, 101.) These baseless and inflammatory claims are missing from the Indictment—likely because the government lacks the evidence to allege them,

---

[7] The government cites domestic RICO cases that provide no assistance in the extraterritoriality analysis. *See United States v. Glecier,* 923 F.2d 496, 499-501 (7th Cir. 1991) (in Illinois Greylord prosecution, it is not necessary to prove overt acts if there is proof defendant knowingly joined the conspiracy); *United States v. Tello,* 687 F.3d 785, 794-95 (7th Cir. 2010) (in RICO prosecution of Milwaukee Latin Kings gang, allegations of agreement to commit predicate acts is sufficient); *United States v. Benabe*, 654 F.3d 773, 776 (7th Cir. 2011) (in street gang conspiracy to distribute drugs in the Northern District of Illinois, it was sufficient to prove that defendant agreed that other members of the conspiracy would commit two acts and not necessary to prove acts were carried out); *Salinas v. United States*, 522 U.S. 52, 65-66 (1997) (in a Texas case regarding illegal sale of prison contact visits, conspiracy can exist even if coconspirators do not agree to commit every part of the substantive offense); *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014) (in domestic illegal gambling operation, it is not necessary to prove that defendant committed the charged acts himself, but that defendant agreed a member would commit two predicate acts).

[8] The government states that *RJR Nabisco* did not address the scope of a 1962(d) RICO conspiracy (Resp. at 49), while omitting that *RJR Nabisco's* very next line was to state that the Court would assume that the 1962(d) analysis was the same as for the underlying substantive act.

let alone assume the burden of proving them at trial—and they add nothing to the government's response other than to unfairly prejudice Defendants in the press and in the public. Because these prejudicial allegations were not included in the Indictment, the Court should ignore them in ruling on Defendants' Motion to Dismiss.

The Indictment, on its face, centers on allegations that Defendants, both foreign nationals, participated in a scheme to bribe officials in India in connection with a vertically integrated ilmenite mining and refining project that was to take place wholly in India. There is no allegation that the operation in India was not legitimate. There is no allegation that the alleged bribery scheme would have had a substantial effect on United States commerce. And there is no allegation sufficient to suggest that any part of the alleged scheme either took place in the United States or affected the United States.

The Indictment's allegations also have no parallel to the RICO conspiracy charged in *RJR Nabisco*. There, the European Community and 26 member states filed suit under RICO alleging that RJR Nabisco and related entities "participated in a global money-laundering scheme in association with various organized crime groups" in which "drug traffickers smuggled drugs into Europe and sold them for euros that – through transactions involving black-market money brokers, cigarette importers, and wholesalers – were used to pay for large shipments of RJR cigarettes into Europe." *RJR Nabisco*, 136 S. Ct. at 2093. Allegations in the *RJR Nabisco* case support an inference of international organized crime sufficiently connected to the United States to warrant extraterritorial jurisdiction. The allegations in this Indictment do not.[9]

---

[9] Neither are the allegations in the Indictment similar to the international RICO conspiracy cases cited by the government. *See United States v. Casamento,* 887 F.2d 1141, 1148-49 (2d Cir. 1989) (prosecution of over a dozen Sicilian defendants for developing distribution network of narcotics in the United States); *Chevron Corp. v. Donziger,* 871 F. Supp. 2d 229, 240-46 (S.D.N.Y. 2010) (group of predominantly American defendants charged with scheme to extort Ecuadorian company that was conceived, orchestrated, and carried out principally in the U.S.).

And even in *RJR Nabisco,* which did plead an international organized crime conspiracy, the United States Supreme Court did not jettison logical analysis of extraterritoriality. While the government ignored it, *RJR Nabisco* began its analysis by affirming that a basic premise of our legal system is that, in general, "United States law governs domestically but does not rule the world." *RJR Nabisco*, 136 S. Ct. at 2100 (citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). This premise results in the legal presumption against extraterritoriality. *Id.* As explained by the Supreme Court in *RJR Nabisco*, the presumption "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *Id.* (citing *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663-64 (2013), *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). It also reflects the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Id.* (citing *Smith v. United States*, 507 U.S. 197, 204, n. 5 (1993)). Thus, the presumption applies whether or not there is any risk of conflict between a United States statute and a foreign law. *Id.* (citing *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 255 (2010)).

**B.     Under The *RJR Nabisco* Test, The Charges In The Indictment Are Impermissibly Extraterritorial.**

Applying *RJR Nabisco* to the allegations in the Indictment dictates that this Court should dismiss the RICO count (Count One) for two independent reasons. *First*, *RJR Nabisco* requires that the alleged RICO enterprise "must engage in, or affect in some significant way, commerce directly involving the United States." *RJR Nabisco*, 136 S. Ct. at 2105. Enterprises like that alleged here, "whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation." *Id.* *Second*, under *RJR Nabisco*, RICO may apply to allegations of foreign racketeering activity, "but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *Id.* at 2101. Thus, *RJR Nabisco* requires analysis of

extraterritoriality application of the predicate violations of the Money Laundering Statute and the Travel Act. Here, neither statute can apply extraterritorially under the test set forth in *RJR Nabisco*.

### 1. The Alleged RICO Enterprise Does Not Significantly Affect U.S. Commerce.

The Indictment alleges that a United States company, Company A, intended to purchase titanium sponge derived from the Indian project. (Indictment ¶¶ 1(d), (e).) The government contends that this allegation establishes the significant effect on United States commerce mandated by *RJR Nabisco*[10] and that Defendants' argument to the contrary is, in essence, a failure of proof argument. (Resp. at 47-48.) The government is wrong. That no project was completed in India and no titanium sponge sold to Company A helps refute the claim that this Indictment relates to a project with a significant effect on United States commerce. And that is not all. Even if Company A had purchased titanium sponge, that would not have satisfied the "significant" effect or "anchor to U.S. commerce" required by *RJR Nabisco*.

The Indictment does not allege that the United States company, Company A, was involved in or affected by the alleged bribery scheme. There is no allegation that the price Company A would have paid for the titanium sponge would have been affected by the alleged bribery scheme. There is not even an allegation that Company A intended that any titanium purchased was intended for the United States (as opposed to Company A's operations anywhere else in the world). Given the absence of any connection between Company A and the alleged foreign scheme, the government's position would result in the novel and untested principle that

---

[10] In *RJR Nabisco*, the alleged enterprise was held to have sufficient connection to United States commerce because United States companies were members of the enterprise and the activities of the alleged enterprise depended on sales of cigarettes conducted through United States mail and wires. *RJR Nabisco*, 136 S. Ct. at 2105.

any illicit plan or agreement in any foreign country is subject to prosecution in the courts of the United States if a United States company (or presumably even an individual consumer) planned to buy something that was made in connection with that plan.

Given the breadth of international trade, this principle would expand the reach of United States statutes to almost every manufacturing operation in the world. That is not the law of *RJR Nabisco*. This Court should interpret "significant" effect and "anchor to U.S. commerce" according to the ordinary meaning of those words. That a United States company, entirely uninvolved in the alleged bribery scheme, agreed to consider buying titanium sponge does not meet that test.

### 2. The Predicate Act Of Money Laundering Does Not Apply Extraterritorially.

The Indictment charges a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) as both a substantive count of the Indictment (Count Two) and as a predicate act of the RICO scheme charged in Count One. In *RJR Nabisco*, the Supreme Court accepted the Second Circuit's finding that the money laundering statute applied to extraterritorial conduct. *RJR Nabisco*, 136 S. Ct. at 2099.

In cases where a statute has extraterritorial effect, the scope of the statute "turns on the limits Congress has or has not imposed in the statute's foreign application, and not on the statute's 'focus.'"[11] *RJR Nabisco*, 136 S. Ct. at 2094.[12] With respect to the money laundering statute, those limits are set forth in 18 U.S.C. § 1956(f)(1), which provides that a money

---

[11] As discussed in Section B.3. below, in analyzing statutes such as the Travel Act that do not apply extraterritorially, the test of permissible extraterritorial application is determined according to the statute's focus.

[12] The government's Response states that application of 1956(f) is optional. (Resp. at 61.) The *RJR Nabisco* case held the opposite. *RJR Nabisco*, 136 S. Ct. at 2101 ("The scope of an extraterritorial statute thus turns on the limits Congress has (or has not) imposed on the statute's foreign application….").

laundering prosecution is appropriate if "the [prohibited] conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States."[13]

Because Defendants are both non-U.S. citizens, the permissibility of the money laundering counts (both independently, and as predicate acts justifying the RICO prosecution), turns on whether the alleged money laundering activity occurred "in part in the United States." 18 U.S.C. § 1956(f)(1). Since it did not, the predicate money laundering count does not apply extraterritorially. The government's arguments to the contrary are unavailing.

First, the government is incorrect that the domestic RICO case, *United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991), stands for the principle that a RICO conspiracy indictment need only allege the specific types of predicate racketeering acts to be committed. (Resp. at 44-45, 50, 52-53.) The government argues that merely alleging a conspiracy to violate section 1962(c), and then perfunctorily identifying the predicate racketeering acts without any supporting facts or allegations, is sufficient to establish permissible extraterritorial application of United States law to the allegations. This is not the holding of *Glecier*. *Glecier* stands for the undisputed principle that the government is not required to allege or prove an overt act or a specific predicate act that the defendant personally agreed to commit for a section 1962(d) offense. *Glecier*, 923 F.2d at 500. *Glecier* provides no guidance whatsoever as to the scope of extraterritorial application of United States law at issue in the Motions to Dismiss.

Second, the government relies on a civil forfeiture case, *United States v. All Assets Held At Bank Julius*, 2017 WL 1508608 (D.D.C. Apr. 27, 2017), to argue that the alleged use of a

---

[13] The government's reading of Defendants' arguments as to the extraterritorial application of section 1956(f)(1) is wrong. (Resp. at 64-65.) Defendants do not argue that, in a case involving allegations of joint criminal activity, the government could only charge a defendant if the defendant took action within the United States.

United States correspondent bank for wire transfers is sufficient to allow United States criminal prosecution based on allegations of a foreign money laundering conspiracy.[14]   (Resp. at 55-57.) This Court should decline to extend this non-precedential case beyond its holding.

The *Bank Julius* case was a civil *in rem* action where the government sought forfeiture of over $250 million scattered in bank accounts all over the world.   *Bank Julius*, 2017 WL 1508608, at *1.   The forfeiture action stemmed from the criminal prosecution of a prominent Ukrainian politician who was "able to acquire hundreds of millions of United States dollars through a variety of acts of fraud, extortion, bribery, misappropriation and/or embezzlement committed during the 1990s."   *Id.*   The Court found, as the government's Response notes (Resp. at 56-57), that electronic fund transfers ("EFTs") through United States correspondent banks constitute two separate transactions: one into and one out of the United States.   *Id.* at *8.

The Court also expressly stated, however, that this conclusion "does not end the inquiry of whether EFTs are conduct occurring in part in the United States sufficient to satisfy the extraterritorial provisions of 18 U.S.C. § 1956(f)."   *Id.*   Indeed, *Bank Julius* specifically held that "use of U.S. currency alone would not be sufficient under 18 U.S.C. § 1956(f)."   *Id.* at *9.   The Court further recognized that limitations on the application of the money laundering statute to foreign conduct were meant to "'ensur[e] that Federal extraterritorial jurisdiction is confined to significant cases' where 'the interests of the United States are involved.'"   *Id.*

---

[14] The government's Response also makes reference to evidence at trial that would theoretically include evidence of transfers of money into the United States to pay expenses of coconspirators in the United States and other transfers in the United States for the benefit of third parties.  (Resp. at 54.)  Because these allegations were not included in the Indictment, this Court should not consider them in response to a motion to dismiss the Indictment.  *See, e.g., United States v. Gotti*, 457 F. Supp. 2d 411, 429-30 (S.D.N.Y. 2006) (allegations made in response to a motion to dismiss found to be an impermissible attempt to broaden the indictment).

Ultimately, the *Bank Julius* court found that the conduct of the defendants justified extraterritorial application of the money laundering statute given that defendants "transferred millions of dollars to and from accounts in the United States and between foreign bank accounts as EFTs that passed though U.S. financial institutions." *Id.* The Court placed particular emphasis on the defendants' transfer of money to and from United States accounts, noting that such conduct "is certainly more substantial conduct than transferring money <u>through</u> an intermediary bank's U.S. account." *Id.* (emphasis in original).

This case is distinguishable. This Indictment alleges activities of Defendants restricted to the use of EFTs through correspondent banks. The Indictment did not allege that any United States accounts were used in connection with the charged offenses. Thus, the facts here are outside the holding of *Bank Julius*.[15]

Moreover, asking this Court to apply D.C. Circuit precedent from a civil forfeiture case to allow a criminal money laundering prosecution on the facts alleged in this Indictment would significantly and unwarrantedly extend *Bank Julius* in an area with scarce legal precedent. Considering the presumption against extraterritoriality affirmed in *RJR Nabisco,* as well as the facts in *Bank Julius*, this Court should not agree to that extension and should find that a United States prosecution of the money laundering charges at issue (and by extension the RICO Count based on the money laundering predicate acts) is an impermissible exercise of extraterritorial jurisdiction.

---

[15] The government's reliance on another civil forfeiture case, *United States v. Prevezon Holdings, Ltd.*, 2017 WL 1951142 (S.D.N.Y. May 10, 2017), is similarly misplaced. (Resp. at 58-59.) There the court was examining the use of correspondent United States banks in the context of a statute criminalizing the transportation of property stolen or taken by fraud (18 U.S.C. § 2314.) *Id.* at *5-6 (noting that because the focus of § 2314 is on the <u>transportation</u> of stolen proceeds, the use of correspondent banks is sufficient to constitute domestic conduct) (emphasis in original).

### 3. The Predicate Travel Act Statute Does Not Apply Extraterritorially And Is Not A Permissible Domestic Application Of The Statute.

The Indictment charges Travel Act violations in contravention of 18 U.S.C. § 1952 as both substantive counts of the Indictment (Counts Three and Four) and as predicate acts of the RICO scheme charged in Count One. The government alleges that the Travel Act violations charged in the Indictment are a permissible domestic application of the Travel Act statute and that Defendants' arguments to the contrary do no more than register disagreement with *RJR Nabisco*. (Resp. at 66-68.) The government is incorrect.

*RJR Nabisco* accepted the Second Circuit's conclusion that the Travel Act did not overcome the presumption against extraterritoriality. *RJR Nabisco*, 136 S. Ct. at 2105. The Court then proceeded to the next step of the inquiry to determine whether the case "involves a domestic application of the statute" by looking to the statute's focus. *Id.* at 2101. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

Defendants have not located, nor does the government cite, any case analyzing the focus of the Travel Act under the test set forth in *RJR Nabisco*. *Bank Julius* provides guidance on the point, however. In *Bank Julius,* in the context of assessing domestic application of the wire fraud statute, the Court determined that the defendants committed conduct relevant to the "focus" of the statute only when: (1) the defendant committed a substantial amount of conduct in the United States; (2) the conduct in the United States was integral to the fraud; and (3) at least some conduct involved United States wires in furtherance of the scheme to defraud. *Bank Julius*, 2017

WL 1508608, at *15 (citing *Elsevier, Inc., v. Grossman*, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016)).

Similarly, in *United States v. Hawit*, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017), the Court held that determining whether the wire fraud statute was domestically applicable for purposes of extraterritoriality required a "holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires." *Id.* at *5 (citing *Petroleos Mexicanus v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014)); *see also Norex Petroleum Ltd. v. Access Indus. Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) ("Simply alleging that some domestic conduct occurred cannot support a claim of domestic application.")

The focus of a Section 1952 charge is interstate or foreign travel with the intent to promote, carry on or further an unlawful activity, and the performance of some act after the interstate or foreign travel designed to promote, carry on or further that illegal purpose. *United States v. Vanichromanee*, 742 F.2d 340 (7th Cir. 1984); *United States v. Briggs*, 700 F.2d 408 (7th Cir. 1983). Here the Travel Act counts (which the Indictment includes as predicate acts to the alleged RICO scheme) do not simply charge that coconspirator Lal traveled between Greensboro, North Carolina (where he resided), and other places. They charge that Lal traveled and thereafter performed acts to "promote, manage, establish, carry on and facilitate" the unlawful activity of money laundering.

But just as the *Bank Julius*, *Hawit*, and *Elsevier* cases evaluated the focus of the mail or wire fraud scheme, this Court too must look to the focus of the money laundering scheme that was the basis of the Travel Act Counts. The alleged money laundering scheme, as discussed in Section B.2 above, was connected to the United States only insofar as correspondent United

States banks were used for EFTs. All of the alleged acts relevant to the bribery scheme took place outside of the United States, as did the mining and refining operation itself. Furthermore, all of the accounts from which money was transferred and all of the accounts to which money was transferred were outside the United States.

Applying the "focus" test outlined in the *Bank Julius*, *Hawit*, and *Elsevier* cases to the Travel Acts allegations in the Indictment (*see* Indictment at 17-18, ¶¶ 16(f)(i)-(vii) and 22-23), it is clear that this case is an impermissible extraterritorial application of the Travel Act. Lal did not engage in a "substantial amount of conduct" in the United States and the conduct in the United States was not "integral to the fraud." *Bank Julius*, 2017 WL 1508608, at *15 (citing *Elsevier*, 199 F. Supp. 3d at 784). Meetings with a prospective purchaser of titanium sponge and a prospective participant in the project, (Indictment at 17-18, ¶¶ 16(i), (ii), (v)), were not "integral to the fraud." And Lal's other travel within the United States or between the United States and India was not only not "integral to the fraud," but was "only incidental or minimal." *Hawit*, 2017 WL 663542, at *5 (in wire fraud context). That Lal lived in North Carolina and traveled to and from North Carolina during the course of the alleged scheme does not create the type of substantial connection between the charges in the Indictment and the United States sufficient to justify extraterritorial prosecution.

In cases like this, where contacts with the United States are not substantial and integral to an alleged fraud, courts have concluded that the alleged conduct is not sufficiently domestic to justify a United States prosecution.[16]  *See, e.g., Petroleous Mexicanos*, 572 F. App'x at 61

---

[16] The government suggests that Defendants miscite *Cedeno v. Intech Group, Inc.,* 733 F. Supp. 2d 471 (S.D.N.Y. 2010), because the case was overruled. (Resp. at 67.) As Defendants specifically noted in their motion, however (and which the government's Response ignored), since *Cedeno* was decided before *RJR Nabisco*, that portion of its holding involving RICO was no longer good law. Nevertheless, post-*RJR Nabisco* cases such as *Hawit* continue to cite pre-*RJR Nabisco* cases such as *Petroleous Mexicanos* in

(rejecting application of wire fraud statute to the scheme based on insufficient domestic contacts when contacts with the U.S. included foreign defendants obtaining financing in the U.S., invoices for over $159 million being sent by fax through New York, and payments being made through a trust in New York); *United States v. Prevezon Holdings, Ltd.,* 122 F. Supp. 3d 57 (S.D.N.Y. 2015)[17] (allegation that United States wires were used to send a kickback to a Russian tax official not sufficiently domestic to allow United States prosecution of wire fraud scheme when the Indictment did not plead that the fraud scheme was formed in the United States, let alone that all elements of the fraud scheme were completed in the United States); *Laydon v. Mizuho Bank, Ltd.,* 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015) (allegation that defendants completed the wire fraud scheme in the U.S. or while crossing U.S. borders based on use of electronic chats routed through electronic servers in New York to coordinate their daily trading positions held to be "far too attenuated" to establish that the scheme came about in the United States); *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (finding an insufficient domestic connection when scheme required transfer to a bank account located in the United States based on the finding that these were "actions needed to carry out the transaction and not the transactions themselves").

The *RJR Nabisco* analysis centers on whether there are sufficient domestic contacts with the United States to justify an extraterritorial prosecution. The government's argument that the prosecution was not impermissibly extraterritorial because there were numerous instances of

---

analyzing the extraterritoriality of the substantive predicate acts. The government is thus wrong to claim that *Cedeno* has no persuasive value.

[17] The government cites a different *Prevezon* case, *United States v. Prevezon Holdings Ltd*., 2017 WL 1951142 at *5-6 (S.D.N.Y. 2017), for the principle that in a prosecution under 18 U.S.C. § 2314 charging transportation of stolen property, use of correspondent banks is sufficient domestic conduct. That is different, however, because in enacting 18 U.S.C. § 2314, Congress was specifically concerned with the movement of property across state lines. *Id.* at *5.

travel within the United States misses the mark. (Resp. at 66.) That Lal travelled "domestically" fails to address or even acknowledge the extraterritorial analysis and does not advance the inquiry.

In cases such as this, where the contacts with the United States are insubstantial, not integral to the fraud, and/or merely incidental, courts have concluded that there are insufficient domestic contacts with the United States to justify a United States prosecution. United States prosecution of the Travel Act charges (and by extension the RICO Count based on the Travel Act predicate acts) is thus an impermissible exercise of extraterritorial jurisdiction.

## IV. The Court Should Dismiss The FCPA Charge Because Defendants Are Not Subject To Jurisdiction In The United States.

The issue raised by Defendants in their Motion to Dismiss was that they do not fall within any of the categories of persons subject to prosecution under the FCPA and that under *United States v. Hoskins*, 123 F. Supp. 3d 316 (D. Conn. 2015) and related cases, courts should not allow the government to accomplish through a conspiracy charge what the legislature did not permit in enacting the FCPA. The government cites a number of domestic conspiracy cases in which extraterritorial application of a statute is not at issue and then argues that the Court should reject the reasoning of *Hoskins* based on a Hobbs Act domestic conspiracy case and cases analyzing the kingpin statute which applies to enhanced penalties for domestic felony narcotic cases. The government's position is without merit.

### A. Defendants Do Not Fall Within Any Category Enumerated In The FCPA As A Permissible Prosecution.

The "text and structure of the FCPA" are the "clearest indication of legislative intent." *Hoskins,* 123 F. Supp. 3d at 322-23. The FCPA provides three categories of people and circumstances for which an FCPA prosecution is permissible: (1) when the case involves a "domestic concern" or officer, director, or employee thereof (regardless of nationality) who

makes use of United States commerce in furtherance of a corrupt payment, 15 U.S.C. §§ 78dd-1(a), 78dd-2(a); (2) when a United States citizen, national, or resident acts outside the United States in furtherance of a corrupt payment regardless of whether he or she makes use of United States commerce, *id.* at § 78dd-2(i); and (3) any other person who, while in the territory of the United States,[18] acts in furtherance of a corrupt payment regardless of nationality or use of interstate commerce, *id.* at § 78dd-3. *Hoskins,* 123 F. Supp. 3d at 319. Defendants do not fall under any of these three categories in that they are foreign nationals, not domestic concerns, and the Indictment fails to charge that either Defendant took any action within the United States in furtherance of a corrupt payment.

**B.** **There Is No Basis To Charge Defendants With A Conspiracy To Violate The FCPA When Congress Has Specifically Exempted Them From FCPA Coverage.**

As Defendants are well aware, the government's theory is conspiracy and that they are not obligated to establish that Defendants committed each element of each offense as long as a coconspirator has (and Defendants agreed to it). In the FCPA context, the government's theory is that Defendants do not need to be domestic concerns under the FCPA because coconspirator Lal was a domestic concern and that is enough. (Resp. at 78.)

In *Hoskins*, the Court concluded, based on the principle set forth in *Gebardi v. United States,* 287 U.S. 112 (1932) and the text and structure of the FCPA, that the government's position is not enough. *Hoskins*, 123 F. Supp. at 322-23. *Hoskins* explained the *Gebardi* principle, noting that when Congress chooses to exclude a class of individuals from liability

---

[18] The government's Response states that Defendants have argued that they cannot be liable for an FCPA Count if they have not acted in United States territory, calls the argument "meritless," states that Defendants have not cited any case law or other authority on this point, and claims that Defendants did not develop and waive the argument. (Resp. at 75 and n.38.) That is wrong. The basis of Defendants' argument is 15 U.S.C. § 77dd-1(a) & 2(a) and the context is that Defendants fit none of the enumerated categories for prosecution set forth in the FCPA.

under a statute, "'the Executive [may not] override the Congressional intent not to prosecute' that party by charging it with conspiracy to violate a statute that it could not violate directly." *Hoskins*, 123 F. Supp. 3d at 321 (citing *United States v. Castle*, 925 F.2d 831, 833 (5th Cir. 1991)); *United States v. Bodmer*, 342 F. Supp. 2d 176, 181 n. 6 (S.D.N.Y. 2004) ("In *Gebardi*, the Supreme Court held that where Congress passes a substantive criminal statute that excludes a certain class of individuals from liability, the Government cannot evade Congressional intent by charging those individuals with conspiring to violate the same statute.")

The government argues that the situation in *Gebardi* was unusual and should be strictly interpreted.[19] But *Gebardi* is not as limited as the government would have it. The Fifth Circuit has applied the *Gebardi* approach to the FCPA:

> The principle enumerated by the Supreme Court in *Gebardi* squarely applies to the case before this Court. Congress intended in both the FCPA and the Mann Act to punish certain activities which necessarily involved the agreement of at least two people, but Congress chose in both statutes to punish only one party to the agreement.

*Castle*, 925 F.2d at 833. In *Castle*, the Court held that based on the text and legislative history of the FCPA, because the government could not charge foreign officials directly it also could not charge them indirectly through a conspiracy.

*Castle* rejected the argument that *Gebardi* was only good law for the class of individuals the statute was designed to protect, holding that "[n]othing in *Gebardi* indicates that only 'protected' persons are exempted from conspiracy charges." *Id.* Rather, the Court held that

---

[19] The *Gebardi* case involved the issue of whether a woman could be convicted of conspiracy to violate the Mann Act, which outlaws transportation of a woman across state lines for an immoral purpose when she agreed to her own transport. *Gebardi*, 287 U.S. at 118. The Supreme Court reasoned that in enacting the Mann Act, the legislature purposefully declined to criminalize the woman's agreement to her transportation. Therefore, the Court held, the woman could not be found guilty of conspiracy because that result would frustrate the intent of the legislature. *Id.*

Congress made the same choices in drafting the Mann Act as it did in drafting the FCPA "and by the same analysis, this Court may not allow the Executive to override the Congressional intent not to prosecute foreign officials for their participation in the prohibited acts." *Id.* at 833; *see also United States v. Pino-Perez*, 870 F.2d 1230, 1234 (7th Cir. 1989) (recognizing that "an affirmative legislative policy" to create an exemption from the ordinary rules of accessorial liability may exist); *United States v. Falletta*, 523 F.2d 1198, 1199 (5th Cir. 1975) (expressly recognizing that courts "have adopted the *Gebardi* reasoning in other contexts [outside the Mann Act]").

*Hoskins* traced the legislative history of the FCPA and found that it supported the principle that Congress specifically and intentionally delineated the classes of persons subject to liability under the FCPA, excluding people like Defendants – foreign nationals, not agents of domestic concerns who did not act within the territory of the United States. *Hoskins*, 123 F. Supp. 3d at 322-23. The Court also examined the 1998 amendments to the FCPA which were "intended to conform [the FCPA] to the requirements of and to implement the OECD Convention." *Id.* at 326 (citing S. Rep. 105-277 at *2-3 (1998)).[20] Contrary to the government's arguments, Congress evidently believed that these amendments *did* bring the FCPA into conformity with the OECD Convention. None of the amendments expanded the reach of the FCPA to individuals like Defendants, foreign nationals who did not act in furtherance of the corrupt payment in the territory of the United States.

---

[20] The three 1998 amendments were: (1) adding 15 U.S.C. § 78dd-3(a), which prohibited individuals or entities not already under the FCPA statute from taking any action while in the territory of the United States in furtherance of corrupt payments; (2) adding 15 U.S.C. § 78dd-2, providing that a foreign national acting as an agent of a domestic concern could be criminally prosecuted for violating the FCPA if he or she used interstate commerce; and (3) pursuant to 15 U.S.C. § 78dd-2(i)(1), providing for nationality jurisdiction, making it unlawful for any United States person to do any act outside the United States in furtherance of a foreign bribe.

The Court in *Hoskins* addressed an argument about conformity with the OECD Convention identical to the argument the government raises here.[21]  In *Hoskins,* as here, the government argued that because the OECD Convention required each signatory to make it a "criminal offense under its laws for any person to pay a foreign bribe" (OECD Convention, Article 1.1), unless the FCPA was interpreted to allow prosecution of foreign nationals who did not act within the United States, the United States would contravene the Convention.

*Hoskins* held*, however, that the OECD did not require or even contemplate the breadth of liability the government was arguing because of the "any person" formulation.  Rather, these issues were determined by Article IV of the OECD Convention addressing jurisdiction.  Article IV provides that each signatory "shall take such measures as may be necessary to establish its jurisdiction over the bribery of a foreign public official when the offense is (1) committed in whole or in part in its territory (OECD Convention, art. 4.1) or (2) by its own nationals while abroad (*id*., art. 4.2).  *Hoskins*, 123 F. Supp. 3d at 327.  "Therefore, there is no indication that the OECD Convention requires the U.S. to prosecute foreign bribery committed abroad by non-resident foreign nationals who conspire with United States citizens."  *Id.*

The Court should adopt *Hoskins*' reasoning in the near-identical circumstance at issue here and bar the prosecution of Defendants under the FCPA.  As the detailed analysis of the FCPA's legislative history conducted reveals, in enacting the FCPA, Congress was chiefly concerned with the actions of United States nationals and drafted the categories of persons to whom the act should apply carefully and with sensitivity to concerns about extraterritorial application of United States law.  The government's argument that Defendants are not in any

---

[21] The government cites *United States v. Kay*, 359 F.3d 738, 755 n. 68 (5th Cir. 2004) for the proposition that courts should not interpret United States laws in opposition to international conventions.  In addition to articulating this general principle, however, the Court in *Kay* stated, "We recognize that there may be some variation in scope between the [OECD] Convention and the FCPA."  *Id.*

class Congress has excluded from FCPA coverage (Resp. at 86) misses the mark. The point is that the FCPA provided specific guidance as to the categories of persons to whom it applied and Defendants are not in any of those categories.

Allowing the FCPA to apply to foreign nationals who have not acted in connection with corrupt payments in the territory of the United States falls on the other side of the line Congress arrived at with the FCPA and this Court should not allow the government to avoid that line with the conspiracy statute when it otherwise could not under the substantive provisions of the FCPA. This conclusion is amply supported by Supreme Court precedent, which dictates that when a United States statute is given some extraterritorial application, "the presumption against extraterritoriality operates to limit that provision to its terms." *RJR Nabisco,* 136 S. Ct. at 2102 (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 265 (2010)).

### C. The Government's Arguments Against Strict Construction Of FCPA Applicability Should Be Rejected By The Court.

The government offers four principal arguments in favor of allowing a conspiracy charge to expand the categories of persons to whom FCPA applies. The first is that this construction of the FCPA would cause the United States to violate its obligations under the OECD Convention. (Resp. at 89.) This argument is addressed in Section B, above. The second is that construction of the FCPA to ban prosecution of foreign nationals who do not act in connection with corrupt payments in the United States would create anomalous results and insulate supervisors[22] while authorizing prosecution of employees. (Resp. at 87-88.) This argument rests on false premises.

The reason that Lal is subject to prosecution under the FCPA and Defendants are not is that Lal is the only one who is a domestic concern based on his previous United States residency.

---

[22] Part of this reliance on the concept of "supervisors," as will be discussed below, stems from a misreading of *Pino-Perez*, which analyzed the kingpin statute provision that included a requirement that the defendant occupied a supervisory or management position.

If Lal had been an employee or agent of a "domestic concern," that would mean that both Lal and his supervising "domestic concern" were subject to prosecution under the FCPA. It does not mean, as stated by the government, that Lal could be prosecuted and his "domestic concern" supervisors could not.

The reason that the FCPA categories apply to Lal and not to Defendants is that Defendants are foreign nationals who did not act in connection with corrupt payments in the United States. The legislature excluded such persons from the FCPA's applicability just as it excluded foreign officials who accepted bribe payments from the reach of the FCPA.[23] *See Castle*, 925 F.2d at 833. This exclusion reflected a decision that even if these categories of persons were culpable, it was not in the interest of the United States to subject them to prosecution under the FCPA. Concerns as to international comity, foreign relations, and limitations on extraterritorial jurisdiction all justify Congress's determination to limit application of the FCPA.

The government's third argument is that Defendants are not necessary parties for an FCPA violation and that their exclusion from the categories of persons to which the FCPA was to apply is not indicative of Congressional intent on this point. (Resp. at 92.) The argument is derived from *Pino-Perez*, 870 F.2d at 1233-35. In that case, the Court was interpreting 21 U.S.C.A. § 848, the Continuing Criminal Enterprise or "kingpin" statute. The kingpin statute imposed heavy penalties for felony narcotics violations when a defendant engaged in a series of

---

[23] The case the government cites for the proposition that interpreting the FCPA as argued by Defendants would create "a gaping loophole in the law" (Resp. at 88) is *United States v. Henson,* 848 F.2d 1374, 1384 (6th Cir. 1988). *Henson* involved an individual who was charged with tampering with the odometer of a motor vehicle and sought to avoid liability by arguing that he was not technically a transferor of the vehicle. The Court rejected that position based on a provision in the same statute allowing prosecution of anyone who either acts to tamper with an odometer or causes an act to be done. Because *Henson* was not an FCPA case or a case dealing with specific carve-outs to the applicability of a statute, it is inapposite.

drug transactions with five or more others and occupied a supervisory or management position. The court held that it was permissible to apply the statute and its enhanced penalties to aiders and abettors.

In analyzing whether aider and abettor liability could attach to the kingpin statute, the court first recognized that because the statute specifically required the defendant to occupy a supervisory or management position over others in his drug organization, it was impermissible to punish people the defendant supervised under the kingpin statute as aiders and abettors. *Pino-Perez,* 870 F.2d at 1231. The Court reached this conclusion based on the reasoning that if a crime is defined so that participation by another party is "necessary" to its commission, that party cannot be an aider or abettor. *Id.* In essence, this was a manner of construing legislative intent.

The court held: "[B]y specifying the kind of individual who is to be found guilty when participating in a transaction necessarily involving one or more other persons, [the legislature] must not have intended to include the participation by others in the offense as a crime. This exception applies even though the statute was not intended to protect the other participants." *Id.* (citing *United States v. Southard*, 700 F.2d 1, 20 (1st Cir. 1983)). The court recognized this as one of three exceptions to the general rule that aiding and abetting liability automatically attaches to statutes. The other two exceptions the Court identified were: (1) when the individual was a victim and (2) when the individual was a member of the group the statute sought to protect. *Id.* at 1232 (citing *Gebardi*, 287 U.S. at 123).

The court in *Pino-Perez* held that the defendant there, a person who assisted a kingpin, but who was not supervised by the kingpin, did not fall within any of these three exceptions and thus was subject to prosecution as an aider and abettor. In reaching that conclusion, the court disagreed with *United States v. Amen*, 831 F.2d 373 (2d Cir. 1987), which held that persons who

were not the head of a continuing criminal enterprise could not be subject to the kingpin statute as aiders and abettors since the legislative history of the kingpin statute did not mention aiders and abettors.

Understood in proper context, the holding of *Pino-Perez* supports *Hoskins*' holding that individuals like Defendants are not subject to prosecution under the FCPA. The exception to aider and abettor liability in *Pino-Perez* is that if a statute specifies who can be guilty of a crime "necessarily involving"[24] one or more others, the legislature did not intend to include those others in the crime. Applied to the FCPA, this principle means that when the legislature defined domestic concerns, United States nationals, and others who act in furtherance of a corrupt payment in the United States, *see* 15 U.S.C. §§ 78dd-1(a), 2(a), 2(i), 78dd-3, as persons who the government may prosecute under the FCPA, the legislature meant to exclude the parties it did not include, namely foreign officials (as was concluded by *Castle*, 925 F.2d at 833) and foreign nationals who do not act in furtherance of the corrupt payment in the United States (the defendant in *Hoskins* and Defendants here).

The government's final argument against a strict construction of the FCPA is that the approach is foreclosed by other cases. That is incorrect. The government cites *Ocasio v. United States,* 136 S. Ct. 1423 (2016), for the principle that the case suggests that the Court should not follow *Hoskins* because *Ocasio,* which was decided after *Hoskins*, reaffirmed a narrow construction of *Gebardi.* (Resp. at 91.)

*Ocasio*, however, stands for the principle that a person may be convicted of a substantive crime that he or she cannot commit. This reasoning is inapplicable to the argument raised by

---

[24] *Pino-Perez*, 870 F.2d at 1231. The full context of the *Pino-Perez* analysis reveals that describing its exception to aider and abetter liability as the "necessary party" exception and requiring the individual in question to be indispensable to the alleged crime misconstrues the *Pino-Perez* holding.

Defendants, that if the legislature has carefully limited the FCPA's application to certain classes of individuals, that the prosecution cannot alter this result through use of the conspiracy statute. Furthermore, that *Ocasio* was decided after *Hoskins* is a red herring. As the government noted, *Ocasio* was merely a reiteration of a limited reading of *Gebardi* that courts had previously applied. (Resp. at 82, n. 41.)

The government's second care-related argument fares no better. The government contends that this Court should not follow *Hoskins* because *Hoskins* was "heavily premised" on the reasoning of *United States v. Amen*, 831 F.2d 373 (2d Cir. 1987). That is wrong too. *Hoskins*' reasoning was based on the text and the legislative history of the FCPA and not on a Second Circuit case analyzing the kingpin statute. Furthermore, as discussed above, the exception to aider and abettor liability arrived at in *Pino-Perez*, properly understood, actually supports Defendants' FCPA arguments, and it is irrelevant to this analysis that the Second and Seventh Circuits came out differently in analyzing the legislative history of the kingpin statute.

The FCPA by its terms does not apply to Defendants – foreign nationals who did not act in connection with a corrupt payment in the United States. Under *Hoskins*, *Gebardi*, *Castle*, and the principles articulated by the Seventh Circuit in *Pino-Perez*, this Court should conclude that the government may not extend the FCPA through a conspiracy charge beyond the reach Congress carefully constructed into the FCPA and its amendments.

## V. Defendants Have Fifth Amendment Due Process Rights And This Case Violates Those Rights.

The government argues that Defendants do not have Fifth Amendment due process rights because they are foreign nationals who are not physically present in the United States. *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009), shows that the government is wrong. There, the Seventh Circuit acknowledged a foreign national defendant's due process rights – even issuing a writ of

mandamus directing the district court to rule on his motion to dismiss – despite the fact that he was not physically present in the United States. The government also argues that its prosecution does not offend Defendants' due process rights because the alleged conduct took place in substantial part in the United States, was intended to have a substantial effect on the United States, and was directed against significant United States interests. Based on the facts charged in the Indictment, the government is mistaken.

### A. Defendants Have Fifth Amendment Due Process Rights.

*Hijazi* shows that foreign defendants outside the United States have Fifth Amendment due process rights. While *Hijazi* did not state as much directly, this conclusion is inescapable based on its facts and holdings.

In *Hijazi,* the Seventh Circuit held that a foreign national defendant was entitled to a ruling on a motion to dismiss an indictment based in part on his argument that exercising jurisdiction over him for conduct that centered on a foreign country was a violation of his due process rights. *In re Hijazi*, 589 F.3d at 403. Despite the fact that the defendant had never appeared before the United States Court, the Seventh Circuit issued a writ of mandamus directing the district court to rule on the defendant's motion to dismiss. In ruling that the defendant met the requirements for issuance of the writ, the court found that the defendant was "attempting to raise fundamental questions about the legislative reach of the Major Fraud Act and the Wire Fraud Act." *Id.* at 408. In so finding, the Seventh Circuit accepted the principle that foreign nationals who have not appeared before a United States court, like Defendants here, have Fifth Amendment due process rights. *See also United States v. Hayes*, 2015 WL 1740830, at *3-4 (S.D.N.Y. Mar. 20. 2015) (recognizing that in issuing the writ of mandamus, the Seventh Circuit suggested that the defendant had due process protections); *United States v. Noriega*, 683 F. Supp. 1373, 1374-75 (S.D. Fl. 1988) (exercising discretion to allow defendant to challenge the

jurisdiction of the court on grounds including due process despite the fact that defendant was a

fugitive with no expectation that he would ever be brought to the United States); *United States v.*

*Bokhari*, 757 F.3d 664 (7th Cir. 2014) (analyzing defendant's challenge to the indictment on

international comity grounds despite the fact the defendant was in Pakistan contesting

extradition).

The government's cases are not to the contrary.[25]  Put simply, and based on *Hijazi,*

*Bokhari*, and *Hayes*, Defendants have cognizable Fifth Amendment due process rights.

**B.      Prosecuting These Defendants In The United States Does Not Comport With
Due Process.**

Defendants and the government agree that the due process analysis here is governed by

Sections 402 and 403 of the Restatement (Third) of Foreign Relations Law.  Defendants and the

government differ, however, as to how to interpret the connections between Defendants and the

United States.   The government argues that "a substantial part of the enterprise's criminal

activity occurred in the United States" (Resp. at 97), that Defendants' conduct "had, or was

intended to have, a substantial effect within the United States" (Resp. at 98), and that the conduct

---

[25] *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) involved a resident alien who was ordered removed from
the United States and held at the Immigration and Naturalization Service beyond the 90-day removal
period. Because the alien was not involved in criminal court proceedings in the United States, the case is
distinguishable.  *Johnson v. Eisentrager*, 339 U.S. 763, 783 (1950) is also different as the Court there
denied a habeas corpus challenge by German national enemy aliens outside the United States.  The
defendants challenged post-World War II convictions by a military tribunal in China for violating the
laws of war by continuing military activity against the United States after the surrender of Germany but
before the surrender of Japan.  Part of the basis of the Supreme Court's ruling was that if enemy aliens
were entitled to Fifth Amendment due process protections, they would receive more protection than
United States soldiers who are stripped of their Fifth Amendment rights and subjected instead to military
trials.  *Id.* at 783.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264, 269 (1990) cited *Johnson* and
also observed that the Fourth Amendment (which does not apply to non resident aliens outside the United
States) operates differently than the Fifth Amendment (which is at issue here).  In *In re Kashamu*, 769
F.3d 490, 492 (7th Cir. 2014) the Seventh Circuit observed that the denial of that defendant's Sixth
Amendment rights "seemed right," but then went on to determine that the defendant's constitutional
rights were not violated.

was directed against the security or interest of the United States (Resp. at 100). Based on the Indictment's allegations, though, the conduct in the United States was merely incidental to Lal's residency in the United States and/or was not criminal.

1. **The Indictment Does Not Allege Substantial Criminal Activity In The United States.**

The allegations in the Indictment center on a supposed scheme to bribe Indian officials in India in connection with a mining and refining project to be completed in India. Six defendants were charged in the Indictment; five are foreign nationals. The Indictment does not allege any meetings in the United States with Indian officials or any payment to Indian officials in the United States. The Indictment does not plead that any part of the mining and refining operation was to take place in the United States, to receive funding from the United States government, to obtain funding from United States sources, or to make use of United States bank accounts. There is no allegation of a single meeting in the United States discussing bribery. And there is no allegation that the titanium sponge meant for sale to Company A was improperly priced based on the alleged bribery scheme, or that if the sponge had actually made it to the United States it would have adversely affected United States commercial or foreign policy interests.

Although the government claims that Defendants conducted "extensive operations" in the United States (Resp. at 97), the allegations in the Indictment reveal that the actions of others in the United States, for which the Defendants would be responsible only under the layers of conspiracy charges crafted into the Indictment, were minimal, incidental, and non-criminal. The Indictment does not plead that any of the money transfers were from United States bank accounts or to United States bank accounts (Indictment at 11-16, ¶¶ 16(b)(i)-(xvii)).

The Indictment charges two instances in which Lal evidently had correspondence related to the alleged bribery scheme while in the territory of the United States. (Indictment at 17-18, ¶¶

16(f)(iv), (vii).)  But neither of these allegations required Lal's presence in the United States. Rather, he was there incidentally because he resided there.  The same is true of the allegation that United States phone lines were used and that emails were sent from the United States. (Indictment at 18-19, ¶¶ 16(g) and (h).)  The Indictment does not plead that any part of the alleged scheme depended on the use of United States internet or phone service – it was merely incidental.

Finally, the allegations related to Company A and Company D are not criminal.  There is no allegation that either Company A (which allegedly considered purchasing titanium sponge) (Indictment at 2-3, 6 ¶¶ 1(d)-(e), 5) or Company D (which allegedly considered participating in the Indian project) (Indictment at 18, ¶ 16(f)(v)) was involved in the alleged bribery scheme. Thus, there is no basis to conclude, and the Indictment does not allege, that any illicit discussions with Company A or D took place in the United States (or anywhere else).  As such, contacts in the United States with Company A or Company D cannot satisfy the requirement of "substantial" "criminal activity" in the United States.

> **2.**     **The Alleged Activity Did Not Have And Was Not Intended To Have A Substantial Effect Within The United States.**

The fact that Lal lived in the United States, travelled, and used email and phone service while in the United States does not show a substantial effect on the United States or the intent to have such an effect.  And while Company A might have been interested in purchasing titanium sponge, the Indictment does not allege that the bribery scheme affected that intent in any way (for example, by changing the price of or market for titanium sponge).  Even if Company A had purchased the titanium sponge as it allegedly intended, that does not show the type of substantial

effect on the United States required to meet the requirements of due process.[26]  Absent any allegation that the charged offenses would have affected United States companies, consumers, or taxpayers, the case simply does not have the requisite substantial effect on the United States to sustain this prosecution.

### 3. The Alleged Activity Was Not Directed Against Significant United States Interests.

While the government goes outside the Indictment to claim that Defendants are organized crime members, and describes at length the evils of organized criminal activity, the allegations actually in the Indictment – i.e., that bribes were paid to Indian officials in India in connection with a vertically integrated mining and refining operation there – do not suggest a threat to international security.  The Indictment raises no objection to the legitimacy of the Indian project itself and articulates no connection between the project and any other criminal activity other than the allegation of bribes paid in India.  These allegations do not raise the types of threats to the United States that are outlined in the government's Response at pages 100-105 and do not justify the prosecution of Defendants in the United States.

### 4. This Prosecution Is Not Reasonable.

The government has charged Defendants, a Ukrainian and a Hungarian, with a scheme to bribe Indian officials in India in connection with an Indian mining and refining project. The connections to and effects on the United States were minimal and incidental. Moreover, because neither Company A nor Company D were alleged to have been involved in any illicit activity, contacts with these entities in the United States were not criminal.  In short, prosecuting Defendants in the United States is unreasonable.

---

[26] Section C below discusses the facts of the due process cases cited by the government and shows that the instant prosecution extends United States law far beyond acceptable bounds.

## C. The Government's Cited Authority Does Not Show That This Prosecution Satisfies Due Process.

The government cites a number of cases for the proposition that this case meets due process standards. These cases are distinguishable and, read carefully, show that this prosecution flunks the due process analysis.

In *United States v. Hijazi*, 845 F. Supp. 2d 874 (C.D. Ill. 2011), defendant was one of two bidders to attempt to obtain a contract to supply a United States company, KBR, which contracted with the United States Army to procure goods and services around the world, including Kuwait. The KBR procurement manager in Kuwait was corrupt and agreed to accept a bribe from Hijazi to award Hijazi's company a contract to supply the United States Army with fuel tankers and services in exchange for a bribe which would have inflated the cost of fuel tankers by $3.5 million — a sum to be paid by the United States government. *Id.* at 885.

Hijazi and the corrupt procurement manager exchanged numerous emails across the procurement manager's United States email server that constituted both the corpus of the crime and a subsequent cover-up attempt. In addition, the defendant submitted inflated invoices to the United States government to cover the bribe payments. Even in these circumstances, which are much different than the instant case and far more connected to the United States, the Seventh Circuit found that the due process determination was "by no means a foregone conclusion." *In re Hijazi,* 589 F. 3d 401, 412 (7th Cir. 2009).

In support of the argument that this prosecution does not violate due process, the government also cites *United States v. Leija-Sanchez*, 602 F.3d 797 (7th Cir. 2010), *United States v. Schmucker–Bula*, 609 F.2d 399 (7th Cir. 1980), *United States v. Nippon Paper Indus. Co., Ltd.*, 109 F.3d 1 (1st Cir. 1997), and *United States v. Campbell*, 798 F. Supp. 2d 293 (D.D.C. 2011). None of these cases supports the government's argument.

*Leija-Sanchez* involved the allegation that the defendant was a kingpin of an organization that was procuring fraudulent social security cards, driver's licenses, green cards, and other documents for aliens living unlawfully in the United States. *Leija-Sanchez*, 602 F.3d at 798. The defendant moved to dismiss one count of the Indictment which charged him with arranging and paying for the murder, in Mexico, of a former employee who was competing with his business. *Id.* According to the defendant, the alleged crime was not sufficiently connected to the United States and violated his due process rights.

The Seventh Circuit concluded that all of the defendant's conduct in planning and paying for the murder occurred in the United States and that the murder advanced the defendant's business interests in the United States through the elimination of competition. *Id.* at 800-801. Considering those facts, the court held that the prosecution did not violate the defendant's due process rights. *Id.* at 801. This case is nothing like that.

In *Schmucker-Bula*, the defendant was charged with conspiracy to import cocaine into the United States from Colombia. An informant in the case spoke on the phone numerous times in connection with the illegal conduct in Chicago and also sent a sample of the illegal drugs to Chicago by mail, which the Court found constituted an overt, illicit act in the United States. *Schmucker-Bula*, 609 F.2d at 402. *Schmucker-Bula* is distinguishable because there a specific illegal act, sending a sample of cocaine to Chicago, occurred in the United States and the scheme involved introducing cocaine, an innately illicit and harmful substance, to the United States. Again, this case is completely different.

In *United States v. Nippon Paper Industries Co., Ltd.,* 109 F.3d 1 (1st Cir. 1997), the Court considered whether alleged price-fixing actions in Japan could constitute a criminal violation of the Sherman Act in the United States. The court concluded that paper shipped and

sold to United States subsidiaries at substantially inflated prices had a substantial adverse effect on United States commerce such that a United States prosecution would not violate due process. Here, however, there are no allegations of inflated prices or any other adverse effects on United States commerce.

Finally, in *United States v. Campbell*, 798 F. Supp. 2d 293 (D.D.C. 2011), the defendant was a senior construction manager working on contracts funded by the United States Agency for International Development ("USAID"). In that role, the defendant agreed with a USAID undercover officer to accept a $190,000 cash payment in exchange for steering USAID work to the agent's supposed construction company. *Id.* at 297. The Court concluded that the defendant's acts hindered "the United States's substantial efforts in Afghanistan and also robs USAID of support for its efforts from the U.S taxpayer." *Id.* at 307-08. Given the substantial effects of the alleged conduct in *Campbell* on United States foreign policy and financial interests, the Court held that a United States prosecution comported with due process. Here, though, there are no allegations of any similar negative effects on commerce or foreign policy.

While this case is unlike those cited by the government, it is akin to *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015). In *Sidorenko*, the Northern District of California found a due process violation where the government sought to prosecute a defendant in the United States based on his role in a bribery scheme in Canada involving an entity that received 25% of its funding from the United States and established standards for United States passport features. The court held that the defendant's actions did not implicate the financial or security interests of the United States in a significant enough manner to justify his prosecution in the United States. *Id.* at 1133. The same is true here where the Indictment fails to allege any effect on the finances or security interests of the United States.

## CONCLUSION

For the reasons described above, Defendants respectfully request that this Court enter an order dismissing the Indictment against them.

Dated:  August 30, 2017                    Respectfully submitted,

                                           */s/ Dan K. Webb*

                                           Dan K. Webb
                                           Matthew R. Carter
                                           Alison S. Cooney
                                           WINSTON & STRAWN LLP
                                           35 West Wacker Drive
                                           Chicago, IL 60601
                                           (312) 558-5600
                                           dwebb@winston.com
                                           mcarter@winston.com
                                           acooney@winston.com

                                           *Attorneys for Dmitry Firtash*

                                           */s/ Carolyn Pelling Gurland*

                                           Carolyn Pelling Gurland
                                           Law Offices of Carolyn Gurland
                                           414 North Clay Street
                                           Hinsdale, IL 60521
                                           (312) 420-9263
                                           cgurland@comcast.net

                                           *Attorney for Andras Knopp*

## CERTIFICATE OF SERVICE

I, Dan K. Webb, hereby certify that on August 30, 2017, the Joint Reply Of Dmitry

Firtash And Andras Knopp To The Government's Consolidated Response To Defendant

Firtash's And Knopp's Motions To Dismiss The Indictment was served upon the following by

electronic mail:

Amarjeet Singh Bhachu
Michael Thomas Donovan
United States Attorney's Office
219 South Dearborn Street
Suite 500
Chicago, IL 60604
(312) 353-5300

Jonathan P. Robell
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20530
(202) 616-5136

*/s/ Dan K. Webb*
Dan K. Webb