```
1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3


4    UNITED STATES OF AMERICA,         )
                                       )
5                   Plaintiff,         )    Docket No. 13 CR 515
                                       )
6              vs.                     )
                                       )
7    DMITRY FIRTASH and ANDRAS         )    Chicago, Illinois
     KNOPP,                            )    September 11, 2017
8                                      )    2:08 p.m.
                    Defendants.        )
9


10             TRANSCRIPT OF PROCEEDINGS - Oral Argument
              BEFORE THE HONORABLE REBECCA R. PALLMEYER
11

12   APPEARANCES:

13

14   For the Plaintiff:         HON. JOEL LEVIN
                                 ACTING UNITED STATES ATTORNEY
15                               BY:  MR. AMARJEET S. BHACHU
                                 219 South Dearborn Street
16                               Chicago, Illinois  60604

17                               UNITED STATES DEPARTMENT OF JUSTICE
                                 BY:  MR. JONATHAN P. ROBELL
18                               1400 New York Ave. NW
                                 Washington, DC  20530

19

20   For the Defendant           WINSTON & STRAWN LLP
     Dmitry Firtash:             BY:  MR. DAN K. WEBB
21                                    MR. MATTHEW R. CARTER
                                 35 West Wacker Drive
22                               Chicago, Illinois  60601

23   For the Defendant           LAW OFFICES OF CAROLYN GURLAND
     Andras Knopp:               BY:  MS. CAROLYN PELLING GURLAND
24                               414 North Clay Street
                                 Hinsdale, Illinois  60521

25
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Court Reporter:          FRANCES WARD, CSR, RPR, RMR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Suite 2144D
                         Chicago, Illinois  60604
                         (312) 435-5561
                         frances_ward@ilnd.uscourts.gov

1           THE CLERK:  13 CR 515, United States versus Dmitry

2   Firtash and Andras Knopp for oral argument.

3           MR. BHACHU:  Good afternoon, your Honor.

4           Amru Bhachu and Jonathan Robell on behalf of the

5   United States.

6           THE COURT:  Good afternoon.

7           MR. ROBELL:  Good afternoon, your Honor.

8           MR. WEBB:  Your Honor, Dan Webb, and Matt Carter's

9   in the courtroom, on behalf of the Defendant Dmitry Firtash.

10          MS. GURLAND:  Good morning, your Honor.

11          Carolyn Gurland here on behalf of Defendant Andras

12  Knopp.

13          THE COURT:  Good afternoon, everybody.

14          The motions to dismiss the indictment are fully

15  briefed, and I have had a chance to review the briefs.  I

16  obviously would benefit from your oral presentations as well.

17          This is the defendants' motion, so I assume you

18  will make the first argument, and we will hear then from the

19  government.  I will certainly allow time for rebuttal as

20  well.

21          MR. BHACHU:  May I be seated, Judge?

22          THE COURT:  Sure.

23          MR. BHACHU:  Thank you.

24          MR. WEBB:  Your Honor, Dan Webb on behalf of the

25  Defendant Dmitry Firtash.

1    Your Honor, this is our -- the motion was filed by
2    Dmitry Firtash on behalf -- by my firm on behalf of Dmitry
3    Firtash, and Ms. Gurland filed a motion on behalf of her
4    client, Mr. Andras Knopp.
5         THE COURT:  Right.
6         MR. WEBB:  The entire motion is based on Rule 12(b)
7    and the fact that we believe the indictment fails to plead
8    adequate facts to establish the requirement of venue in the
9    Northern District of Illinois or jurisdiction in the United
10   States.
11        As your Honor, I think, can tell from looking at
12   the reply brief, there are actually five issues that have now
13   been briefed before your Honor.  And because we filed joint
14   briefs and because we are adopting each other's arguments, to
15   avoid us in any way duplicating arguments on issues,
16   Ms. Gurland and I have simply split the issues up, if that's
17   okay with your Honor.
18        THE COURT:  Sure.
19        MR. WEBB:  I will address the first two issues in
20   the brief dealing with ripeness and venue, and Ms. Gurland
21   will address the last three issues that deal with
22   jurisdiction, so that we avoid any possibility of taking up
23   the Court's time unnecessarily with duplication.
24        THE COURT:  Before you dive in, let me ask, is it
25   your view on behalf of the defendants that venue is not

1    proper anywhere in the United States or just not proper in

2    the Northern District of Illinois?

3          MR. WEBB:  Northern District of Illinois.  I'm not

4    going to -- there may be some other venue that they may plead

5    venue in, but they haven't plead -- yes, our position is they

6    have not adequately pled venue in the Northern District of

7    Illinois.  That is our position.

8          THE COURT:  Okay.

9          MR. WEBB:  Now, your Honor, at a high level, I

10   think the Court could say, you folks are coming in here

11   telling me that the government has not adequately pled venue

12   and has not adequately pled jurisdiction in the United

13   States, and those are such fundamental, constitutionally

14   required issues to be pled in an indictment, why would they

15   not be here?

16          Let me just start off by saying, your Honor, there

17   are certain unique and special facts about the defendants

18   that make it very difficult -- in fact, I believe

19   impossible -- for the government to plead venue in the

20   Northern District of Illinois or jurisdiction in the United

21   States.

22          Number two, there is actually special and unique

23   facts about the nature of this crime that's pled in the

24   indictment that creates the same problems of being able to

25   plead venue in the Northern District of Illinois or

1    jurisdiction in the United States.

2              First my client, Mr. Firtash.  Four fundamental

3    facts about venue and jurisdiction.

4              Number one, Mr. Firtash is not a United States

5    citizen.  He is a citizen of the Ukraine.

6              Number two, Mr. Firtash has never, ever been in the

7    United States at any time.  He has never set foot in the

8    United States in his life.  He has never asked for a visa to

9    come to the U.S.  He has, period, never been in the United

10   States.

11             Number three, at no time has Mr. Firtash or any of

12   his companies ever done any business in the United States.

13   None.

14             And the fourth fact is, this indictment does not

15   even allege a single act performed by Mr. Firtash in the

16   United States that has any connection to the crimes charged

17   in this indictment.

18             So those unique facts about my client, I think,

19   explain why they can't plead venue or jurisdiction.

20             But it is compounded by the nature of the crime,

21   your Honor, because, as far as the unique and special nature

22   of this crime and creating impossibilities for the government

23   to plead venue and jurisdiction, the charges against

24   Mr. Firtash all relate -- all of them relate to a plan to

25   bribe public officials not in the United States but in the

1    nation of India.  And the plan dealt with a mining project

2    that was planned to take place entirely within the nation of

3    India by foreign companies that have no connection to the

4    United States.

5             In fact, as far as the crime itself that's pled --

6    it may not be totally obvious the first time you look at this

7    indictment, as much as we've studied it, but I just point out

8    to your Honor, this crime doesn't even plead bribery in

9    India.

10            They crime pled -- they plead three conspiracies,

11   your Honor.  There is basically three alleged conspiracies

12   pled in the indictment, but there is no -- there is no

13   allegation that this plan ever led to any Indian public

14   official actually ever being paid or receiving any bribes.

15            They do allege there was a plan to do so, but the

16   indictment, when you read it, they didn't charge any foreign

17   corrupt -- they pleaded conspiracy to violate the Foreign

18   Corrupt Practices Act, but I can't see anywhere in the

19   indictment where they plead an actual Foreign Corrupt

20   Practices Act substantive violation.

21            And they don't even plead -- they don't plead on

22   this indictment events that occurred that would be evidence

23   or show that there is an allegation that bribes were actually

24   paid to any Indian public official.

25            The government may -- if I'm wrong about that, they

1    can correct it, but that's my understanding when I read the

2    indictment.

3         So when you combine kind of all those facts at a

4    high level together, your Honor, I believe it explains why

5    the government is failing in these basic issues in pleading

6    venue in the Northern District of Illinois and jurisdiction

7    in the United States.

8         Now let me go through the first two issues in the

9    brief.

10        First is ripeness.  At the beginning of the

11   government's argument in its response brief, your Honor, the

12   government's very first argument is that the defendants'

13   motion to dismiss is not ripe for you to decide now as a

14   matter of what they call international comity.  Let me talk

15   about that just briefly.

16        In the ripeness argument, the government makes the

17   argument that there are certain U.S. cases that seem to

18   suggest that, as part of the concept of international comity,

19   a U.S. court should not address a motion before you that

20   challenges whether the extraditing state has the power or

21   authority to order extradition of the defendant back to the

22   United States to face charges.

23        The idea there, your Honor, is, you shouldn't do

24   that because you might do something that would -- that might

25   be basically a -- "dueling proceedings" is the term that the

1    government uses -- that you would decide some dueling

2    proceedings here in which you would telling the Austrian

3    authorities, well, you can't do this.  That's not here.

4         We have not raised any issue at all about the U.S.

5    treaty with Austria.  We're not alleging -- we are making no

6    arguments about whether or not Mr. Firtash or Mr. Knopp can

7    be extradited from Austria, which is why, quite frankly, I

8    have never understood the government's argument on this.  I

9    may be missing something, but when I read those cases over,

10   all of them involve where I would be raising here in front of

11   your Honor some issue, asking you to decide about whether,

12   under the treaty, Mr. Firtash could be extradited back.

13   There is just no -- this is a motion to dismiss because of

14   venue and jurisdiction and has nothing to do with dual

15   proceedings.

16        And I should emphasize, by the way, all the

17   research we have done, I can't find a single case anywhere in

18   the U.S. that in any way suggested that a motion to dismiss

19   for lack of venue and jurisdiction is somehow a dueling

20   proceeding that under principles of international comity

21   would prevent you from ruling on this issue.

22        Now, I think it's fair for your Honor to say,

23   "Well, why are you here now, Mr. Webb?"  I will address it

24   briefly.

25        Let me just give you a current statement from me as

1  to the current status of extradition in Austria and answer

2  any questions you have about it.

3  And, by the way, we have an Austrian extradition

4  lawyer here, who has been handling the matter in Austria,

5  named Mr. Otto Dietrich.  I don't know that you will need to

6  ask him any questions, but he is here.

7  The bottom line is the following:  The bottom line

8  is that, for several years, I have believed, based on what I

9  learned from the Austrian lawyers, that, based on laws and

10  facts, that Mr. Firtash I thought would likely not be

11  extradited back to the U.S.

12  In fact, there was actually a trial in Austria in

13  which they litigated the whole issue of extradition; and, for

14  a variety of reasons, the Austrian court in April of 2015,

15  the trial court, ruled that Mr. Firtash would not be able to

16  be extradited back to the United States.

17  Things have changed now.  And based on where things

18  stand today, the bottom line is that Mr. Firtash, I believe,

19  is highly likely to be extradited back to the United States.

20  I can't give you an exact date because of uncertainties about

21  certain matters, but I will tell you that it could happen

22  within weeks or certainly months.

23  Just briefly where it stands is that after

24  Mr. Firtash won at the trial level -- after he won and he was

25  not being extradited, so I didn't see any reason to file a

1   motion here, because he wasn't going to be extradited.  What

2   happened then is under -- he filed an appeal and that appeal

3   went forward.

4           THE COURT:  Why would he have appealed?

5           MR. WEBB:  I'm sorry.

6           THE COURT:  You mean --

7           MR. WEBB:  The Austrian government filed -- that's

8   my mistake, and I apologize.

9           The Austrian prosecutors filed an appeal

10  challenging the trial court's decision.  And on February 21st

11  of this year, 2017 -- which actually didn't become final

12  until sometime in March, I believe -- the Austrian appellate

13  court disagreed with the trial court and entered -- after a

14  hearing, entered a ruling that Mr. Firtash was ordered

15  extradited back to the United States.

16          Now under Austrian procedural law, that was the end

17  of the road for Mr. Firtash in the Austrian courts as a

18  matter of appellate rights.

19          Mr. Firtash did file this thing called a special

20  extraordinary remedy writ with the Supreme Court of Austria

21  asking the Supreme Court to review the case and review the

22  decision by the appellate court.

23          However, that's simply a discretionary

24  extraordinary writ, and there is no stay.  And so the

25  Ministry of Justice, as far as I know, under the law could

1    have extradited Mr. Firtash in March or April of this year.

2         However -- however, there was another wrinkle.

3    While this case was pending, Spain, the nation of Spain filed

4    an extradition request for Mr. Firtash.  Under Austrian law,

5    as long as there were two competing extradition requests by

6    two different sovereign nations, the Ministry of Justice is

7    not allowed to pick and choose which one he will grant.  So

8    the Ministry of Justice in Austria has to wait for the courts

9    to resolve this.

10        Well, Mr. Firtash's case was resolved by the

11   appellate court, at least as a matter of right, and the

12   Supreme Court has not entered any indication they are going

13   to hear the case.  But the Spain case was alive up until

14   August 29th, just ten days ago.

15        On August 29th, an Austrian trial court denied the

16   Spanish request for extradition, and that ends the Spanish

17   case, although the prosecutor in Austria could appeal that

18   Spanish ruling by the trial judge to the appellate court.

19   And I think that decision has to be made in the very near

20   future.  I don't know what's going to happen there.  I have

21   heard speculation that the prosecutor might appeal.  So it

22   could be several more weeks.  It could be several more

23   months.

24        But the fact is, I think it's fair to say that

25   Mr. Firtash is clearly at significant risk of being

1   extradited, which brought us to come before your Honor,

2   because if venue -- if I'm right and venue and jurisdiction

3   are not proper in the U.S., it would be an enormous injustice

4   to my client to make him go into U.S. marshal custody, bring

5   him back to the U.S., put him in prison waiting for a bond

6   hearing in front of your Honor.

7           And if there is no venue here and if there is no

8   jurisdiction, that should not happen, because that whole

9   purpose of these -- venue is to make sure that it's proper to

10  have somebody brought here.  And if it's not proper to have

11  him brought here, then we should resolve that issue now.

12          So that's why I am here now.  Before, I thought

13  there was no need to, obviously, take up your time.  You

14  always will take time for anything, but a complex

15  jurisdiction and venue motion I thought was probably not

16  going to be necessary, and now it looks like it's necessary.

17  That's what brought us here today.

18          So on the issue of ripeness, this is about as ripe

19  as it can get, because it's going to happen, and it's going

20  to happen pretty quickly.

21          Now, let me go to venue, because this is -- I am

22  going to walk through this and try to explain it concisely to

23  your Honor as to what the problem is.

24          I am going to walk through -- there's only three

25  paragraphs in the indictment that allege any act occurring in

1   the Northern District of Illinois.  I am going to walk

2   through those, because, under the law, those pled acts do not

3   satisfy the requirements of U.S. law on what has to be pled

4   for venue.

5          Now, there's some legal principles, and

6   surprisingly, there is very little, if any, difference

7   between the defendants and the government on the legal

8   principles you should apply in deciding venue.

9          First of all, the government and the defendant

10  agree that venue is a constitutional requirement, which

11  requires that part of the crime charged must have been

12  committed in the Northern District of Illinois or else there

13  is not venue here.

14         The government and the defendant also agree that

15  the vast majority of this case is a conspiracy case.  There

16  actually are three separate conspiracies charged in the

17  indictment.

18         Count I is a RICO conspiracy.

19         Count II are travel acts in furtherance of a money

20  laundering conspiracy.

21         And Count V is a 371 conspiracy to violate the

22  Foreign Corrupt Practices Act.

23         So the government and the defense agree that if I

24  object to venue and contend that it's not pled, I have to

25  file this motion under 12(b), because 12(b)(3) on its face

1    says that if I'm going to challenge venue at trial, I need to

2    challenge it now for your Honor to decide whether or not it's

3    been properly alleged or else I waive it.  And therefore,

4    there is no dispute about that, that venue should be raised

5    now and not at some later point in time.

6            Number four, the government and I agree that

7    because of the conspiracies being the heart of this

8    indictment, under the case law, the government must plead and

9    set forth at least one overt act in furtherance of the

10   conspiracy that actually occurred in the Northern District of

11   Illinois in order to make venue proper in the Northern

12   District of Illinois.

13           And we agree with the government that you could

14   have -- a conspiracy could have multiple federal districts

15   where overt acts were carried out in, and so a conspiracy can

16   clearly be brought in multiple jurisdictions.  I am not

17   arguing that.

18           But if they are going to proceed on it in Chicago,

19   in the Northern District of Illinois, I think the

20   government -- the cases are cited on Page 22 of the

21   government's brief, where they concede that they must plead

22   and then prove actual acts in the Northern District of

23   Illinois that are in furtherance of the pled conspiracy.  And

24   they cite three Seventh Circuit cases that stand for that

25   proposition.

1           So we agree on that.

2           The government also agrees with me on the next

3   critical issue, which is that when you plead the overt act in

4   furtherance of the conspiracy, it must -- venue must be pled

5   by pleading specific facts, which, if proven at trial, would

6   establish venue.

7           The lead case there is the case in the Seventh

8   Circuit called the *Bohle*, B-o-h-l-e, case.  It's a Seventh

9   Circuit case.  The government cites it on Page 27 of its

10  brief.  That case states very directly venue must -- because

11  it's a constitutional requirement of venue, it has to be pled

12  by setting forth specific facts, which, if proven at trial,

13  would establish venue.

14          In fact, in that *Bohle* case, your Honor, what

15  happened is that the defendant didn't raise venue pretrial in

16  a motion under 12(b).

17          The Court later -- the Seventh Circuit said venue

18  was not pled -- venue was pled with specific facts, but that

19  was not sufficient.  If you prove those facts, you would not

20  have venue in the Northern District of Indiana.  And

21  therefore, when you didn't raise it, Mr. Defendant, you

22  waived it.

23          So everyone -- I don't think there is any dispute

24  that the government has got to plead specific facts in order

25  to have a -- to have venue for the conspiracy in Chicago, in

1    the Northern District of Illinois.

2         So there are three paragraphs in the indictment

3    that -- may I hand up a copy of the indictment to your Honor?

4         (Document tendered.)

5         MR. WEBB:  Your Honor, the overt acts in

6    furtherance of the conspiracy actually begin on Page 11.  I

7    believe that's how I read the government's indictment.  And

8    they go up to Page 17.  No.  They actually go further than

9    that.  They go all the way up to Page 19.  I apologize.

10        So I went through the indictment to find any

11   paragraph that sets forth any act by anyone in the Northern

12   District of Illinois, and I only see three acts that are

13   pled.

14        The first one is on Page 17.  And if you go to Page

15   17 of the indictment, at the bottom you have little Roman

16   numeral iv.  And I will just quickly read it.  It says, on or

17   about July 5th, 2009, Lal traveled from Chicago to

18   Greensboro, North Carolina, and thereafter, after getting to

19   North Carolina, informed Knopp about Individual C's planned

20   meeting with an Indian public official about bribery and then

21   later instructed a subordinate to pay fees to professionals

22   who were assisting with the project.

23        So that paragraph clearly on its face -- Lal is a

24   named defendant.  He is listed as a coconspirator.  But that

25   doesn't plead that Lal did anything at all in the Northern

1    District of Illinois in furtherance of the conspiracy.  They
2    contend that he traveled to North Carolina and then did
3    something in North Carolina.

4            Now, I believe that's because Lal was simply going
5    through Chicago on a plane, I think.  All I can do is accept
6    what's in the indictment.

7            But they plead that on July 5th, he is traveling
8    from or through Chicago.  And then, when he gets to North
9    Carolina, sometime after that -- I don't know when, a month,
10   a day, a year -- he does two acts, but those acts are not in
11   Chicago and cannot bring venue to Chicago.

12           The next mention of Chicago or the Northern
13   District of Illinois, your Honor, is on Page 18 of the
14   indictment, which is in the middle of the page.  It's little
15   Roman numeral vii, in the middle of the page, on Page 18,
16   which has that on about August 16th, Lal traveled from
17   Chicago to Greensboro, North Carolina, and thereafter
18   instructed a subordinate to transfer funds used to pay
19   publish officials and -- same type of language.

20           Again -- which again, there is no allegation that
21   Lal performed any act in Chicago in furtherance of the
22   conspiracy at all and is alleged to have done acts somewhere
23   else.  I'm not even sure where, because it just says
24   "thereafter."  So that's clearly not -- that's not an act in
25   the Northern District of Illinois.

1          Now, the only other paragraph that's left is
2    Paragraph H on Page 19.  If you go to Page 19 and you get to
3    Paragraph H, you have that long paragraph there, and your
4    Honor can read it.

5          The essence of this paragraph is that one or more
6    of the coconspirators used cell phones somewhere.  We don't
7    know where they used the cell phones.  Don't know if they
8    used them in the Northern District of Illinois.  But they
9    used cell phones with the intent to promote money laundering
10   and then later carried out acts to facilitate money
11   laundering somewhere.  We don't know where.

12         But there is no allegation whatsoever, your Honor,
13   that those acts were in furtherance of a money laundering
14   conspiracy, that they occurred in the Northern District of
15   Illinois.

16         The only thing that's alleged -- they do allege
17   that at some point one of the cellular telephones was located
18   in Chicago, Illinois, but that's all they say.  I mean,
19   having a cell phone in the Northern District of Illinois
20   could not be an act in furtherance of a conspiracy.

21         So the government clearly has not set forth -- and,
22   by the way, that paragraph, Paragraph H -- at least the other
23   two paragraphs do at least allege some facts that occurred
24   elsewhere that I think you could say are acts that, on the
25   face of it, could be in furtherance of the conspiracy.

1      Paragraph H doesn't even allege -- they just allege

2   the statutory language that thereafter someone promoted and

3   managed and carried out acts in connection with the

4   activities of the coconspirators.  And that's not what the

5   case law says.

6      Under *Bohle*, you need to be told what are the acts

7   you are going to prove at trial, with specific facts, to see

8   if they actually occurred.  And if you could prove them at

9   trial, would that be in furtherance of the conspiracy?

10      So Paragraph H does not add to the government's

11   ability to prove that.

12      So therefore, your Honor, if the government --

13   right now, based on this indictment, under the law that I

14   just discussed with your Honor, there is no proper venue pled

15   in this indictment which, your Honor could say, if proven at

16   trial, would establish venue in the United States.

17      Now, the government says, well, we have some other

18   arguments.  And I will touch upon them briefly.

19      They say, well, you know, there is a money

20   laundering statute, 1956, that has a specific venue pled --

21   set forth in the statute.  The statute is 18 USC 1956.  But

22   the venue provision is the one I have been talking about.

23   That statute pleads that venue needs to be a conspiracy that

24   has to be in the district where an act in furtherance of the

25   conspiracy took place.

1          Well, that's the very element that I am saying has
2    to be in every conspiracy under Seventh Circuit law.  So I
3    have already talked about that.

4          Count II is the money laundering Section 1956
5    discussion and conspiracy.  And there is nothing at all that
6    pleads any act in furtherance of the conspiracy.

7          The only three acts are the same three acts that I
8    just walked through with your Honor.

9          Now, the government at least -- I'm not sure
10   about -- the government at some point in its brief, your
11   Honor, I thought was trying to say, well, let's just wait and
12   see what we prove at trial, and don't worry about venue now.
13   They may or may not be making that argument.

14          But, your Honor, that argument cannot fly.
15   12(b)(3) of the Federal Rules of Civil Procedure require I
16   have to raise it now.  And that *Bohle* case clearly makes it
17   clear that they have to plead the facts now that they are
18   going to prove at trial.  And if they are not there, the
19   indictment should be dismissed.

20          The government also makes an argument at some point
21   in its brief that, as long as they just use the language from
22   the statute, that the acts occurred in the Northern District
23   of Illinois, and they say, we have done that.  We have used
24   that cookie-cutter language that all the acts occurred in the
25   Northern District of Illinois -- all the crimes occurred in

1    the Northern District of Illinois.

2           Your Honor, there is not a single Seventh Circuit

3    case that says that.  The *Bohle* case says exactly the

4    opposite, and so do all the other cases, which say that you

5    have to have an act in furtherance of the conspiracy pled in

6    the indictment.  You can't just say, well, the crime occurred

7    somehow in some way.  We all agree that you can have venue in

8    the Northern District of Illinois, even if they only have one

9    overt act in furtherance -- pled with specific facts that

10   your Honor can judge and say, that, if you proved at trial,

11   would be sufficient.  And they haven't done that.  Pleading

12   that occurred in the Northern District of Illinois clearly is

13   not correct.

14          And, by the way, of all the circuits -- the

15   circuits that have actually taken venue seriously, I think

16   the Seventh Circuit may have -- if you look at the cases we

17   cite in our brief -- the *Radley* case, the *Muhammad* case.

18          In the *Radley* case, your Honor, Judge Castillo took

19   a case -- this is decided in 2008 -- called the *Radley* case,

20   and he traces the constitutional requirements and the

21   importance of a defendant to have a right to have his case

22   charged properly in the judicial district where there is

23   proper venue.

24          And the court observed -- and I quote -- "These

25   constitutional venue guarantees are more than just procedural

1    technicalities.  They touch closely on the administration of

2    criminal justice and public confidence in our criminal

3    justice system."

4          And I respectfully suggest to your Honor, the idea

5    that we set aside all this law in the Seventh Circuit and

6    simply allow the government to say, well, we have said the

7    Northern District of Illinois.  We haven't pled any facts

8    that, if proven at trial, show that, that that's all we need.

9          So respectfully, your Honor, on this issue of

10   venue, because they haven't pled venue with specific facts

11   that are required by the Seventh Circuit, they haven't set

12   forth acts in furtherance of the conspiracy that occurred in

13   the Northern District of Illinois, as a result, this

14   indictment should be dismissed.

15         And if your Honor has no questions, I will have

16   Ms. Gurland address the other issues, if that's okay with

17   your Honor.

18         THE COURT:  Okay.  Thank you.

19         Ms. Gurland.

20         MS. GURLAND:  Good afternoon, your Honor.

21         I am here on behalf of Andras Knopp.  He is a

22   79-year-old Hungarian citizen.  Like the specific facts

23   mentioned by Mr. Webb in connection with Mr. Firtash, he is

24   not a U.S. citizen, and he doesn't have any businesses in the

25   United States.

1    Based on the indictment, there are no allegations

2    that he ever entered the United States of America in

3    connection with any act charged in this indictment.

4    Mr. Knopp, contrary to some suggestions in the

5    government's response, has been an active participant in both

6    the preparation and presentation of this motion.

7    The government responds -- states that this case is

8    just an inconvenience to Mr. Knopp because he can't travel

9    anymore at a whim.  I would just respectfully submit that

10   that's unfair to Mr. Knopp, because he finds himself subject

11   to a five-count indictment in this district that he believes

12   is impermissible under the law.  And it's for that reason

13   that I am here on his behalf in tandem with Winston and

14   Mr. Webb, Mr. Carter to address these legal issues.

15   I will be arguing from our brief and, just

16   corresponding to the order in the reply brief --

17   THE COURT:  Right.

18   MS. GURLAND:  -- Points 3 and 4 and 5, picking up

19   where Mr. Webb left off.

20   So the first argument is that Count I, the alleged

21   RICO conspiracy, is an impermissible extraterritorial

22   application of United States law, because there is not a

23   significant direct effect on U.S. commerce and because none

24   of the pattern acts on which the RICO conspiracy charge is

25   based can be applied extraterritorial.

1    And those pattern acts, your Honor, are the Count

2 II, which is the money laundering conspiracy; and Counts III

3 and IV, which allege Travel Act violations.

4    The second major topic that I will cover is that

5 the Foreign Corrupt Practices Act, Count V, does not apply

6 extraterritorially under the clear terms of the FCPA statute,

7 which does not apply to either Mr. Knopp or Mr. Firtash.  And

8 it would be my argument that it would be impermissible to

9 extend the application beyond the terms of the FCPA statute

10 by charging a conspiracy.

11    And finally I will address that the prosecution is,

12 in our view, a violation of both defendants' due process

13 rights.

14    I will discuss each of these in order, but first I

15 would like to raise two main principles that I think govern

16 all of these arguments.

17    The chief principle, your Honor, is that there is a

18 presumption against the extraterritorial application of

19 United States law.  It is a basic premise of U.S. law.  It

20 was articulated in the Supreme Court case *United States* v.

21 *Morrison* and most recently specifically affirmed in the

22 2016 Supreme Court case *RJR Nabisco*.

23    It is the defense view that the government does not

24 adequately acknowledge and appreciate that basic principle of

25 U.S. law.

1       Secondly, your Honor, the government's response in

2   the briefing in this case describes a very different case

3   than the one that was set forth in the indictment.  The

4   response claims that this case is a textbook example of a

5   transnational criminal enterprise.

6       But the indictment allegations are not that.  They

7   are that a group of foreign nationals participated in a

8   business venture to mine ilmenite in India and to then refine

9   it into various components that would be sold thereafter, one

10  of which was titanium sponge.  The indictment nowhere alleges

11  that the Indian project itself was anything less than a

12  legitimate exercise of a business venture.

13      The allegations of wrongdoing against the

14  defendants in general and against Mr. Knopp and Firtash in

15  particular are that the six defendants participated in a

16  scheme in which it's alleged that they agreed to bribe Indian

17  officials in India in connection with this Indian project.

18      But, your Honor, I believe that it's inaccurate and

19  unfair to say that this is a transnational criminal

20  enterprise.  In fact, this is no different from the mine-run

21  of FCPA cases in which some large U.S. transnational company

22  that does completely legitimate business is alleged to have

23  gone overseas in connection with some project overseas and to

24  have entered into a scheme to bribe somebody.

25      Those allegations, when made against a U.S.

1    company, would never be seen as converting every operation of

2    that large U.S. transnational enterprise into a criminal

3    organized crime violation.  And I would submit, your Honor,

4    that if we were just looking at the allegations in the

5    indictment, there is no reason that it should do so in this

6    case either.

7              The allegation of bribes in India, in other words,

8    doesn't convert legitimate business done in India, in terms

9    of mining and refining and selling product, into a criminal

10   enterprise.

11             So I would submit this is not a textbook example of

12   a transnational criminal enterprise, as the government says.

13   It is, rather, a textbook example of a case without any real

14   connection to the United States, which violates these

15   long-standing Supreme Court principles against

16   extraterritorial prosecutions.

17             So turning to the three specific arguments, your

18   Honor.  The first centers on Count I, the RICO conspiracy.

19             The RICO conspiracy, under the facts alleged in the

20   indictment, is an impermissible extraterritorial application

21   of the RICO statute.

22             And the first point, your Honor, the general point

23   that I want to make about RICO is that it really is the case

24   that -- looking at the *RJR* case, the 2016 Supreme Court case,

25   that was really kind of a watershed event in RICO

1   extraterritorial jurisprudence, because before then, the
2   cases went one way and cases went another as to whether or
3   not RICO could apply extraterritorially.

4           In that case, the Supreme Court said RICO can apply
5   extraterritorially.  However, there is a limit.  It's limited
6   in its extraterritorial application to the extent to which
7   the pattern acts underlying the RICO claim can be applied
8   extraterritorially.

9           So that was the sort of seismic shift in *RJR,* and
10  it really did change jurisprudence on this issue.

11          But importantly, the *RJR* case specifically
12  reiterated this general U.S. principle that there is a
13  presumption against the extraterritorial application of U.S.
14  law.  It said it, it cited the cases that form the basis of
15  that presumption, and it reaffirmed them.

16          The last general point, your Honor, is that the
17  government's briefing says that, because somehow they have
18  charged this 1962(d) violation, which Count I is under
19  1962(d), which is the RICO conspiracy, that maybe it's the
20  case that all of this analysis in *RJR Nabisco* shouldn't apply
21  because we are dealing with conspiracy.

22          But as it turns out, your Honor, in the *RJR* case,
23  one of the allegations was a RICO conspiracy, and the court
24  actually addressed that and said -- although they didn't
25  engage in a lengthy discussion, they said that they were

1    going to proceed and assume, without discussion, that the

2    RICO conspiracy, 1962(d), actually tracks the provisions

3    underlying the conspiracy.

4           So under *RJR*, then, your Honor, RICO can only apply

5    to extraterritorial conduct to the same extent to which the

6    pattern acts do.

7           And the RICO -- and I will come back to it, but the

8    *RJR* case also, in addition to making that holding, provided

9    some specific guidance as to how should a court analyze

10   whether or not the pattern acts themselves are able to be

11   applied extraterritorially.

12          The first component is just the general commerce

13   component.  Under *RJR,* there is a requirement that RICO

14   conspiracy allegations in an indictment must present

15   allegations that affect in a significant way commerce

16   directly effected to the U.S.

17          And incidentally, your Honor, even aside from the

18   pattern act analysis that I will cover after this, this would

19   be an independent reason, under the law, to dismiss the RICO

20   conspiracy.

21          If your Honor finds that there is not sufficient

22   allegations of a significant effect on commerce directly

23   affecting the U.S., that's enough to dismiss Count I.  This

24   requirement comes directly from *RJR*.

25          In the government's response, they claim that all

1   that is required in the indictment is just to say that there

2   is an effect on commerce and they really don't have to do any

3   more.  But, your Honor, under the law, they are incorrect.

4           What the indictment has to do and what the

5   government has failed to do in the indictment is to plead

6   facts that would establish the required effect on U.S.

7   commerce.  They haven't done that.  The government has not --

8   it's not enough, actually, to just assert that there has been

9   an effect on commerce without facts.

10          And how do we know this?  We know this because the

11  *RJR* case itself and other cases that are cited in the

12  briefs -- this *Hawit* case, the *Bank Julius* case that the

13  government cites, the *Prevezon* case -- all of those cases

14  arise not from a challenge to a result after a trial.  They

15  actually arise from a motion to dismiss, either a motion to

16  dismiss an indictment or a motion to dismiss a complaint.

17          And in analyzing this issue of the application of

18  RICO, the courts don't just accept the assertion that it's

19  been made in a complaint or an indictment.  They actually

20  analyze the facts.  And that's what, we would submit, must

21  also -- must be done under the law and should be done in this

22  case.

23          The allegation in the indictment that the

24  government claims establishes the required effect on U.S.

25  commerce principally is that Company A, which is a U.S.

1    company, intended to a buy a product, a by-product from the

2    mining and refining operation, titanium sponge, from the

3    project.

4            The defense argument is not that this never

5    happened.  Although, as it turned out, the project didn't

6    progress far enough, and actually Company A never really

7    bought anything.

8            But that's not our point, because when the

9    government says, look, it's a conspiracy; it's an allegation;

10   we have got to assume that everything in the indictment did

11   happen, and you have got to assume that, if there was an

12   agreement to do something, that's the same as doing it, they

13   are absolutely right.  Under general conspiracy law, they are

14   right.  And we don't take any issue with any of that.

15           Our assertion, though, is that, even if Company A

16   had bought this titanium sponge, even if they had done it,

17   that this would not establish the direct significant effect

18   on U.S. commerce required by the *RJR* case.  And that's for

19   several reasons, your Honor.

20           First, there is no allegation that Company A was

21   involved in any bribery scheme.  It has never been alleged

22   that they were aware of any bribery scheme, affected by any

23   bribery scheme.

24           There is also no allegation that the price that

25   they had agreed to pay for titanium sponge was affected in

1    any way by this alleged bribery scheme.  There is no
2    allegation of that.
3              In the government's response brief, they say that
4    it is an effect on U.S. commerce because there was an
5    agreement to -- and I think this is close to a direct quote.
6    There was an agreement to introduce illegally obtained
7    titanium sponge into the U.S. market.  And that was an
8    allegation that seems to be going directly to this allegation
9    of commerce.
10             However, that's also not what was charged in the
11   indictment.  There is actually no allegation in the
12   indictment that titanium sponge was actually ever going to
13   come to the United States.
14             Company A, although I won't say who it is, it's a
15   large operation.  It has operations all over the world.
16   There is no necessity that, because Company A bought
17   something, that it was necessarily going to be used or
18   transported into the United States at all.
19             And that's at -- the allegation about Company A is
20   at Page 3, Paragraph E.  We can see that all that they have
21   alleged, that there was a memorandum of understanding to
22   maybe supply titanium sponge, nothing about where it was to
23   come or where it was to be distributed.
24             In effect, then, the government's position would be
25   that any time that there is a scheme in a foreign country

1    that can be in any way connected to when a U.S. company or,

2    presumably, even a U.S. consumer was going to buy something

3    that was affected by this scheme, that there would be U.S.

4    jurisdiction.  And that would be even if the thing that the

5    consumer or the company bought was never even brought into

6    the United States of America.

7            I just submit to your Honor that that would render

8    this limitation in the *RJR* case absolutely meaningless, and

9    it can't be the law.

10           The government also, in terms of the commerce --

11   this commerce -- this prong of the RICO requirement, refers

12   to meetings in the United States.  I mean, there are a

13   total -- in the indictment there are a total of four meetings

14   in the United States, two with Defendant Gevorgyan.  That's

15   at Page 17, i and ii; and then one in -- one with Lal, and

16   that's on Page 18, number v.

17           But there can't, I don't think, be a serious

18   allegation that these distinct, limited meetings in the

19   United States could have an effect on the United States

20   commerce.

21           And again, to have this sort of approach toward the

22   significant and direct effect on U.S. commerce requirement in

23   *RJR Nabisco* I think would read the requirement into oblivion.

24   For this reason, the allegations in the indictment don't

25   satisfy that test.

1        The second reason that the RICO count, Count I of
2    the indictment, is an impermissible extraterritorial
3    application is that the first of the pattern acts on which it
4    was based, which is the money laundering conspiracy, cannot
5    be prosecuted -- the underlying money laundering conspiracy
6    cannot be prosecuted extraterritorially.

7        The government's position, as I understand it from
8    the brief, is that, under generalized conspiracy law, they
9    cite this *Glecier* case.  They say that all they have to
10   allege are sort of types of racketeering acts and they don't
11   have to allege the completed conduct.

12       Your Honor, we agree with that.  We agree that
13   under *Glecier* -- and we don't take any issue with anything
14   that they have said in their briefs about the application of
15   domestic conspiracy law.  And it gives the government broad
16   latitude, and everything they said about the law is accurate.

17       But where we take issue with the government's
18   briefing is that they try to claim that, because of these
19   domestic conspiracy principles, that that means that we don't
20   really have to engage in the *RJR* extraterritorial analysis.
21   And that's where we take issue, because the *RJR* Supreme Court
22   analysis of extraterritoriality is the law, and the
23   government has not adequately addressed the law in the
24   briefing of this case.

25       So first taking the money laundering statute -- and

1    the money laundering and the Travel Act are analyzed slightly

2    differently, and *RJR* does provide some guidance.

3         Taking first the money laundering statute.  The

4    Second Circuit, which was the underlying case in *RJR*,

5    concluded that the money laundering statute does apply to

6    extraterritorial conduct.  But that does not end the inquiry.

7         Under *RJR*, when a statute has been found to have

8    extraterritorial effect, the question as to whether or not

9    the statute can be applied extraterritorially in a specific

10   circumstance depends on the limits set forth in the statute

11   itself.

12        So in terms of money laundering conspiracy, we go

13   to 18 USC 1956(f)(1), which is a section that speaks about

14   jurisdiction over money laundering.  And that provision says

15   that, in the case of a non-U.S. defendant, a money laundering

16   prosecution is permissible in the U.S. if the conduct

17   occurred in part in the U.S.

18        And this would be another area in which our brief

19   and the government's brief overlap.  We both recognize that

20   this "in part in the U.S." test is what should be applied to

21   money laundering.

22        Here, the conduct that's alleged in connection with

23   the money laundering conspiracy is that defendants paid

24   bribes to Indian officials in India with money that came from

25   foreign bank accounts but was transferred through

1    correspondent banks in the U.S.  The government says this is

2    enough, and our argument is, the government is incorrect.

3           Now, in the government's response, they first say,

4    well, there will be evidence beyond just correspondent banks,

5    and that's where we are wrong, because, if this case were to

6    go to trial, they have some other evidence that they didn't

7    put in the indictment and that they will be raising that.

8           But respectfully, there is a line of cases, your

9    Honor.  One of them is *U.S. v. Gotti*.  It's impermissible to

10   expand -- in a discussion of a motion to dismiss to add facts

11   that were never pled in the indictment.

12          So I don't know if they can or can't -- what they

13   can or can't prove at trial, but I think what's before your

14   Honor are the allegations that the government contained in

15   the indictment, and those allegations don't have anything

16   other than this correspondent -- to connect the money

17   laundering fraud to the U.S. other than this correspondent

18   banking allegation.

19          But the government addresses that, and they cite

20   this *Bank Julius* case.  It was a civil *in rem* forfeiture case

21   out of Washington, D.C.  And They cite some language in *Bank*

22   *Julius* about correspondent banks.

23          But importantly, *Bank Julius* does not stand for the

24   principle that a transfer of electronic funds through a U.S.

25   correspondent bank, which is what we are dealing -- when we

1   are dealing with U.S. dollars, we are dealing with transfer

2   of -- electronic funds transfer through a U.S. correspondent

3   bank, because if you are denominating a transaction in

4   dollars, that necessarily has to happen.

5              THE COURT:  Okay.

6              MS. GURLAND:  So what the *Bank Julius* case actually

7   specifically held was that the use of U.S. currency, meaning

8   U.S. correspondent banks, alone is not sufficient under

9   1956(f)(1) to satisfy the requirement for prosecution in the

10  U.S. that the conduct occurred in part in the U.S.

11             And in *Bank Julius* the court specifically

12  recognized the limits of the money laundering statute

13  application of foreign conduct.  And the *Bank Julius* court

14  concluded, look, in a case like this, which was the *Bank

15  Julius* case, they actually had U.S. accounts.  They had U.S.

16  accounts -- I don't know if it was coming from or going to,

17  but U.S. bank accounts were being used.  We don't have that

18  here.

19             And the *Bank Julius* case actually made a specific

20  distinction and said, you know, it's much more complicated

21  and it's much more attenuated if all you have is

22  correspondent banks.  But that's not what we have here.

23             And in addition, the *Bank Julius* case reiterated

24  that it was the intention of 1956(f) to make sure that

25  jurisdiction in the United States was confined to significant

1  cases where the interests of the U.S. were involved.

2  Well, in this instance, your Honor, we would submit

3  there is not significant interests of the United States being

4  involved beyond what the *Bank Julius* court -- the case cited

5  in the government's own brief said it wasn't enough.  There

6  is not a significant interest.

7  The money didn't come from a U.S. bank account.  It

8  didn't go to a U.S. bank account.  And there are no

9  significant U.S. interests implicated to allegations

10  concerning the payment of bribes to Indian officials in India

11  in connection with a project that was unfolding entirely in

12  India.

13  So also, your Honor, it's our position that

14  Count II fails on its own.  Count II -- the money laundering

15  conspiracy charged in Count II fails on its own but also

16  fails as a way of supporting the Count I RICO conspiracy --

17  the RICO conspiracy in Count I.  So it fails as a pattern act

18  and fails as an independent count.

19  The same, we would say, your Honor, as to the

20  Travel Act pattern acts.  Those are Counts III and IV in the

21  indictment.

22  So it's not enough to just analyze one pattern act.

23  You have to analyze now the second pattern act, which is the

24  Travel Act.

25  As I alluded to earlier, the Travel Act is analyzed

1    slightly differently than is the money laundering, because
2    the Second Circuit in *RJR* actually looked at the Travel Act
3    and said, well, the Travel Act, by its terms, actually
4    doesn't overcome the presumption that the statute applies
5    extraterritorially.  Again, it doesn't end the inquiry.  It
6    just redirects it.

7            So when we were dealing with the money laundering
8    conspiracy, we had to look to the language of the statute.

9            Now, in the Travel Act, because we are dealing with
10   a statute that doesn't, on its face, have extraterritorial
11   application, the court directs you to try to figure out the
12   focus of the statute.  And the test under *RJR* for the focus
13   of the statute is whether conduct relevant to the statute
14   occurred in the U.S.

15           If conduct relevant to the focus of the statute
16   occurred in a foreign country significantly, it's
17   impermissible to apply the statute in the U.S., even if other
18   conduct occurred in the U.S.  So they are looking very much
19   at the focus.

20           So if the focus is internationally, it doesn't
21   matter if some incidental things occur in the U.S., because
22   what they are really after is, what was the focus?

23           So we are talking about the Travel Act.  The Travel
24   Act in Counts III and IV, they both charge that a
25   coconspirator traveled from Chicago to North Carolina to

1    promote the illegal activity of money laundering.

2           The whole Travel Act is important, your Honor,
3    because, of course, it can't be a crime just to travel from
4    one place to another.  The important part of the Travel Act
5    is that you travel from one place to another in order to
6    accomplish some illegal objective.  That's the essence of the
7    Travel Act.

8           Here, the underlying money laundering allegations
9    all surround India.  It's an allegation that there was
10   illegal conduct, bribes in India, making bribe payments to
11   Indian officials in India, in connection with India.

12          So I would submit that, looking at the illegal
13   conduct that's alleged, it's practically enough to understand
14   that the focus is India.  But there are some tests, and it's
15   a relatively new area of the law.

16          There are two cases that provide some guidance
17   about how to assess the focus of the statute.  I didn't find
18   any cases that analyzed how to assess the focus of the Travel
19   Act statute, but I found two cases -- well, the government
20   actually found one and I found the other -- that assess the
21   wire fraud, that assess wire fraud in terms of how you
22   decipher the focus of wire fraud.

23          Although it's a slightly different statute, I would
24   submit that they could provide guidance, because we don't yet
25   have a lot of guidance with this *RJR* case being so new.

1    So under the *Bank Julius* case that the government

2    cited, one could find that the focus of -- one can assess the

3    focus of the statute by seeing that the defendant either

4    committed a substantial amount of conduct in the U.S. or that

5    the conduct that occurred in the U.S. was integral to the

6    fraud or that the wire transfers happened in the U.S.  So we

7    will leave it there, that it's not really relevant here.  But

8    we can look at whether or not there is a substantial amount

9    of conduct and whether or not the conduct that there was, was

10   integral.

11   The *Hawit* case, out of the Eastern District of

12   New York, said that when you are analyzing focus, you should

13   have a holistic assessment of the conduct, but it did mention

14   that incidental or minimal use of U.S. wires, in that case,

15   was not enough.

16   So first, in this instance, the allegations of

17   Travel Act violations in the indictment that were made were

18   not integral to the fraud.  So what we are talking about is

19   Counts III and IV of the indictment.  At Page 22 and 23 of

20   the indictment, they allege travel between one of the

21   coconspirators between Chicago and North Carolina without

22   more detail.

23   I believe that I have located -- I believe that the

24   more detail can be found at Page 17 and 18 of the indictment,

25   Paragraphs 4 and 7, where it's alleged that Defendant Lal

1    traveled from Chicago to North Carolina, and then, after that
2    travel, had a conversation, in some cases with a supervisor
3    and in some cases with a subordinate, some conversations that
4    were allegedly in connection with the bribery scheme.

5           But importantly, your Honor, I think that it would
6    be difficult to argue that there would be any requirement
7    that Lal traveled from Chicago to North Carolina, or indeed
8    from anywhere to anywhere, in order to have this kind of
9    correspondence with a subordinate or with a superior.  He
10   could have had these conversations anywhere in the world.

11          So in that, the travel was not integral to the
12   fraud that was charged in the indictment.  It just simply
13   had -- the travel was incidental, as the *Hawit* case said was
14   not enough, and it had nothing to do with the fraud that was
15   alleged.

16          By the same token, your Honor, I would say that
17   under the first prong of the *Bank Julius* case, the conduct
18   that was in the United States wasn't substantial.  And I
19   think it's important, your Honor, to note that, in all the
20   motion practice before this Court, we are always talking
21   about the allegations of Lal's travel and email and computer
22   use that are at Pages 17 through 19 of the indictment.

23          And the reason that our focus is always there is
24   because these actions of Lal and, in some circumstances, this
25   other defendant, Gevorgyan, are really the only connection in

1    the indictment between anything that's happening in the

2    Indian bribery scheme and the United States.

3         But importantly, the allegations that are actually

4    the basis of the conduct in the indictment, looking at sort

5    of Page 1 through 10, those allegations center on the claims

6    that foreign nationals participated in a scheme to bribe

7    Indian officials in India.

8         They talked about planning for this offense.  They

9    talked about commission of this offense.  They talked about

10   concealment of this offense.  And all of those prongs of this

11   substantive offense of alleged bribery conspiracy, all of

12   those things occur outside of the United States.

13        Given that the only thing that occurs in the United

14   States is some travel by two of the defendants, it appears

15   very much incidental to anything, your Honor.  It would be

16   our position that the Travel Act counts, Counts III and IV of

17   the indictment, do not apply extraterritorially, nor do those

18   counts form a sufficient basis as a pattern act for Count I,

19   the RICO conspiracy violation.

20        So I am going to move on to the second, which is

21   much shorter.  It's just that that was actually pretty

22   complicated legal -- a lot of complicated legal arguments.  I

23   anticipate these will go slightly more quickly, your Honor.

24        The second of the two legal arguments that I'm

25   addressing is that the Foreign Corrupt Practices Act charged

1    in Count V of the indictment can't be prosecuted in the

2    United States, because Mr. Firtash and Mr. Knopp do not fall

3    into any of the enumerated categories to which the FCPA is

4    meant to apply and that that result should not be altered

5    through charging them with conspiracy.

6            So again, there is some points that the government

7    and we agree on.  I think there can be no doubt that

8    Mr. Firtash and Mr. Knopp don't meet any of the three parties

9    that it states in the FCPA that it applies to.  That's a

10   domestic concern.  They are definitely not that.  And a

11   U.S. citizen acting outside the U.S.  They are not that.  And

12   a person who acts in the territory of the U.S. who, I guess,

13   could presumptively be a foreign national, but who acts -- a

14   person who acts in the territory of the U.S. in furtherance

15   of a corrupt payment.  And there is no allegations in the

16   indictment that, with respect to Mr. Firtash or Mr. Knopp,

17   that they took a single action in the United States in

18   connection with a corrupt payment, not a single one.

19           So that's where I think the government would not

20   disagree with any of this.

21           Where the government and the defense part ways is

22   that the government would say, okay, even accepting that

23   that's true, we have charged conspiracy.  So under conspiracy

24   and under general conspiracy principles, you can be

25   responsible for what another coconspirator does even if you

1    are not acting in the same place where they are acting.

2              We don't disagree that, as a matter of general

3    conspiracy law, that would be the case.

4              But what -- our contention is something different.

5    It's that it's a special circumstance when you have a statute

6    that actually takes the time and goes to the trouble of

7    enumerating people who can violate that statute.  And our

8    contention is that, when they do that, that Congress meant to

9    restrict people who should be charged to the people

10   enumerated in a statute, and that you shouldn't avoid the

11   result of what Congress drafted carefully -- you presume

12   drafted into the statute -- by simply charging a conspiracy

13   and then accessing people through conspiracy that you

14   couldn't access directly under the statute.

15             So this principle -- and the government is right.

16   It stems from sort of an unusual case, this *Gebardi*

17   principle.  But we would part ways with the government.  We

18   don't think that this principle is quite as narrow as they

19   would have it.

20             The principle is that, if Congress chooses to

21   exclude a class of people for liability under a statute, then

22   the executive can't simply override that by charging them

23   with conspiracy.

24             There is a case, *United States v. Hoskins*.  It's a

25   Connecticut case.  But interestingly, the *Hoskins* case

1    applied that exact reasoning to a defendant who is exactly --
2    who is situated exactly like these defendants.

3          The defendant in *Hoskins* was an individual who was
4    a foreign national, and they didn't allege that Hoskins took
5    any actions in the United States.

6          The *Hoskins* court -- it was actually a very -- it
7    was a lengthy -- it was a very, in my view, anyway, a very
8    well-reasoned opinion.  It went through in enormous detail
9    the legislative history of the FCPA statute, tried to figure
10   out through the various iterations and amendments of the FCPA
11   statute, what was Congress trying to do.

12         And one of the conclusions that the *Hoskins* court
13   made, your Honor, in looking at the FCPA statute, is that
14   Congress was very cautious when it drafted the parties to
15   whom FCPA should apply and that, even if there were
16   individuals who could theoretically have been charged with
17   bribery, Congress made a specific decision not to allow
18   certain people to be prosecuted under this act.

19         In the *Castle* case, the Fifth Circuit applied the
20   precise same reasoning, but *Castle* barred foreign officials,
21   which is slightly different, because here we are -- we argue
22   that what should be barred are foreign nationals not acting
23   in the U.S.  But the *Castle* case had the same exact analysis,
24   finding that if the FCPA statute was drafted to exclude
25   certain parties, then you shouldn't avoid that result by

1   charging them with conspiracy.

2         The government has several arguments against this,
3   which I will go through very briefly, none of which we think
4   is compelling.

5         First is that they say that, because defendants
6   Knopp and Firtash are not necessary parties to the FCPA, that
7   the exclusionary principle articulated under *Gebardi* and as
8   adopted in *Hoskins* and *Castle* shouldn't apply.

9         This approach is actually based on a Seventh
10  Circuit case called *Pino-Perez*, but the government actually
11  misapplies the reasoning of the case.

12        *Pino-Perez* didn't involve FCPA at all.  It involved
13  an analysis of the "kingpin" statute, which is 21 USC 848.
14  The kingpin statute is a statute that increases the penalties
15  for major drug dealer supervisors.  The statute provides for
16  increased penalties if the defendant has a series of, like,
17  five drug transactions and has a supervisory role.

18        The issue in *Pino-Perez* for the Seventh Circuit to
19  assess was whether or not, under the drug kingpin statute,
20  that could apply to aiders and abetters as a matter of
21  statutory construction.

22        In trying to figure out what the proper statutory
23  construction was, the court in *Pino-Perez* found that if a
24  crime is defined so that participation by another party is
25  necessary to commit the crime, then that party can't be an

1    aider and abettor.

2            And what they were trying to do, your Honor, is to
3    look at what -- they made an assumption that if a court knew
4    that there was a necessary party and chose not to include
5    that party in liability, then the court must have intended
6    that that party not have liability.

7            What the court stated in *Pino-Perez* is -- the
8    *Pino-Perez* exception is that if a statute specifies who can
9    be guilty of a crime necessarily involving one or more
10   others, then the legislature didn't mean to include the
11   others in the crime.

12           But I think properly applied -- I think it's
13   important it's outside the FCPA arena.  But if you apply this
14   to FCPA, you are talking about a crime necessarily involving
15   one or more parties.

16           Well, FCPA necessarily involves one or more
17   parties.  And in a crime necessarily involving one or more
18   parties, if you don't put the party that you want to charge
19   in the list of parties that it should apply to, I think
20   *Pino-Perez* -- I would assert that *Pino-Perez*'s Seventh
21   Circuit case stands for the principle, then, they weren't
22   meant to be included.  They weren't -- if you haven't
23   included them and they are necessarily part of it, then they
24   weren't meant to be included.

25           That would mean that Knopp and Firtash, as foreign

1    nationals, who never acted inside the U.S., would be excluded
2    from the people who should be prosecuted under FCPA.

3        This conclusion, while we are never on absolute
4    solid ground when we are analogizing something like the drug
5    kingpin statute to FCPA, but I think my interpretation of
6    this is amply justified by principles in *RJR Nabisco* and
7    *Morrison*, the Supreme Court cases about the presumption
8    against extraterritoriality, because both of those Supreme
9    Court cases hold that when a U.S. statute has some
10   extraterritorial application, the presumption against
11   extraterritoriality operates to limit those provisions to
12   their precise terms.

13       I think what that means in this case is restricting
14   prosecution of Mr. Firtash and Mr. Knopp to the precise terms
15   of FCPA under which they are not parties that can be
16   prosecuted, just as *Hoskins* and *Castle* had held should not be
17   able to be prosecuted under the FCPA.

18       Another of the government's arguments is that
19   somehow, if this were the result, that neither Knopp nor
20   Firtash could be prosecuted under FCPA, that this would be
21   some violation of the OECD convention, because United States
22   was supposed to take seriously foreign corruption.  But I
23   think that *Hoskins* went through and I think pretty much
24   dispensed with that argument.

25       And the bottom line that *Hoskins* found is that --

1    Article 4 of the OECD convention is the portion on
2    jurisdiction, and that portion of the convention provides
3    that signatory states are to take all measures necessary to
4    establish jurisdiction when the offense, one, is committed in
5    its own territory; or, two, by its own nationals while
6    abroad.

7            Well, interestingly, your Honor, those two
8    jurisdictional requirements set forth in the OECD convention
9    parallel exactly what the FCPA says, that they would govern
10   action in U.S. territory, and they would govern nationals
11   committed while abroad.

12           What we are arguing for is exactly what the
13   provisions in the OECD jurisdictional article specify.  And I
14   would submit that because the OECD convention would specify
15   those categories and would not include foreign nationals that
16   don't act in the United States, it's actually support for the
17   defendants' position, that the FCPA should not have applied
18   to them.

19           The government has -- and it's in our briefs.
20   There was some suggestion that a conspiracy case, *Ocasio*,
21   changes the analysis, that another kingpin statute changed
22   the analysis.  Those arguments are in our brief.  I won't
23   take up any more of the Court's time on FCPA.

24           I want to move to the final part of the argument,
25   being that it's our position that this prosecution violates

1    defendants' due process rights.

2          I guess I should first briefly assess that it is

3    our position that, yes, defendants do have due process

4    rights, notwithstanding the fact that they are foreign

5    nationals.  And the government says that there is no Seventh

6    Circuit case that specifically engages in some lengthy

7    discussion, but I don't think that that's necessary, because

8    there is a Seventh Circuit case, really, on all fours with

9    what our discussions are here today, which is *United States*

10   *v. Hijazi*, H-i-j-a-z-i.  And that case it's remarkably

11   similar to the facts of this case.

12         In *Hijazi*, like this case, it is about foreign

13   nationals.  Incidentally, in *Hijazi* the foreign national in

14   question wasn't in the United States, hadn't come to the

15   United States, hadn't been arraigned, and that individual

16   filed a motion to dismiss for extraterritorial jurisdiction,

17   lack of jurisdiction.  And the district court just didn't act

18   on it.  Just kind of waited and waited to see, well, he is

19   not here.  Is he going to come here?  What's going to happen?

20   And deferred ruling.

21         Also in *Hijazi*, specifically the defendant alleged

22   that there was a due process violation.  There was a

23   violation of his due process rights.

24         And the Seventh Circuit had an occasion to look at

25   this in some detail, because what they eventually did is,

1    they issued a writ of *mandamus*, directing the district court

2    to rule on the defendant's jurisdictional motion, directing

3    them to, and in that, directing them to rule on the portion

4    of the argument which was the Fifth Amendment due process

5    rights.

6         So while *Hijazi* didn't go into a lengthy discussion

7    as to whether or not a foreigner could have due process

8    rights, it certainly proceeded on the assumption that the

9    defendant in that case did have due process rights.

10        And then, cited in our brief, your Honor, there is

11   a number of other cases.  Although they don't always engage

12   in a lengthy discussion, although some do have some

13   discussion, there is uniformly in the Northern District and

14   in the Seventh Circuit the presumption that, if a foreign

15   defendant raises Fifth Amendment due process rights in the

16   court, the court should take up the discussion of those

17   rights and that they have those rights.

18        THE COURT:  What happened with Mr. Hijazi on

19   remand?  What did the district court do?

20        MS. GURLAND:  On --

21        THE COURT:  On remand.  After the Seventh

22   Circuit -- well, I shouldn't say "remand."  After the

23   *mandamus* issued, what happened to Mr. Hijazi?

24        MS. GURLAND:  I think that they -- I don't know

25   what they finally ruled as to whether or not that his due

1    process rights were violated in that case.

2          THE COURT:  That's what I was wondering.  All

3    right.

4          MS. GURLAND:  Then, from there, your Honor, once

5    you accept that the *Hijazi* case and others establishes that

6    these foreign nationals have due process rights, the issue

7    becomes how, then, to analyze those due process rights.

8          This is another area in which the defense and the

9    government are in agreement.  We both believe that, as the

10   lower court in *Hijazi* alluded to, and the Seventh Circuit

11   came back and said, yes, we believe that the proper analysis

12   in the Seventh Circuit is an international law analysis,

13   which means that you would proceed under Sections 402 and 403

14   of the Restatement (Third) of Foreign Relations.  So under --

15   that's what the test would be under the Seventh Circuit for

16   due process rights.  So it's in four parts.

17         First, there is the requirement that the -- it

18   would be a due process violation unless conduct occurred

19   wholly or in substantial part in the United States.

20         So obviously we know that we are not talking here

21   about conduct that occurred wholly within the United States,

22   because there was plenty of conduct that took place not in

23   the United States.  But in assessing whether or not it's

24   substantial, there is just a whole list of things that had

25   nothing to do with the United States.  There is zero

1    allegation that any of the defendants met with each other in

2    the United States to talk about a bribery scheme.  There is

3    no allegation that they ever talked to or emailed with, like,

4    Indian officials who were supposed to be bribed in the United

5    States.  There is no allegation that anybody paid any Indian

6    officials in the United States.

7            There is no allegation that U.S. bank accounts were

8    used to transfer money from these accounts.  There is no

9    allegation that U.S. banks were used to receive money in

10   these accounts.

11           There is no allegation, as was in *Sidorenko* -- in

12   the *Sidorenko* case -- and it wasn't even found to be

13   enough -- that somehow the United States Government funded a

14   portion of some of the operations going on.  There was no

15   question of U.S. Government funding anything in this case.

16   It was -- anything in the U.S. was a private company going to

17   maybe buy something.

18           There was also no allegation that any of the

19   discussions that are alleged in the indictment about

20   concealing their activity or hiding their activity,

21   disguising their activity, that any of those things happened

22   in the United States.

23           So what the government says is -- again, at Page 17

24   to 19, some travel by a couple of people within the U.S. and

25   phone and email use, U.S. correspondent banks.  And, your

1    Honor, it's our position, as I had to go through with you

2    earlier in the analysis under RICO, it's not substantial

3    conduct in the United States of America.

4            And particularly relative to all of the things that

5    are charged in the indictment about this massive, they say,

6    bribery scheme in India, with Indian officials, especially in

7    comparison to all of the things that they allege that are

8    happening in India, it's our position that it's incidental,

9    it's minuscule, and it's insignificant.

10            Secondarily, under the Restatement, it would be a

11   due process violation if the allegations in the indictment do

12   not establish the intent to have a substantial effect in the

13   U.S.

14            This requirement sort of grew up around the

15   mine-run of cases in which you have these kind of

16   discussions, which are drug cases, in which somebody is

17   saying, okay, well, you did all of this preparation outside

18   the U.S.  You conspired outside of the United States.  You

19   didn't do anything within the United States.  But what your

20   intention was, was to introduce huge amounts of drugs into

21   the United States that people could illegally buy and suffer

22   from.

23            So in cases like that, as is the case in terrorism

24   cases, for example, you could have foreign defendants

25   planning all kinds of nefarious things outside of the United

1    States, nothing to do with United States.  But ultimately, if
2    there was going to be -- I mean, I guess on this day, it's a
3    very appropriate day to discuss it, on the anniversary of the
4    tragedy that befell this nation on September 11th.  But in
5    terrorism cases -- and there is a huge expanse in the
6    jurisdiction that U.S. courts were willing to allow in such
7    circumstances.  And that connection would be some people
8    acting from outside the United States to hurt or damage
9    United States interests or United States citizens in the
10   United States.

11          In cases like that, when there is some intent to
12   cause harm or damage in the United States, quite reasonably
13   United States courts have routinely found that, no, you can't
14   direct and intend to cause damage to United States citizens
15   or interests in the United States and avoid prosecution here
16   under a due process analysis.

17          Well, your Honor, this case is nothing like those
18   cases.  There is nothing that would show that these
19   individuals are engaged in transnational criminal activity or
20   anything like this.  There is some allegation -- there is
21   U.S. correspondent banks.

22          But again, even if Company A had bought titanium
23   sponge, I mean, this is not going to have some enormous
24   effect on U.S. commerce, particularly because they can't even
25   allege that this titanium sponge that they never bought was

1    even going to come into the United States.  And it's just --

2    it's absolutely different than the cases that would expand

3    jurisdiction to protect U.S. citizens and a violation of due

4    process.

5          The next point under the Restatement -- this is

6    402(3) -- is that you can -- it's not a due process violation

7    if the activity is designed -- there is a significant U.S.

8    interest.

9          Again, it's the same sort of thing.  Security

10   threats, terrorism cases, drug cases targeting our nation.

11   In that, your Honor, when the government talks about this

12   case and it talks about transnational organized crime,

13   criminal operations, I think it can't be emphasized enough

14   that the reality is just different.

15         There is no allegation that there was anything

16   wrong with this mining and refining operation in India.

17   There was no problem that was going to hurt India or hurt the

18   United States or hurt any United States interests in titanium

19   sponge or anything else.  There is just nothing like that.

20         Just to appreciate just how different this case is,

21   the facts of the *RJR* case -- in the *RJR* case, it was an

22   allegation that there was this global drug smuggling

23   conspiracy involving organized crime and involving getting

24   money paid in euros through a black market.  In fact, that

25   was what the *RJR* case was about.  But in that case, U.S.

1    companies were actually involved in it, and U.S. wires were

2    actually integral, like critical to these operations.

3            In this case, this case is just, respectfully,

4    absolutely nothing like the cases -- the mine-run of cases

5    that you would even see in a due process analysis, because

6    it's so far outside the confines of anything that anybody

7    would reasonably try to prosecute in the United States.

8            Which leads me to my last point.  The prosecution

9    is not reasonable.  That's under Restatement 403(2).

10           It's a fact-specific inquiry, of course, that they

11   give just a few examples of what might be some factors to

12   consider in assessing reasonableness.

13           One is, again, the extent to which the activity has

14   a substantial, direct foreseeable effect on the U.S.  We have

15   been through that several times.  I won't go through it

16   again.

17           Two, the character of the activity to be regulated.

18   Here, the character of the activity -- I think they are

19   looking for somebody to say, you know, guns or drugs or

20   terrorism.  No.

21           Here, it's the character of the activity is the

22   allegation of bribing foreign officials in a foreign country

23   in connection with foreign operations.  That's the character

24   of the activity to be regulated.  Your Honor, we respectfully

25   submit, it should not be regulated.

1          Another point is the justified expectation that

2    somebody might have that they would be protected and they

3    would be hurt.  I would hearken back to what Mr. Webb said at

4    the beginning about his client.  He doesn't speak English.

5    He has never been to the U.S.  Has no business here.

6          Mr. Knopp does speak English but has never been

7    here.  No business interest here.  They have done nothing

8    that's alleged in the indictment that was here.

9          And I think they would have a reasonable

10    expectation that they wouldn't be hailed into court in the

11    Northern District of Illinois, or even in the United States,

12    based on operations and allegations occurring entirely within

13    India.

14          The last two points, the extent to which the

15    prosecution would be consistent with traditional --

16    traditions of the international system.  Well, your Honor,

17    there is no more -- there is no stronger tradition of the

18    international system than the presumption against

19    extraterritoriality; whereas, other cases have said that the

20    United States, it can enforce its laws, but it's not the

21    policeman of the world.  And it's something that the U.S.

22    comes under fire for from time to time.  That's why we have

23    this presumption, and it should be enforced.

24          And finally, the extent to which another state may

25    have an interest in regulating the activity.  Well, your

1    Honor, if any state or nation has an interest in regulating
2    the activity here, I expect it would be India, because the
3    allegations are that Indian public officials took bribes, in
4    India, in connection with Indian mining and refining
5    operations.

6            I don't know the precise status of what people are
7    doing in India, but certainly, if we are assessing what state
8    could have some interest in prosecuting this case, I would
9    assume it would be India, not the United States, where
10   absolutely, with very little, other than incidental, conduct
11   even happened, and there was practically zero effect on
12   anything involving the U.S.

13           THE COURT:  All right.  Thank you, Ms. Gurland.

14           I want to hear from the government.  Let's take a
15   five-minute recess.

16           (A brief recess was taken at 3:30 p.m. until 3:43 p.m.)

17           THE COURT:  You may be seated.

18           All right.  Mr. Bhachu, you have a response for us?

19           MR. BHACHU:  Yes, Judge.

20           And if I might, Judge, I have my colleague from the
21   fraud section in Washington.  Jonathan Robell has come out --
22   flown out for this proceeding.  I would ask, if I might
23   respectfully, to have Mr. Robell, after I am done giving you
24   some thoughts, address the FCPA challenge, if that's
25   possible.

1              THE COURT:  That's fine.

2              MR. BHACHU:  Thank you, Judge.

3              Judge, we have been here for probably about a good

4   hour and a half now.  I certainly would invite you, if you

5   have any questions of me, to -- so that I don't just drone on

6   myself, I welcome any questions you might have as I am

7   talking.  If I can address anything that would be helpful to

8   you, I appreciate you letting me know.

9              THE COURT:  Okay.

10             MR. BHACHU:  Judge, with regard to the arguments

11  that were raised, I think we can start, first off, with the

12  issue of ripeness that was discussed by Mr. Webb.

13             First off, there is a suggestion that the

14  proceedings in Austria are over, but that's tagged on to --

15  or the statement tagged on to that is that the Austrian

16  Supreme Court is still engaged with the case, because there

17  has been a discretionary appeal that's been filed with the

18  Austrian Supreme Court.

19             THE COURT:  Have they taken the appeal?  Do you

20  know?

21             MR. BHACHU:  I don't know if they have taken the

22  appeal or not.  So far as I know, no decision has been made

23  as of today.  Sometimes it takes a little while for us to

24  find out what's going on in Austria, as you might imagine.

25  But I know an appeal has been filed.  I know there was a 70-

1    to 80-page document that was filed on behalf of Mr. Firtash.

2          So to say that everything is over in Austria, I

3    don't think is really correct.  It may be that the Austrian

4    Supreme Court can decide that they are not going to hear the

5    case, but we simply just don't know right now what is going

6    to happen.

7          THE COURT:  Was Mr. Webb right that there is no

8    stay?

9          MR. BHACHU:  Well, from what I understand, Judge,

10   the Ministry of Justice is not going to act to extradite

11   Mr. Firtash until proceedings before the Austrian Supreme

12   Court have been concluded.

13         I have gotten no indication.  And, frankly, I think

14   I would have gotten indication to the contrary, because

15   Mr. Firtash lost in that appeal, I believe, back in

16   February -- at the end of February.  So if it were the

17   case -- I am obviously anxious to get Mr. Firtash back

18   here -- we would have taken the appropriate steps to bring

19   him back here and we wouldn't be having this inquiry.

20         If it's, in fact, true, as Mr. Webb says, that the

21   proceedings are within weeks or months of concluding and that

22   they will conclude shortly, then, I guess, as a practical

23   approach or a question kind of raises its head, which is, why

24   not wait, then?  Why not wait for Mr. Firtash to actually be

25   here?  If it's just going to be, as Mr. Webb suggests, a

1  matter of a couple weeks or several weeks, what's the harm in
2  waiting?
3          There is a benefit in waiting, and that is that, if
4  a decision is rendered by this Court that is adverse to
5  Mr. Firtash, we can be confident that Mr. Firtash will
6  actually be bound by the decision, that he is not going to
7  decide, as he is right now in Austria, if he hears that the
8  court renders an adverse decision, he is going to hop on a
9  private plane -- that's the way he gets around -- and head
10 over to Moscow or some other country where we can't extradite
11 him.
12         By the same token, I think that, with regard to
13 Mr. Knopp, we heard today that he is an old man and he wants
14 to travel.  But I look back to the filing that he made.  In
15 his initial motion to dismiss, on Page 1 of that motion, he
16 indicates, effectively, that he was quite content to not do
17 anything.
18         And it says -- and I am reading from his filing --
19 "Knopp has maintained his silence in the face of Firtash's
20 battle against extradition from Austria."
21         And then it says, "However, with the decision
22 having been made on February 21st, 2017 --" alluding to the
23 decision to extradite Mr. Firtash "-- he can no longer
24 refrain from addressing this injustice."
25         So the only reason that he makes -- or gives, at

1    least initially, for why this motion has been filed is

2    because Mr. Firtash has been ordered extradited.

3              What I would suggest to your Honor is, at a

4    minimum, that we wait for Mr. Firtash to come back here, and

5    then we can consider whether or not it might be appropriate

6    to consider Mr. Knopp's motion to dismiss.

7              One of the concerns I have, too, is, having watched

8    the extradition proceedings unfold for about three years in

9    Austria, I have been watching what Mr. Firtash and his media

10   representatives have been saying over there, what they have

11   been saying both to the media and to the court.  There have

12   been a lot of statements there that we are not in a position

13   to correct, because we are not in Austria, that are full of

14   statements that are just simply not accurate.

15             And I am concerned that if we go forward and we

16   have this type of decision now, how that might be used or

17   misinterpreted in Austria.

18             There was a suggestion, I think even in one of

19   these filings, that the United States was responsible for

20   Spain charging Mr. Firtash in Spain.  That is untrue, but

21   nonetheless some of the attorneys from Austria do not feel

22   constrained to suggest that that is, in fact, the case.

23             So there is a concern that what happens here and

24   how it is portrayed in Austria is something beyond our

25   control.  And that's why we have a great concern about moving

1    forward until we actually have Mr. Firtash here in our

2    jurisdiction.

3              I think, given the fact that the defense claims

4    that his appearance here is imminent, we will pay for his

5    cost of travel here.  So it may be inconvenient, but he has

6    been effectively detained in Austria for three years.  If it

7    is in fact so, that he is entitled to have his claim heard,

8    there is no reason why he can't wait a couple more days or

9    weeks after having been detained for three years in Austria

10   during the course of the extradition proceedings.

11             With regard to the issue of venue, our brief -- it

12   was pretty lengthy.  I apologize for that, but there was a

13   lot to cover.  But our brief does cover this issue of venue

14   quite extensively, and there were some things that were

15   talked about by Mr. Webb and some things that were not talked

16   about by Mr. Webb with regard to venue.

17             We would point, first of all, the Court to the case

18   from the Fourth Circuit, which has been adopted, recited with

19   approval by the Seventh Circuit.  That's the *Engle* case,

20   which is referenced on Page 27 and 28 of our brief.

21             And effectively that *Engle* case says that where the

22   government alleges in a criminal indictment that the offense

23   occurs in a particular district and elsewhere, that that is

24   sufficient to deny a pretrial motion for venue.

25             There is some suggestion that, no, we must actually

1    set forth a litany of facts about all overt acts that may

2    have taken place in this district.  That's simply not the

3    case.  We do not agree with the defense about that.  That is

4    not the law.  If that were the law, can you imagine how many

5    narcotics indictments that come through this courthouse every

6    month that just allege in one paragraph that the crime

7    occurred in the Northern District of Illinois and elsewhere,

8    what type of deficiency we would have there?

9         THE COURT:  Except usually it's really not

10   contested.

11        In this case -- because usually, when you are

12   dealing with drug deals, they happen kind of all over and

13   certainly happen here.

14        The argument here is that all the acts occurred --

15   at least, that's what I understand the argument to be -- all

16   the acts occurred in India or mostly in India.  They involved

17   bribes paid to Indian officials about a product that was

18   being generated there for transfer outside of India to all

19   over the world, I guess, but also to here.

20        I guess I am troubled by the fact that there is no

21   allegations specifically about the Northern District of

22   Illinois.

23        What does show up in the indictment -- I mean, the

24   three that Mr. Webb spent some time on, we looked at those.

25        There is also the matter of -- there are

1    allegations, for example, in -- I guess these are all money

2    laundering allegations -- about travel from the Northern

3    District -- in the Northern District of Illinois, from

4    Chicago to Greensboro.  I assume those are other defendants

5    besides the ones that are before us.

6          MR. BHACHU:  Yes, Judge.  Let me try to address

7    that, then.  One baseline thing, I think, to talk about, as

8    it relates to the offenses charged.

9          So the 1956 offense, which is one of the

10   racketeering predicates in this case, is promoting specified

11   unlawful activity, engaging in financial transactions to

12   promote specified unlawful activity.

13         And you just mentioned earlier -- and I think it's

14   important to kind of talk about this -- that, look, this

15   involved a bribery scheme involving Indian public officials.

16         Congress has said that a specified unlawful

17   activity under 1956 is the bribery -- or bribery of a foreign

18   official in violation of foreign law.

19         So if you engage in activity that relates to the

20   bribery of a foreign official; i.e., financial transactions

21   to promote that activity, that is a violation of U.S. law.

22         And the reason why that's in there is because

23   Congress added that so that we were in compliance with our

24   treaty obligations.  We have these treaties to counteract

25   bribery throughout the world that are treaties that had been

1   signed by dozens, if not over 100, countries with regard to

2   both the Palermo Convention, which we talked about, that

3   governs cooperative efforts with regard to transnational

4   organized crime, as well as the bribery conventions that we

5   also mentioned in our filings.

6           So while it is true that the bribery was taking

7   place or was -- concerned Indian public officials, what is

8   also true is that the transactions that are alleged to have

9   taken place in the indictment concern payments that were made

10   from or to the United States in furtherance of that bribery

11   activity.  And that is something perfectly within the scope

12   of that statute.

13           We alleged 50 financial transactions in the

14   indictment under 1956 in Count I that specify that there were

15   transactions from or to the United States in aid of the

16   illegal activity that was taking place.  These were financial

17   transactions that used the U.S. financial system.

18           If you look at the *Julius Baer* case, the case that

19   was cited by counsel, respectfully, I think they have

20   misinterpreted the case.

21           The court in that case made clear that Congress'

22   intention in applying the statute in these types of

23   circumstances was to ensure that the U.S. financial system

24   did not become a clearinghouse for criminals.  And for that

25   reason, Congress wanted to get within the scope of U.S.

1   criminal law, allow prosecutors to challenge and attack any

2   efforts that were made to promote this type of bribery

3   activity through the use of the U.S. financial system.  And

4   that's precisely what we are doing here.

5          So part of the allegations relate to the use of the

6   U.S. financial system.  *Julius Baer as well as the Prevezon*

7   *Holdings* case both specify and hold that it's appropriate to

8   base jurisdiction, if you will, on the use of banks in the

9   United States for that purpose.

10          But that's not the only thing that ties the case to

11   this country.

12          The purpose in obtaining these licenses through

13   bribery -- these licenses or approvals through bribery in

14   India was so that product could be sold and money could be

15   made to enrich the racketeering conspiracy.

16          A substantial portion of the product to be

17   generated from that mining operation was to be sold to

18   Company A here in the United States.  In fact, we allege in

19   the indictment that there was a memorandum, which the parties

20   entered into, which specified that they would work toward the

21   provision of between 5 and 12 million pounds of titanium

22   annually to Company A.  That's not some insignificant amount.

23   That is not some sort of incidental sort of effect, if you

24   will.

25          That goes to, I think, an issue that I will speak

1   to a little bit later in my remarks, but one about the effect
2   on commerce.

3          Certainly there is an effect on commerce where you
4   have a conspiracy, part of which is designed to introduce
5   12 million pounds annually of tainted goods into the United
6   States.  How can that not represent an effect on commerce?

7          Your Honor well knows from the instructions that
8   are given when we talk about effect on commerce that the
9   instruction for effect on commerce talks about an effect on
10  commerce to any degree.  And sometimes, in some cases, that
11  effect on commerce can be rather small.  But we are not
12  talking about a potential small effect on commerce.  We are
13  talking about a substantial one.

14         And not only are we talking about the financial
15  system being utilized through the United States, not only are
16  we talking about the introduction of titanium into the United
17  States.  We are also talking about the other acts that were
18  taken throughout the United States in aid of the conspiracy.

19         The indictment itself, which does not actually have
20  to allege any overt acts, I would respectfully submit, with
21  regard to a racketeering conspiracy case, because there is no
22  overt act requirement, does specify certain things did occur
23  here in the United States; for example, meetings that took
24  place with representatives of Company A by one of the
25  codefendants, who went to discuss the progress of the project

1    as well as the terms on which titanium product would be sold
2    to Company A.

3           We also have, with regard to this district in
4    particular, the trips that are taken by Mr. Lal, the
5    codefendant, from this district to his home in Greensboro.

6           Now, one of the things that was, I think, missed is
7    that Section 3237, when we talk about venue -- and I believe
8    this appears on perhaps Paragraph 33 of our brief.  I think
9    there might be a reference to the statute.  Sorry.  I beg
10   your pardon.  Not 33.

11          3237, which I should probably reference, says
12   effectively that an offense involving transportation is a
13   continuing offense and may be prosecuted in any district from
14   or through which a person moves.

15          And the correct citation is on Page 27, where we
16   actually reference that portion of the venue statute.  Let me
17   cite it for you in full.

18          "Any offense involving the use of the mails,
19   transportation in interstate or foreign commerce, or the
20   importation of an object or person into the United States is
21   a continuing offense and, except as otherwise expressly
22   provided by enactment of Congress, may be inquired of and
23   prosecuted in any district from, through, or into which such
24   commerce, mail matter, or imported object or person moves."
25          So we have allegations both in Count I as well as

1   in Counts III and IV that Mr. Lal traveled from this district
2   to Greensboro, North Carolina, and thereafter takes steps to
3   advance the conspiracy.

4          My friends on the other side say that, well, these
5   acts or this travel was incidental.  That's their view of the
6   issue.  That's something that has to be resolved at trial.
7   That will be up to us to convince a jury that it was an
8   integral part or an important part of the actual
9   conspiratorial activity.

10         Parenthetically, I would note that what happens
11  here is, Mr. Lal goes on two trips to India for the purposes
12  of furthering the bribery activity.  He does what he does in
13  India and he comes back.  And then, when he returns, he
14  travels from Chicago to North Carolina and then takes further
15  steps in aid of that bribery activity.

16         So it's not incidental.  It was an integral part of
17  the conspiracy as a whole.  And obviously, we need to have
18  the full sense of the evidence at trial in order for a jury
19  to appreciate that, in fact, it was not incidental at all.

20         So Count I, Count III, Count IV all actually
21  allege, as is appropriate under Section 3237, travel from
22  this district.  And they all indicate that those offenses
23  include travel from this district.  That should end the venue
24  inquiry right there as to those counts.

25         With respect to Count II, it's obviously based on

1    the same sorts of operative facts with regard to Count I as
2    well.  And Count V incorporates certain paragraphs from
3    Count I that specify the travel as well.

4            There was also some sort of allegation that, well,
5    look, there is no indication some cell phone or anything like
6    that was used in the Northern District of Illinois in aid of
7    the conspiracy.

8            I would invite the Court to actually take a look at
9    the indictment in paragraph -- the paragraph concerned, which
10   appears on Page 19 of the indictment, and I think that that
11   argument is not well-founded either.

12           On Paragraph 19 it says, "It was further part of
13   the conspiracy that one or more of the conspirators used and
14   caused the use of cellular telephones, including, but not
15   limited to, a cellular telephone located in Chicago,
16   Illinois, and operated on the interstate network of AT&T with
17   the intent to promote, manage, establish, carry on, and
18   facilitate the promotion, management, establishment, and
19   carrying on of the money laundering."

20           And then it says, "and thereafter did perform,
21   cause to be performed, and did aid and abet the performance
22   of acts to" -- and then it continues on to say, promote,
23   effectively, the unlawful activity, including, but not
24   limited to, communicating the status of the conspirators'
25   activities and discussing and directing future activity.

1    So a fair reading of that paragraph in the

2    indictment is that there was actually use of a cell phone in

3    Chicago -- and I think that's what the evidence is going to

4    show -- that was used to promote the carrying on of the

5    unlawful activity in this case.

6    With regard to the other defense arguments that

7    were raised with respect to venue, there was some suggestion

8    of, well, we can't wait to raise it.  We have to actually

9    raise it before trial, under Rule 12.

10   That may be fair and that may be true, but that

11   doesn't mean, then, that what the defense gets to do is give

12   their opinion of what the facts will show at trial.  That's

13   what the trial is for.

14   And while we have pled that there were acts taken

15   in this district, the evidence at trial will be what will

16   decide whether or not we have sufficiently alleged venue.

17   As I said -- as we wrote in our filing, we are not

18   restricted to the evidence that appears in the indictment to

19   prove venue in this district.

20   One example I gave that doesn't appear in the

21   indictment is that Andras Knopp actually traveled to this

22   district and met with Company A in this district for the

23   purpose of furthering the project.  That is something that

24   will also come into evidence.

25   What will also come into evidence are those acts

1    that were taken by Company A at the behest of the

2    conspirators to assist and aid the project.  Some of those

3    acts -- and we are not saying that Company A did anything

4    wrong, but what we are saying is that those acts assisted the

5    conspiracy.  There is going to be evidence of, for example,

6    folks traveling from the United States, Company A personnel

7    traveling from the United States on multiple occasions to

8    meet with some of the conspirators in this case to discuss

9    the advancement of the project.

10          These are all things, obviously, that aren't

11   necessarily in the indictment, because they are disputed.

12   And because they are disputed, I don't think it's proper at

13   this point for the Court to decide those matters.

14          We have made the allegation that the crime took

15   place here and elsewhere in the indictment.  We have given a

16   couple of examples in the indictment about activities that

17   took place in Chicago.

18          And it's also not correct to say that overt acts in

19   Chicago have to be illegal on their face.  That's not true

20   either.

21          If we look at Page 33 of our brief, there is

22   reference to cases that say that an overt act is an act

23   that's legal or illegal that advances or furthers the

24   conspiracy.

25          So it isn't correct to say that an overt act must

1  be illegal on its face in order for it to give rise to venue

2  in this district.

3          So I think for those reasons with regard to venue,

4  unless the Court has other questions with regard to venue,

5  which I am happy to address right now, venue is proper here.

6  And the defendant will have ample opportunity to raise the

7  issue of venue in motions after trial, once the evidence is

8  in.

9          We have made the allegations that there was

10 activity in this district, and that should be sufficient to

11 end that inquiry.

12         With regard to --

13         THE COURT:  No specific question about venue, but

14 what exactly is titanium sponge?

15         MR. BHACHU:  Well, titanium sponge and products

16 like it can be used for aerospace applications, for example,

17 to be used to build airplanes.

18         THE COURT:  Is it actually spongy?

19         MR. BHACHU:  That might be beyond my area of

20 expertise, Judge.

21         THE COURT:  Somebody in this room knows.  At the

22 conclusion of the hearing, I will invite that person to speak

23 up.

24         MR. BHACHU:  That's probably right, Judge.

25         With regard to the issue regarding extraterritorial

1  application of the racketeering statute, of course, we

2  discuss at length in our filing the purpose of the

3  racketeering statute and the history of the racketeering

4  statute.  I won't belabor that discussion here today.  But

5  suffice it to say that the racketeering statute was intended

6  to be, effectively, the premier tool in the kit, if you will,

7  to go after organized crime, criminal enterprises that

8  Congress felt posed a major threat to the general welfare of

9  the United States.

10  And it's worth noting that when Congress also

11  ratified -- the Senate ratified both the Palermo -- well, the

12  Palermo Convention and when the president and the executive

13  branch urged the ratification of the Palermo Convention,

14  which obligates the United States to join in this

15  international fight against organized crime, both the

16  president and the Senate believed that the existing body of

17  federal laws -- federal criminal laws -- would be sufficient

18  to tackle the problem of transnational organized crime.

19  This is a case that, by definition, is one which

20  concerns transnational organized crime.

21  As I discussed earlier, yes, we do have criminal

22  activity taking place in India, but Congress has actually

23  made this law that actually outlaws the use of the U.S.

24  financial system in aid of bribery activity abroad.

25  We have people taking advantage of the U.S.

1    financial system, taking acts here in the United States in

2    aid of that illegal activity, traveling in the United States

3    in aid of that illegal activity.

4         This is the kind of quintessential example of what

5    folks were concerned about, that if you have a case of

6    transnational organized crime, that it be something that you

7    can actually tackle and challenge in a unified way by -- by

8    the global community in a unified way.

9         So with regard to the racketeering statute and its

10   application here, obviously there is this presumption against

11   extraterritoriality, which has been discussed.  But what is

12   really important is that the holding of *RJR Nabisco* was that

13   foreign enterprises are actually covered by the racketeering

14   statute.

15        So while there is this discussion of, hey, this

16   happened abroad, you know, Indian and public officials were

17   bribed, et cetera, the Supreme Court made it clear that

18   foreign enterprises, criminal rings, associations were

19   covered by the racketeering statute, so long as the pattern

20   of racketeering involved racketeering acts that either

21   applied domestically by their terms or applied

22   extraterritorially by their terms.  And that's what we have

23   in this case.

24        There was some discussion about the Travel Act

25   allegations in Count I, but it was incomplete.

1       If you look at the Travel Act allegations in

2   Count I, which appear on Pages 16 and 17, just if you look at

3   them -- I guess one of the things is -- again, if we look

4   back at *Glecier*, the Seventh Circuit's case, we are not

5   required to allege a completed act of racketeering activity

6   in order to allege a racketeering conspiracy.

7       So how can it be that by not specifying something

8   as it relates to a completed act, that we have failed to

9   properly allege a racketeering conspiracy, so long as we do

10  allege that it took place in part in this district, as we

11  did.

12      But if we look at the indictment, we go above and

13  beyond what's required under the statute, Judge.  And it says

14  there that we have -- for example, on Page 17, Codefendant

15  Suren Gevorgyan travels from New York to Seattle and

16  thereafter meets with representatives of Company A and

17  discusses the progress of the project.

18      There are multiple examples that are given over the

19  next two pages that discuss travel taken solely within the

20  United States and acts done solely within the United States

21  to advance the conspiracy.  How can that be an

22  extraterritorial application of the statute where we are

23  alleging travel from Point A in the United States to Point B

24  in the United States and then, upon arrival in Point B in the

25  United States, some act taken in furtherance of the

1  conspiracy?

2          That is actually the opposite.  That is, by

3  definition, an example of a domestic application of the

4  statute, not an extraterritorial one.

5          So when there is this discussion about the Travel

6  Act, we have at least probably about six or seven examples of

7  travel in the indictment itself that make it clear that there

8  was travel in the United States and action taken in the

9  United States to advance the goals the conspirators.

10  Those are all domestic applications.  Those are all

11  appropriate, and there is no indication to think that we are

12  not going to be able to prove that at trial.

13          And the same goes for the money laundering statute.

14  We allege 50, approximately, financial transactions occurring

15  in the United States -- in part in the United States, which

16  is all that we are required to allege under the money

17  laundering statute for the reasons that I gave before, if you

18  look at the *Julius Baer* case and the *Prevezon Holdings* case.

19          In those cases, it's simply also not the case

20  that -- I think that counsel may not fully appreciate how the

21  financial transactions may have actually been conducted with

22  regard to those financial transactions that are specified in

23  the indictment.

24          It may not be the case that they were all conducted

25  in the same manner.  There are various different ways that

1    financial transactions are conducted through U.S. banks, and

2    they are not all simply EFTs.  There are certain things

3    called SWIFT payments, which include crediting accounts of

4    different entities or banks at U.S. financial institutions

5    and then sending directions abroad concerning those credits.

6        So there is nothing in the indictment, which is all

7    the Court has right now, for the Court to conclude that, oh,

8    well, these transactions don't somehow involve the United

9    States in part.  The allegation is that they do, and there

10   isn't any reason to think, based on the cases that we cite,

11   that is not a proper invocation of the Court's jurisdiction

12   as it relates to this issue of extraterritoriality.

13       There is also the claim that we haven't shown

14   effect on commerce.  I talked about that a little bit

15   earlier.  I think the only point to make there is that's,

16   again, a trial issue.  Whether or not we show effect on

17   commerce is something that we are going to be bound to prove

18   at trial.  I, frankly, don't think that's going to be an

19   issue at all once it is presented to a jury.

20       THE COURT:  Is it your position that the price of

21   titanium sponge was affected by this bribery scheme?

22       MR. BHACHU:  Judge, we are not going to allege that

23   the price of titanium was affected by this bribery scheme.

24   We are not going to do that.

25       What we are going to do is we are going to prove

1      that the purpose of this criminal activity was to introduce

2      into the United States goods that were obtained through

3      bribery, otherwise known as contraband.

4              Introduction of contraband into the United States

5      is something that the United States surely must be able to

6      prosecute.  The idea that we can't do that is baffling to me.

7              The idea that, for example -- and it seems to be

8      the idea is that since the crime was not successful, the

9      conspiracy did not succeed, we do not have jurisdiction.

10     Even though the crime was aimed at the United States but it

11     did not succeed, we do not have jurisdiction.

12             It's kind of like saying, if somebody tries to blow

13     up a bridge somewhere in New York and they are stopped before

14     they are able to blow up that bridge, so there is no effect

15     on commerce, and they are all based outside the United

16     States, that the United States government does not have

17     jurisdiction to actually prosecute that case.  Why?  Because

18     there was no successful interference with commerce in the

19     United States.

20             Is that so?  Obviously not.

21             The whole purpose of conspiracy law is to punish

22     the agreement.  That's why the jury instruction in this

23     circuit says that we have to prove that the enterprise would

24     affect commerce.  We are going to be able to prove that it

25     did affect commerce, but what we are required to prove is

1  that it would affect commerce.

2  With regard to the other issues that were raised
3  with regard to extraterritoriality, I think I have covered
4  most of what I think bears covering.  I invite the Court to
5  let me know if there is anything else it was concerned about.

6  I would say this, with regard to *RJR Nabisco:*  It
7  was a civil case.  So the Supreme Court, when it's reviewing
8  that case, it's probably looking at a huge civil complaint,
9  some of the paperwork relating to that.  There are different
10  rules for civil complaints and criminal indictments.  And in
11  a criminal indictment, the notion that we have to set forth,
12  basically, our entire case in a criminal indictment just
13  simply is not true.  There is not a different rule for
14  pleading with regard to when somebody says, well, I think
15  this case involves extraterritorial application of the
16  statute, even though our indictment alleges domestic
17  applications of the statute through the Travel Act and the
18  money laundering statute.

19  Even the Second Circuit in the *RJR Nabisco* case,
20  before it got to the Supreme Court, said that 1956(a)(2),
21  which is what we have charged, that is a domestic application
22  of the statute, because we are regulating the introduction
23  and exit of funds from the United States.

24  So it's not even an extraterritorial application of
25  the statute.  So it can't be that, just because somebody

1  says, well, I think it might be extraterritorial, there is a

2  different pleading requirement the government must adopt in

3  advance of entertaining that sort of objection.

4  If there are no other questions about the

5  extraterritorial application issue, I would like to briefly

6  talk about due process and then let Mr. Robell speak about

7  the FCPA argument.

8  THE COURT:  Okay.

9  MR. BHACHU:  I think the one thing before I get

10  there is that I did want to emphasize, there was also kind of

11  a preliminary statement that was made that both Mr. Firtash

12  and Mr. Knopp -- at least as to Mr. Firtash -- have not been

13  to the country.

14  There was some suggestion Mr. Knopp has not been

15  here.  I think the evidence will prove that's not true.  I

16  think the evidence will show that we will have wiretap phone

17  calls where Mr. Knopp actually tells Mr. Firtash that he is

18  traveling here, to the United States, to meet with

19  representatives of Company A here in Chicago.

20  So I think it will be abundant from the evidence

21  that -- abundantly clear from the evidence at trial that both

22  Mr. Firtash and Mr. Knopp were aware of the nexus of Chicago

23  to this crime.

24  We will also be able to prove that Mr. Knopp

25  actually did travel here and meet with a representative from

1    Company A as well, to further the progress of the project.

2                So to the extent there is some suggestion that

3    these guys are somehow clueless about Chicago's involvement

4    in this case, that's just simply not so.

5                Mr. Firtash also was the one that gave

6    authorization, the evidence will show, to enter into some of

7    the agreements that were made with Boeing.  And that's

8    something that the evidence will show as well.

9                With regard to due process -- and this kind of ties

10   into that argument as well.  To answer the Court's question

11   with regard to *Hijazi* on remand, the defendant lost on remand

12   in *Hijazi*.  Footnote 46 in our filing actually discusses the

13   rationale of the district court on remand.  But effectively,

14   Mr. Hijazi lost, and the court found it reasonable to

15   exercise jurisdiction.

16               We do continue to maintain that -- the Supreme

17   Court has been loud and clear on this issue -- that an alien

18   outside the United States does not have due process rights.

19   This might be incidentally another reason to hold off until

20   Mr. Firtash actually gets here.

21               But what the Supreme Court has said is that an

22   alien located outside the United States cannot invoke the due

23   process clause.  I don't think there was any hemming and

24   hawing by the Supreme Court when it made that holding.  I

25   don't think there is anything that would suggest that the

1   Seventh Circuit, when it said that that was probably right or
2   seemed right to it in the *Kashamu* case, which we cite in our
3   brief, didn't agree with that holding as well.

4           Now, with regard to the due process arguments, I
5   think the idea that the conduct didn't take place in
6   substantial part in the United States is mistaken.  We do
7   allege again and again conduct throughout the United States,
8   from coast to coast, taking place -- transfers from
9   California outside the United States, I believe, trips to New
10  York, Washington, Chicago, North Carolina -- and then acts
11  taken in furtherance of the conspiracy throughout the
12  country.

13          We allege that the use of email servers throughout
14  the United States also occurred, and that's going to figure
15  prominently at trial.

16          We will find, I think, at trial that the evidence
17  would show that one of the primary methods by which the
18  conspirators communicated about the bribery activity was
19  through email.  There is going to be emails where the
20  conspirators talk in explicit terms about how much in bribes
21  had been paid.  And to answer that question, bribes were paid
22  to Indian public officials.  The total allocated for that
23  purpose was $18-plus million.  There are going to be charts
24  that will show this is how much X official has received in
25  terms of bribes.

1           Now, in many cases the emails are written in veiled
2    terms -- sometimes not -- discussing the bribery activity.
3    There is also the use of telephones, as I said before, using
4    the telephone system here in the United States to communicate
5    with coconspirators about bribery activity, about the
6    prospect of being found out by law enforcement as well.
7    Those are all things that are going to come into evidence.

8           So to say that there wasn't any activity in the
9    United States is simply not so.

10          It's also not so to say that there was no intended
11   effect in the United States.  I have already talked about
12   that at length.  I'm not going to mention it again.  But it's
13   clear that this whole enterprise was geared toward getting
14   sales of titanium to Company A, a significant amount of
15   sales.

16          The evidence will also show that some of the
17   material that wasn't going to be sold to Company A, there was
18   some talk about introducing conspirators to other folks in
19   the United States that might be able to take some of that
20   supply as well.  Local domestic steel -- not steel mills --
21   processing mills that would process titanium.  These are all
22   things obviously that are not in the indictment but will be
23   something we will be able to introduce at trial.

24          And again, this conduct is directed at significant
25   U.S. interests.  We talked already about the interest the

1   United States has in combatting organized crime.  And this is
2   a case that involves organized crime, even on the face of the
3   indictment itself.

4          Now, there was some suggestion in some of the
5   filings that, well, we didn't put in something about Russian
6   organized crime in our indictment.  We are obviously not
7   required to approve or allege, like many of the other things
8   we have been talking about, what the interest is of the
9   United States in actually charging somebody.  Can you imagine
10  if we did that what the brouhaha would be?  The reason we
11  charged you is because X.  We don't do that.

12          But in responding to the challenge that's made that
13  says, well, there is no interest in the United States here,
14  it is fair game for us to explain to the Court, to understand
15  why it was this is important, from our perspective.

16          There is an importance in challenging and
17  combatting organized crime.  And when the executive, after
18  being given the authority by the legislative branch to do so,
19  exercises that authority and targets certain individuals that
20  it understands are involved in organized crime, I would
21  respectfully submit that's something that great deference
22  should be paid to.  We cite a couple cases to that effect,
23  the *Youngstown* case and another one.

24          This is also an issue that, as I said before, has
25  troubled the international community.  There was a reference

1    to India.  Why doesn't India do something?  The case is that
2    both India and the United States are signatories to the
3    treaties that we have been talking about.  The United States,
4    obviously, was in a better position, in this instance, to
5    carry that ball forward.

6            It's no criticism of India for us to say that we
7    are going to do our best to live up to our international
8    obligations.  And to then say that, well, actually what we
9    should really be focused on is the Restatement, Section 402,
10   or whatever it is, and not the international treaty that the
11   Senate approved, that the president suggested that this
12   country enter into, which is the law of the land, that
13   doesn't sound right to me.

14           In this situation, where our executive branch has
15   made that decision and has carefully weighed what impact our
16   decision may have on relations with other countries, which is
17   what the job of the executive branch is -- the executive
18   power includes foreign affairs power -- we have done that.

19           It's not, I think, for Mr. Firtash and Mr. Knopp to
20   suggest that there is a Restatement that would suggest
21   otherwise, even though, if you look at all the elements of
22   that Restatement, they all point toward suggesting that
23   prosecution is appropriate in this district.

24           If there are no further questions on those matters,
25   Judge, I would turn over the podium to Mr. Robell, who I am

1   sure is ready to --

2             THE COURT:  Hold forth.

3             MR. BHACHU:  -- hold forth.  Yes, Judge.

4             Thank you.

5             MR. ROBELL:  Good afternoon, your Honor.

6             THE COURT:  Good afternoon.

7             MR. ROBELL:  Jonathan Robell from the fraud section

8    at DOJ, also on behalf of the United States.

9             Thank you for the opportunity to address the FCPA

10   portions of the argument.

11            The defendants oversaw a U.S. bribery scheme with

12   the ultimate goal of doing business with a company based here

13   in Illinois.  The scheme involved a domestic concern, as that

14   term is defined in the FCPA; actions in the United States in

15   furtherance of the scheme; and the payment of bribes to

16   foreign officials in India.

17            Whether or not the defendants were in the United

18   States themselves during the conspiracy doesn't alter their

19   criminal liability for the actions of the conspiracy.

20            Now, the defendants take the position that

21   high-level members of a transnational conspiracy, like the

22   one that's been alleged here, cannot be criminally liable as

23   conspirators or as aiders and abettors when it involves a

24   violation of the FCPA, but that's a position that runs

25   contrary to long-standing principles of how Sections 371 and

1   2 are applied to other actions by Congress, and it's contrary

2   to how the Supreme Court and the Seventh Circuit have

3   described the exceptions to that presumption of conspirator

4   and accessory liability.

5           For all these reasons, your Honor, the motion to

6   dismiss Count V should be denied.

7           The presumption -- the baseline presumption -- and

8   I think the defendants said that they agreed with this -- is

9   that conspiratorial and accessorial liability apply.

10          Where we part ways, I think, with the defendants is

11  that -- is on *Pino-Perez*, the Seventh Circuit decision.

12          What *Pino-Perez* said, in the context of aiding and

13  abetting, is that Congress doesn't have to think about this

14  stuff when it writes new statutes, because it automatically

15  kicks in.

16          The same logic applies to 371.  The Seventh Circuit

17  said this automatically kicks in unless the statute fits

18  within a very narrow exception.

19          I would respectfully disagree with the defendants'

20  interpretation of *Pino-Perez*.  I think one quote really sums

21  that up.  The court there said, "Doubt about Congress'

22  intentions must be resolved in favor of aider and abettor

23  liability."

24          The court went on to say that there must be "an

25  affirmative legislative policy to create an exemption from

1    the ordinary rules of accessorial liability."

2             We don't have that here, your Honor.

3             What *Pino-Perez* also said is that if there is any

4    doubt about Congress' intentions, the presumption is that

5    liability applies.

6             So the defendants are saying that this all doesn't

7    apply to them, because they are too high-level, essentially,

8    to be agents of a domestic concern.  If they were agents of a

9    domestic concern, there is really no question that they could

10   be charged as principals under the FCPA.

11            But because they were, as alleged in the

12   indictment, the ringleader and a manager of the scheme, they

13   are exempted from the normal rules of conspiracy and

14   accessory liability.  They hang their hat on the *Hoskins*

15   decision from the District of Connecticut.

16            The *Hoskins* decision is currently on appeal to the

17   Second Circuit.  But the key difference between *Hoskins* and

18   this case goes back to *Pino-Perez*.

19            What the Seventh Circuit did in *Pino-Perez* is, they

20   addressed the case that *Hoskins* relied on extensively, *United*

21   *States v. Amen*, from the Second Circuit.

22            The court *en banc* in *Pino-Perez* looked at the

23   Second Circuit's reasoning in *United States v. Amen* and

24   specifically said, we disagree with the reasoning.  We don't

25   believe that the *Amen* court correctly applied *Gebardi* and the

1  principles of *Gebardi* to the drug kingpin statute.

2      In finding that the *Gebardi* exception did not apply

3  in the Seventh Circuit to the drug kingpin statute, I don't

4  think it was as limited an opinion as the defendants have

5  made it out to be.

6      What the *Gebardi* exception says is that if a crime

7  requires two parties but the statute doesn't condemn one of

8  the parties that acquiesces to the crime or consents to the

9  crime, that's evidence of congressional intent to exclude

10  that consenting or acquiescing party from liability.  And the

11  government can't get around that by charging conspiracy or

12  aiding and abetting.

13      The *Gebardi* decision itself, in 1932, said that it

14  was a limited exception.

15      Fast-forward to 2016, last term, the Supreme Court

16  reaffirmed the narrowness of this *Gebardi* exception in *United*

17  *States v. Ocasio*.

18      What the *Ocasio* court said was that *Gebardi* only

19  applies when "a person's consent or acquiescence is inherent

20  in the underlying statute."

21      The defendants, in their papers, minimize *Ocasio* as

22  merely a reiteration of the limited reading of *Gebardi* that

23  other courts have applied.  But that's exactly the point,

24  your Honor.  *Gebardi* is limited.  It's limited to what's

25  become known as the necessary parties analysis, which

1     *Pino-Perez* also touched on.

2          *Pino-Perez* said there were three general exceptions

3     to the presumption that conspirator and accessory liability

4     apply.  The first two are not at issue here.  It's when a

5     statute is designed to protect a class of person or when the

6     purported defendant is a victim of the crime.

7          What's at issue here is when the crime necessarily

8     involves a category of person that would include the

9     defendant.

10          The defendants also mentioned the *Castle* case, your

11     Honor.  The *Castle* case is from the Fifth Circuit, and it's

12     the one Court of Appeals that has applied *Gebardi* and the

13     principles of *Gebardi* to the FCPA specifically.

14          What *Castle* said is that you can't charge the

15     bribe-taker in an FCPA transaction, if you will, as a

16     conspirator, because the bribe-taker is a necessary party to

17     an FCPA transaction, and yet Congress chose not to

18     criminalize the actions of the bribe-taker in the FCPA

19     itself.

20          In every bribery scheme, of course, there is a

21     bribe-taker, or at least an intended bribe-taker.  Contrast

22     that with the defendants' position.  They are in no way

23     necessary parties to the bribery scheme that's been alleged

24     in the indictment.  There is no requirement that a

25     conspiracy, like the one alleged in the indictment, would

1    have to have foreign nonagent participants.

2              The defendants don't say, because they can't, that

3    they are necessary parties to any violation of the FCPA.

4    They just say that, because they fall within a category of

5    persons that was not enumerated in the statute itself, they

6    get a pass on conspiring with foreign officials.  But that's

7    not the law.

8              Enumeration does not change the necessary parties

9    analysis.  And numerous other criminal statutes enumerate

10   classes of persons, just the way that the FCPA does, but

11   there is no dispute that the normal principles of conspiracy

12   and aiding and abetting apply to those statutes.

13             At bottom, your Honor, the issue here is that the

14   FCPA does not confer immunity on people like the defendants.

15   "Immunity" is the term that the Supreme Court used in

16   *Gebardi*.  It said that the general conspiracy statute does

17   not withdraw the immunity conferred, in that case, by the

18   Mann Act.

19             There is no evidence in the text or structure of

20   the FCPA that Congress intended to immunize high-level

21   foreign nationals who orchestrate a bribery scheme.

22             In fact, it's just the opposite.  The FCPA

23   expansively applies to the bribe-paying side of an offense,

24   and it encompasses a wide array of individuals who act in

25   concert with a domestic concern or any other entity connected

1    to the United States, without regard to their nationality.

2         The statute is silent as to conspirator and

3    accessory liability, but as *Pino-Perez* makes clear, that's

4    because it doesn't have to say anything about that.  Those

5    provisions automatically kick in whenever Congress writes a

6    new statute.

7         To the extent it's necessary, your Honor, to

8    consider the legislative history of the FCPA, we see the same

9    breadth of purpose in the legislative history, both in the

10   original enactment of the FCPA in 1977 and in the expansion

11   of the statute in 1998 to comply with the OECD Convention.

12   Both times Congress said that it intended this to reach

13   foreign bribery broadly.  It intended to include conspiracy,

14   aiding and abetting, causing incitement.  And it said that

15   Congress intended to reach any act that was committed in

16   whole or in part in U.S. territory.

17        That's exactly what we have here, your Honor.  We

18   have a conspiracy that took place in part in the United

19   States.  And therefore, it's a domestic application of the

20   conspiracy statute, as Mr. Bhachu said.  And the

21   extraterritorial aspect of the defendants' argument really

22   doesn't apply.

23        Subject to the Court's questions, your Honor, I

24   would ask the Court to deny the motion to dismiss Count V.

25             THE COURT:  I don't have any further questions

1    specifically for you.

2             I have got a question generally about whether and

3    to what extent we can get any more information on what's

4    going on in Austria.

5             It sounds like, from what Mr. Bhachu says, it's a

6    discretionary appeal.  They don't have any clear rules on

7    when they will even let us know if they are taking it.

8             Is that right?

9             MR. BHACHU:  Judge, I think the way I can answer

10   that is that our Office of International Affairs occasionally

11   will have contact with their counterparts in Austria.  And

12   periodically they ask for an update as to what's going on.

13   Sometimes we just don't get any new information.

14            What I can endeavor to do is ask our contact in

15   Washington to reach out to the Austrian officials and ask if

16   there is an update in relation to the Austrian proceedings.

17            THE COURT:  Your sense that the Austrian Ministry

18   of Justice isn't sending Mr. Firtash over here until that's

19   concluded rests, it seems like, in part on the fact that

20   since February they haven't done so.

21            MR. BHACHU:  Right.  I would be the one to know if

22   something was going to happen on that front, because we would

23   have to actually make the arrangements to get it done.

24            So it's not like they are going to -- the way that

25   will work is, it would probably require U.S. law enforcement

1    to be ready to receive him when he is tendered to U.S. law

2    enforcement.  So there is no question that we would have to

3    be aware of a plan to do that.

4              Of course, as your Honor knows, just recently there

5    was the Spanish extradition, which is not necessarily final

6    yet.  And what we were told is that no decision will be made

7    with regard to extradition to either country until a final

8    determination is made as to the Spanish extradition.  And

9    then the Minister of Justice makes an additional

10   determination about which extradition should take precedence.

11             Now, the appeal -- there is no appeal that, I

12   think, has been filed so far, as it relates to the Spanish

13   extradition.  If that is not appealed, then that may

14   accelerate matters with regard to our case.

15             But in terms of this being ripe, as I said before,

16   if it was the case that he was going to be turned over to us

17   today or tomorrow, I would know about it.  And we haven't

18   gotten any indication whatsoever that that's so.

19             THE COURT:  And the Spanish extradition effort has

20   resulted in an order that he be extradited?

21             MR. BHACHU:  No.  To be clear, the Spanish

22   extradition -- the request for extradition to Spain was

23   denied by the lower court.

24             THE COURT:  But that's on appeal.

25             MR. BHACHU:  No appeal, so far as I know, has been

1    filed yet.  So I don't know if that appeal will be filed or

2    not.  That's a decision, obviously, that I am not privy to.

3         But if it -- for example, if there is no appeal

4    that's filed in the next couple of days, there still remains

5    the Austrian appeal on our extradition proceeding.

6         THE COURT:  Right.

7         MR. BHACHU:  And then also -- as I think I wrote in

8    our filing, there is also some indication that the defendant

9    intends to appeal to the European Court of Human Rights.  And

10   I know that wasn't mentioned before, but I don't know what

11   impact, to be honest with you, that will have on the

12   extradition of the defendant.

13        THE COURT:  That court would trump whatever happens

14   in Austria, right?  Or would it?

15        MR. BHACHU:  I have no idea.  There may be somebody

16   in the room that does, but I don't know exactly how that's

17   going to work.

18        THE COURT:  It may or may not be the same person

19   who knows what titanium sponge is.

20        MR. BHACHU:  I think the person that will most --

21   that would best be able to answer that is probably the

22   Austrian Ministry of Justice.

23        But I would again say, given the fact that

24   Mr. Firtash is not here, given the fact that I would be

25   probably one of the first people to know that he was

100

```
 1   coming --

 2              THE COURT:  If he were on his way, right.

 3              MR. BHACHU:  -- that speaks volumes.

 4              THE COURT:  All right.  Thank you.

 5              I assume that the defendants want to say something

 6   briefly in reply.  You are obviously under no obligation.

 7              MR. WEBB:  Your Honor, you have been extremely

 8   patient.

 9              THE COURT:  Well, it's an interesting case.

10              MR. WEBB:  I have a -- let me just ask you a

11   question.

12              I have -- I do have things I want to say.  Would it

13   be possible just to continue this for another -- I could go

14   on for another 45 minutes, but they just said things that I

15   really want to address about venue.

16              I will do whatever your Honor wants.  I will try to

17   be as concise as I can.  But would it be possible just to

18   give us another hearing in a day or two, and I will -- let me

19   tell you what I think the status -- can I talk about what is

20   the status in Austria, just for a second, as best I know?

21              THE COURT:  Sure.

22              And the short answer to your question is, I am

23   around all week.  I don't know whether everybody else minds

24   coming back, but I wouldn't mind coming back another day on

25   this.
```

1           MR. WEBB:  Thank you.

2           THE COURT:  All right.

3           MR. WEBB:  Thank you very much.

4           I have an Austrian lawyer here, and here is what I

5    believe the status is.

6           There is no question that Mr. Firtash is at

7    significant risk of being extradited.  Whether it's in the

8    next few weeks or few months, nobody knows.

9           THE COURT:  Right.

10          MR. WEBB:  Here are the two things that I know for

11   certain:  The Austrian Supreme Court has not accepted to hear

12   this extraordinary writ; number two, there is no stay in

13   place.

14          And because there is no stay, the Austrian Ministry

15   of Justice -- there is nothing that prevents the Ministry of

16   Justice from extraditing Mr. Firtash tomorrow, under the law

17   of Austria.

18          That's the status of where we are on the appeal in

19   the court system.

20          Until August 29th, we had another layer of

21   protection because of the Spanish extradition proceeding.

22          THE COURT:  Right.

23          MR. WEBB:  However, because the Spanish extradition

24   now has been denied, there are no longer competing

25   jurisdiction requests.

1    So if the Austrian ministry -- or the Austrian

2    public prosecutor does not appeal that, then there is nothing

3    that would prevent the Austrian Ministry of Justice from

4    extraditing Mr. Firtash in very short order.

5    Maybe the Austrian Ministry of Justice would decide

6    to wait to see for a few weeks as to what the Supreme Court

7    does.  I don't think anyone knows the answer to that

8    question, but that's why --

9    THE COURT:  But it's your view the only thing that

10   stood in the way -- stood between Mr. Firtash and extradition

11   from February until now is the fact that Spain had a

12   proceeding.

13   MR. WEBB:  That is correct.  Under the law, that is

14   correct.

15   Now, also, your Honor, if I would have come here

16   two years ago and teed up this motion, under the law, you

17   would have decided the motion at that time.  I mean, there is

18   nothing about the fact that the Austrian extradition

19   proceedings are going on that would mean that you shouldn't

20   rule.

21   I didn't come here because I thought, if we are

22   going win extradition, why do that to this Court?  But now we

23   are at great risk.  That's why I am here.

24   Could I ask to see whether there is some day later

25   this week we could ask for another 45 minutes?

1          THE COURT:  I think I could say yes to that request

2     on any day other than Thursday.

3          MR. WEBB:  Would it be possible to do it on Friday?

4     Would that be consistent with your schedule?

5          THE COURT:  Sure.  I will be around all day Friday.

6          MR. BHACHU:  I think that will be fine with the

7     government, Judge.

8          THE COURT:  Let me just look at the --

9          MR. BHACHU:  Mr. Robell may not be able to attend,

10    but I will try to do my best to --

11         THE COURT:  And if you want to telephone in, we

12    will let you do that.

13         Let me just take a look at the calendar for Friday.

14         How about 10:45?

15         MR. WEBB:  Yes, your Honor.

16         THE COURT:  I will see you then.

17         MR. BHACHU:  Very good, Judge.  Thank you.

18         THE COURT:  All right.  Thank you.

19         (An adjournment was taken at 4:40 p.m.)

20                        *   *   *   *   *

21    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
22

23    /s/ Frances Ward                        September 13, 2017.
      Official Court Reporter
24    F/j

25