```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
                    Plaintiff,        )   Docket No. 13 CR 515
 5                                    )
               vs.                    )
 6                                    )
     DMITRY FIRTASH and ANDRAS        )   Chicago, Illinois
 7   KNOPP,                           )   September 15, 2017
                                      )   10:48 p.m.
 8                  Defendants.       )

 9
                  TRANSCRIPT OF PROCEEDINGS - Oral Argument
10          BEFORE THE HONORABLE REBECCA R. PALLMEYER

11
     APPEARANCES:
12

13   For the Plaintiff:      HON. JOEL LEVIN
                             ACTING UNITED STATES ATTORNEY
14                           BY:  MR. AMARJEET S. BHACHU
                             219 South Dearborn Street
15                           Chicago, Illinois  60604

16                           UNITED STATES DEPARTMENT OF JUSTICE
                             BY:  MR. DANIEL KAHN (Telephonically)
17                                MR. CHRISTOPHER J. CESTARO
                                  (Telephonically)
18                           1400 New York Ave. NW
                             Washington, DC  20530
19

20   For the Defendant       WINSTON & STRAWN LLP
     Dmitry Firtash:         BY:  MR. DAN K. WEBB
21                                MR. MATTHEW R. CARTER
                             35 West Wacker Drive
22                           Chicago, Illinois  60601

23   For the Defendant       LAW OFFICES OF CAROLYN GURLAND
     Andras Knopp:           BY:  MS. CAROLYN PELLING GURLAND
24                           414 North Clay Street
                             Hinsdale, Illinois  60521
25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Court Reporter:                    FRANCES WARD, CSR, RPR, RMR, FCRR
                                   Official Court Reporter
                                   219 S. Dearborn Street, Suite 2144D
                                   Chicago, Illinois  60604
                                   (312) 435-5561
                                   frances_ward@ilnd.uscourts.gov

1          THE CLERK:  13 CR 515, United States versus Firtash

2   and Knopp for continuing oral argument.

3          MR. BHACHU:  Good morning, your Honor.

4          Amru Bhachu on behalf of the United States.  Last

5   name is spelled B-h-a-c-h-u.

6          I believe we also have an individual from the fraud

7   section on a conference call with us -- joining us as well.

8          MR. WEBB:  Your Honor --

9          MR. CESTARO (telephonically):  Yes, your Honor.

10  This is Christopher Cestaro with the Department of Justice.

11         THE COURT:  Good morning.

12         MR. WEBB:  Your Honor, Dan Webb and Matt Carter on

13  behalf of Mr. Firtash.

14         MS. GURLAND:  Good morning, your Honor.

15         Carolyn Gurland on behalf of Andras Knopp.

16         THE COURT:  Okay.

17         MR. WEBB:  Also on the phone, your Honor, in

18  connection with Mr. Firtash is Otto Dietrich, who was

19  physically here in the courtroom last Monday.  He is back in

20  Austria, but he is just on the phone in case there's any

21  questions that come up about the Austrian extradition

22  proceeding.

23         THE COURT:  All right.  And I know that we put this

24  over for a little bit more time this morning.  I thought that

25  perhaps the desire there was to address these issues about

1    what the likelihood is of Mr. Firtash's being removed from

2    Austria.

3              MR. WEBB:  I was going to get into that issue.  I

4    was going to just talk about the two issues -- ripeness and

5    venue -- that should respond to certain comments made by the

6    government during its argument.

7              In talking about ripeness, I was going to update

8    the Court on some developments in Austria.

9              THE COURT:  Okay.

10             MR. WEBB:  And then Ms. Gurland was going to

11   respond to some of the arguments made by the government on

12   Monday in their oral argument on the other three issues in

13   the brief.

14             That's what we were planning on doing, if that's

15   okay with your Honor.

16             THE COURT:  That's fine.  That's fine.  As long as

17   we have -- I will need to break in 45 minutes, but that's

18   fine.

19             MR. WEBB:  Break when?  I didn't hear.

20             THE COURT:  Forty-five minutes.

21             MR. WEBB:  That's fine.  We will try to be very

22   quick, your Honor.

23             MR. BHACHU:  May I be seated, Judge?

24             THE COURT:  Sure.

25             MR. BHACHU:  Thank you.

1        MR. WEBB:  Your Honor, at the outset, by the way,
2   let me just -- as far as the government's argument that we
3   are responding to about the motion to dismiss, I was a little
4   bit surprised that -- as your Honor knows, that, as far as
5   this motion to dismiss, that it has to be decided based on
6   Supreme Court authority in the Seventh Circuit, has to be
7   decided based on the allegations that appear on the face of
8   the indictment.

9        I'm not allowed to go beyond the face of the
10  indictment and talk about evidence at trial, nor is the
11  government allowed to do that, although frequently the
12  government did do that.

13       I counted on 13 occasions the government actually
14  went beyond what's in the indictment.  I will just give you
15  one example, because venue is a big deal, and the government,
16  in talking about venue, told your Honor that one of the
17  codefendants, Andras Knopp, actually traveled to Chicago and
18  had a meeting with Company A in Chicago to further the mining
19  project.

20       So I showed you the indictment, your Honor, last
21  Monday, and I showed you the only three acts that are alleged
22  to have occurred in the Northern District of Illinois.  There
23  is nothing in the indictment -- not a single word in the
24  indictment that Andras Knopp traveled to Chicago and had a
25  meeting in the Northern District of Illinois with Company A.

1    It's just not in the indictment.  It can't be considered.

2              And, by the way, the government knows how to plead.

3    If they need to plead an act in furtherance of the

4    conspiracy, they know how to do that, and they didn't plead

5    it, because, I have to believe, they didn't think it was in

6    furtherance of the conspiracy.  But it's not in the

7    indictment at all.  It's not there.

8              Let me go to ripeness and try to be -- I will try

9    to get to the point.

10             Let me update you on Austria.

11             THE COURT:  Okay.

12             MR. WEBB:  As far as the status in Austria, the

13   significant update is that, after we left court last Monday,

14   we found out the Austrian prosecutor had filed an appeal in

15   connection with the decision by the Austrian trial court that

16   denied the Spanish request for extradition of Mr. Firtash.

17             I'm told by the Austrian extradition lawyers that,

18   while it's impossible to tell with certainty, it's expected

19   this appeal will likely be resolved somewhere between two to

20   four months from now.

21             Also the Austrian lawyers believed that in that two

22   to four months, it's likely that the Austrian Supreme Court

23   will at least rule on whether it will entertain this

24   extraordinary writ that was filed.

25             So the bottom line is that, while we can't predict

1    with great accuracy -- with complete accuracy, Mr. Firtash,

2    depending on the actions taken by the Austrian courts, could

3    very well be facing extradition within two to four months.

4            If the Austrian courts deny the Spanish appeal, and

5    if the Austrian Supreme Court does not take the extraordinary

6    writ, then under Austrian law, Mr. Firtash will be

7    immediately extradited by the Ministry of Justice in Vienna.

8            So the government argued that you should just wait

9    and not rule on this motion and wait for Mr. Firtash to be

10   extradited back to the United States.

11           They didn't cite any case at all in connection with

12   that.  And they said that -- they made a statement to your

13   Honor, in fact, that, well, if you actually ruled and then

14   maybe you ruled against Mr. Firtash, he would jump on a plane

15   and illegally leave Vienna, Austria, and violate the terms of

16   his bond.

17           I just need to point out to your Honor, I respect

18   Mr. Bhachu a lot, and we have a good relationship, but that

19   was just uncalled for.  There is no evidence, your Honor.

20   There is two different courts in Vienna, Austria, that, over

21   the last four years when he has been there waiting to get

22   this resolved one way or the other, that have said he has

23   complied with every single condition of his bond.

24           There was actually, your Honor, a two-year period

25   where a court, after a trial, had actually ruled and told

1    Mr. Firtash, this prosecution in the U.S. is politically

2    motivated because of Ukrainian politics and certain events

3    that occurred.  He didn't try to flee and say, well, my gosh,

4    I'm being held here.  I'm away from my business and my

5    family.  He didn't.  He stayed in Vienna, Austria, and has

6    never violated and done anything to violate any bond

7    whatsoever.

8            As far as harm that would be -- your Honor, right

9    now I am going to get to venue, which they have not pled

10   venue, which is a constitutional requirement.

11           If he were to ship back here in U.S. marshal

12   shackles, put into the MCC, argue about whether he gets bond

13   pending going to trial in this case, he can't run his

14   businesses.

15           While he is in Austria, at least because it's in

16   Europe, people can come in from the Ukraine.  His businesses

17   are in the Ukraine.  He is able to have meetings in Vienna

18   and run a business operation.  He can't from the U.S.

19           So for him to be taken to the U.S. in a case where

20   there is no venue and we don't believe any jurisdiction, we

21   just don't think it's fair.  There is not a single case that

22   says that you should just abstain.

23           And so I'm just respectfully asking your Honor to

24   rule in your due course.  I mean, you rule on motions when

25   you want to, but I'm just respectfully saying, this case is

1  ripe for a decision.

2          They cite some cases, which I told you are these

3  dual-proceeding cases, which have no application here.  And I

4  don't know of any case that would say you should not rule on

5  this motion -- not now, but whenever you find you want to

6  rule on it in the normal course, which, I guess, we are

7  hoping would be over the next two to four months, but that's

8  entirely up to your Honor.

9          THE COURT:  Just so you know, two to four months is

10  not unreasonable for ruling on a motion, even one as very

11  substantial as this one.

12          I was unclear when we were together earlier in the

13  week whether you believed that Mr. Firtash's removal could be

14  imminent, by which I mean days.

15          I am not in a position to rule on this before

16  October 1st, for sure, and I don't think probably for several

17  weeks thereafter.  But I don't think it's unreasonable to

18  think that I should rule in two to four months.

19          I'm not sure that the government is asking for a

20  stay so much as suggesting that there is no panic.

21          MR. WEBB:  Well, anyway, I am not arguing at all --

22  two to four months is fine, and thank you.  I will move on.

23  I am going to move to venue.

24          Your Honor, on venue -- the government argued on

25  venue for quite some time and talked about things that are

1    not in the indictment.  But I showed you the actual

2    paragraphs in the indictment.  There are three.  And those

3    paragraphs do not set forth compliance with the Seventh

4    Circuit *Bohle* case, B-o-h-l-e, that's cited on Page 27 of the

5    government's brief, which has held very specifically that,

6    because venue is a constitutional issue, not a technical

7    issue, the government has to plead specific facts, which

8    then, if proven at trial, would establish venue.

9            In fact, your Honor, the *Bohle* case was a case in

10   which -- what happened in that case is that the appellate

11   court looked at the indictment and said, you know what?  The

12   government did not actually plead facts, which, if proven at

13   trial, would establish venue.  But yet the defendant did not

14   file a 12(b) motion challenging that, and therefore it's

15   waived.

16           So there is no question that we have raised it here

17   and that, when you read over the paragraphs in the indictment

18   that I called to your Honor's attention last Monday, they set

19   forth conduct.

20           Two of the paragraphs deal with a man named Lal

21   that says he traveled from Chicago to North Carolina, and

22   then they plead overt acts in North Carolina.  They don't

23   plead a single act that occurred in furtherance of the

24   conspiracy here in the Northern District of Illinois.

25           And then they plead in Paragraph H that I showed

1    you that there were telephones used somewhere in the U.S. to

2    carry out the conspiracy.  They don't plead any telephones

3    used in the Northern District of Illinois.  They say there is

4    a phone located here in the Northern District of Illinois.

5    And then they don't even plead any facts.

6           I mean, what *Bohle* says is that, for example, it

7    would be proper for the government to say that, on a certain

8    time period, Mr. Lal, while he is in the Northern District of

9    Illinois, placed a phone call and talked about bribery or

10   whatever.  That would be an act in the Northern District of

11   Illinois or a meeting in the Northern District of Illinois.

12          But they have to -- they can't just say that --

13   anyway, they have to plead facts.  And then you have to

14   decide, would those facts, if proven at trial, establish

15   venue?  And they don't satisfy that requirement at all.  I

16   explained to your Honor before that that's because there

17   really are no acts in the Northern District of Illinois

18   because of the nature of this case.

19          So in any event, they have not pled it anywhere in

20   the indictment.  Those three paragraphs do not plead it at

21   all.

22          And as far as -- so the Seventh Circuit and the

23   U.S. Supreme Court, everyone agrees.  If the cause of

24   action -- the crime is a conspiracy, if it is, you have to

25   plead an act in furtherance in this district.  You have to

1   plead it.

2          Now, Mr. Bhachu says, well, that act does not need

3   to be illegal. And I agree with that. I'm not arguing about

4   that. They just have to plead facts, like a meeting or a

5   telephone call or an action that Lal or somebody did in the

6   Northern District of Illinois that you could say, if you

7   prove that at trial, that appears to me to be in furtherance

8   of the conspiracy.

9          So there is no other way to get venue at all under

10  the case law. You have to plead the act that actually -- and

11  you just can't plead it in a conclusory way. You can't say,

12  well, they promoted the bribery scheme in Illinois. They

13  can't say that. They have got to give you facts that

14  actually -- and, by the way, it's interesting. In those two

15  paragraphs that plead that Lal traveled to North Carolina and

16  then engaged in overt acts, they describe the acts.

17         They describe Lal getting on phone calls or having

18  meetings to plan out the bribery scheme. So they know how to

19  plead facts that show an act in furtherance of the

20  conspiracy. They just don't plead any that occurred in the

21  Northern District of Illinois.

22         Now, Mr. Bhachu then made another argument, well,

23  there could be an effect in the Northern District of

24  Illinois. There could be an effect -- not an act, but an

25  effect -- on commerce.

1          I would point out to your Honor that that's

2     actually not the law.

3          There are certain types of crimes where it's an

4     essential element of the crime that something has to occur.

5     Like the Hobbs Act, there has to be harm to commerce.  So

6     they said, well, if the harm to commerce occurred in the

7     Northern District of Illinois, then that would be -- you

8     could do that by pleading that, or if the perjury occurred in

9     Illinois.

10          But that's not true with conspiracy law.  The

11    conspiracy says the act itself has to actually be in the

12    Northern District of Illinois.

13          And although that's what the law is on conspiracy,

14    which is the crimes -- there is three conspiracies charged

15    here.

16          I might also point out, they didn't actually plead

17    an effect in the Northern District of Illinois.  If your

18    Honor remembers, the indictment makes an allegation that a

19    company called Company A entered into an agreement that it

20    was going to be -- an agreement about an India mining

21    project.  And they agreed that in the future they would work

22    toward entering a supply agreement, in which they would then

23    purchase titanium sponge, if any of it ever got manufactured.

24          They didn't plead that there was a supply

25    agreement.  They didn't plead that there was a mining

1    operation, because it didn't happen.  There never was a

2    supply agreement.  There never was a mining operation that

3    ever could sell sponge.

4        So they haven't tried to plead that Company A, in

5    the Northern District of Illinois, what price would they have

6    paid?  Would they have been overcharged because of the

7    bribery scheme?  Would they have been deprived of profits?

8        They just don't -- in fact, they don't even plead

9    that the titanium was ever going to enter the U.S.

10       Company A, your Honor, is an international, large

11   company, and there is no reason to believe that this titanium

12   was ever even destined to the United States.  Those are the

13   kind of details that would be negotiated with a supply

14   agreement, which never happened.

15       So they don't even plead an effect in the Northern

16   District of Illinois on Company A, even though, if they did

17   plead an effect, under the case law, that's -- the effect is

18   not an act in furtherance, and therefore is not, in fact,

19   venue in the Northern District of Illinois.

20       I have talked on long enough.  I am going to turn

21   it over to Ms. -- unless you have any questions about venue,

22   your Honor.

23       THE COURT:  No.  I am sure Mr. Bhachu will respond,

24   but I will hear from Ms. Gurland.

25       MR. WEBB:  Thank you very much.

1    MS. GURLAND:  Good morning, your Honor.

2    THE COURT:  Good morning.

3    MS. GURLAND:  The government's focus on Monday was

4    the policy behind RICO, congressional statements about RICO

5    and money laundering, and international treaty obligations of

6    the U.S. in two separate international treaties, and concerns

7    about organized crime.

8    But, your Honor, in order for this Court to make a

9    decision, a legal decision, on this motion to dismiss, the

10   issue before the Court is whether or not it's an

11   impermissible exercise of extraterritorial jurisdiction.

12   And none of the things that the government -- none

13   of these things that the government talked about, these

14   concepts, are particularly helpful for that analysis.

15   What is required for this Court is to analyze the

16   extraterritorial application of RICO, of money laundering, of

17   the Travel Act, and to make determinations regarding whether

18   charging a conspiracy under FCPA would be enough to broaden

19   the categories of persons to whom that statute is to apply

20   and, relatedly, due process.

21   The analysis isn't simple.  It goes through a

22   number of steps, and I went through them on Monday.  I am not

23   going to repeat them.

24   Further complicating this analysis is that in 2016,

25   in *RJR Nabisco*, the Supreme Court, as we talked about, sort

1    of changed the rules of the game, changed the analysis, and

2    now there are certain precedential cases, but the precedent

3    is new, the law is new, and it's difficult.  It's not

4    impossible, but it requires a level of analysis to get

5    through this.

6              What's critical for this Court to understand, I

7    think, your Honor, is that the government is asking you to

8    extend the principles of extraterritorial jurisdiction beyond

9    any of the cases that the defense cited in our brief and

10   beyond any of the cases that the government cited in their

11   brief.

12             And they are asking you to extend extraterritorial

13   jurisdiction beyond any of the Supreme Court cases on the

14   top, beyond *RJR* and beyond any of the cases analyzing *RJR*.

15             While the government is asking the Court to take

16   this rather extraordinary step in this area of law, it

17   doesn't even do that by citing for your Honor the cases that

18   your Honor would have to analyze in order to come to a

19   conclusion like that.

20             Instead it asks your Honor to do this based on the

21   sensationalist notion that the defendants are upper-echelon

22   organized crime figures or that somehow their entirely

23   legitimate operation to mine ilmenite is some sort of

24   transnational criminal enterprise.

25             This is false.  These allegations are false.  They

1    weren't included in the indictment, because the government
2    can't prove them.

3            And also, as Mr. Webb just described to you, if the
4    government didn't plead these types of allegations, then the
5    Court shouldn't be considering these types of allegations.
6    And the Court certainly shouldn't be considering these types
7    of allegations in lieu of the detailed analysis under *RJR*
8    *Nabisco* and related cases that would be required in order for
9    such an extreme extension of extraterritorial jurisdiction.

10           So what the defense is asking your Honor, quite
11   simply, is for the Court to ignore the distractions.  Ignore
12   the distractions from the government about organized crime,
13   transnational this and that, RICO, RICO enterprise, ignore
14   all of that, and just apply *RJR Nabisco* and related cases,
15   because, your Honor, under the law, this indictment -- as
16   pled, this indictment is an improper exercise of -- is asking
17   the Court to improperly exercise jurisdiction.

18           A critical point for the Court to understand
19   related to that -- and this gets back to something that
20   Mr. Webb just talked about, because he and I both have -- we
21   have overlap, because there is an effects test in venue and
22   there is an effects test under RICO.

23           But something that I think is very important for
24   the Court to understand is that ilmenite -- ilmenite
25   mining -- it starts off with ilmenite mining.  From ilmenite

1    mining you make slag.  I don't know exactly what this looks
2    like, slag, but you make ilmenite slag.
3         From there, there are two separate chains of
4    production.
5         One is that you make titanium sponge.  And,
6    incidentally, your Honor, you are right that it's called
7    titanium sponge for a reason.  It's called sponge because it
8    actually physically looks like sponge, but it's not pliable
9    like sponge is.  It's hard and it's metal.  But it
10   actually -- to look at titanium sponge, it resembles sponge.
11        What they do with it from there is that they melt
12   it down in these high-powered furnaces, and they make, like,
13   plates or wires or other things like this.  It's helpful for
14   certain industries, because it's light and it's durable.
15        A separate chain of production that comes from
16   ilmenite and ilmenite slag is titanium dioxide.  Titanium
17   dioxide is a completely separate chain of production.
18   Titanium dioxide is the white that maybe makes the white in
19   the paper in front of me.  It's in plastics and cosmetics and
20   automotive paints and things like this.  They started using
21   it because it's not as toxic as lead is.  So titanium dioxide
22   is a whole nother type of production.
23        In addition -- I mean, there is not just one sort
24   of purchaser of -- so there wouldn't be just one purchaser of
25   products coming from ilmenite.  And there is not even just

1    one purchaser of titanium sponge.  You can sell titanium
2    sponge to lots of people.

3         One of the reasons it's important -- and I am not
4    trying to go beyond the indictment, because, Mr. Webb is
5    exactly right, that under the law, we are with the four
6    corners of the indictment, and we are not supposed to go
7    beyond that.  And I agree with that.

8         But I would direct your Honor to Page 3 of the
9    indictment at Paragraph E.  And this is what Mr. Webb has
10   already talked about, that the indictment, all that it says
11   is that Company A was going to -- it gave the date of it, and
12   it says there is a memorandum of understanding and that they
13   agreed that they would work toward a supply agreement.

14        But Mr. Webb is exactly right that there wasn't a
15   supply agreement.  There is not a supply agreement that's
16   pled in the indictment.

17        Now, one of the reasons why this is so important is
18   that, if the government were right that this Company A, that
19   this whole issue about titanium sales -- if this were so
20   critical that none of this would have happened, none of this
21   whole alleged bribery scheme would have happened but for this
22   Company A, but for these two meetings that evidently happened
23   in Seattle, that it's just that critical, wouldn't there
24   needed to have been a supply agreement?

25        I mean, Company A had no obligation to do anything.

1    As stated in the indictment at Page 3, Paragraph E, all it
2    says is, they are going to work toward something.  I mean,
3    nobody has obligated themselves to do a single thing.

4           So I think we know just based on what's pled and
5    what's not pled in the indictment that it can't be the case
6    that it was so absolutely critical and necessary that
7    Company A should be involved in this.  Company A had no legal
8    obligations to buy anything whatsoever.

9           And then I want to go, your Honor, just briefly
10   through a couple of the points that the government made on
11   each of the respective issues.  I want to start with RICO.

12          One point that the government made about
13   extraterritoriality and the analysis of the *RJR Nabisco* case
14   is, well, you know, *RJR Nabisco* was a civil case, and so
15   maybe civil cases are a little bit different than criminal
16   and maybe we can't really get that much guidance from *RJR*
17   *Nabisco*.

18          But, your Honor, in *RJR Nabisco* the Supreme Court
19   was analyzing specifically criminal RICO allegations, 18 USC,
20   Section 1962(a) and (b) and (c) and (d).

21          This point is driven home by the fact that in a
22   separate part of the *RJR Nabisco* opinion, the court analyzes
23   RICO 1964(c), which is the civil part of RICO.  And on that
24   point, *RJR Nabisco* actually comes to a completely different
25   conclusion than they do for the criminal point.

1          So it's not accurate to say, as the government

2     does, that it would be a reason that we could ignore or not

3     take as seriously the *RJR Nabisco* case, because it's exactly

4     on point.  It's exactly on point for a RICO conspiracy, as is

5     charged in the indictment.

6          The other point that the government made about the

7     RICO conspiracy is that there was no effect on U.S.

8     commerce -- I mean, there was an effect on U.S. commerce,

9     because there was going to necessarily be 12 million pounds

10    of contraband introduced into the U.S. market.

11         But, your Honor, as we have already talked about,

12    there is no agreement that Company A is going to buy

13    anything.  There is certainly not an agreement that they have

14    already determined that they are going to buy $12 million of

15    titanium.

16         And as Mr. Webb already pointed out, even if the

17    government had pled that, which they didn't, because there is

18    no supply agreement alleged at Page 3, Paragraph E of the

19    indictment, but even if there were, there is absolutely

20    nothing pled in the indictment that would give any indication

21    that that titanium sponge was ever going to be distributed

22    within the United States.

23         I want to go now to money laundering.

24         As best as I could understand the government's

25    allegations about money laundering is that there is

1    jurisdiction over money laundering because they pled money

2    laundering as is required under the money laundering statute.

3    But that's just not proper, your Honor, under *RJR Nabisco*.

4         Under *RJR Nabisco*, the analysis is, first, is money

5    laundering a statute that can apply extraterritorially?  As

6    we have seen the Supreme Court case, *RJR Nabisco* said, yes.

7    We are going to assume that, yes, that's true.

8         But from there you have to look to the focus of the

9    statute, and you have to look to 1956(f), which is the

10   jurisdictional component of the money laundering statute.  I

11   feel like the government is resistant to that result, but

12   that's the result under *RJR Nabisco*, and it's the black

13   letter law of *RJR Nabisco* and of *Bank Julius*, which is a case

14   cited by the government.

15        You have to look to 1956(f).  That tells you that

16   there can be jurisdiction if the conduct occurred in part in

17   the United States.

18        And then going to *Bank Julius*, the case that the

19   government cited for the proposition that there should be

20   jurisdiction under the money laundering statute, *Bank Julius*

21   says, well, if there was only a correspondent banking

22   relationship, if that's all there were, if there weren't

23   U.S. bank accounts also, and you were only restricted to just

24   U.S. correspondent banks, that's not enough.

25        Should I pause?

1          THE COURT:  Go ahead.

2          MS. GURLAND:  And the government refers also to the

3    *Prevezon* case and *Bank Julius*.  And it bears remarking, your

4    Honor, that both of those cases were civil forfeiture cases,

5    and the bank -- and the *Prevezon* case specifically concerned

6    transportation of stolen property.

7          So when you are looking at those statutes that are

8    specifically about money and transfers of money and whether

9    or not the transfers of money are proper, there is a very

10   different analysis going on than in a money laundering

11   conspiracy case, particularly when the focus of that money

12   laundering conspiracy is allegations of bribery done by

13   Indian officials in India in connection with an Indian

14   project.

15         So the cases, in terms of the statutes under which

16   they are analyzed, are distinct.  But even under the *Bank*

17   *Julius* case, what the government has pled in this indictment

18   is not enough.

19         Going to the Travel Act, your Honor, in the

20   government's discussions of the Travel Act, they are even

21   further afield from the *RJR* analysis that the Supreme Court

22   has directed applies to this case.

23         In the Travel Act, they don't even acknowledge that

24   the law of *RJR* is that when you find a case that doesn't, on

25   its face, have extraterritorial jurisdiction, then you have

1   to look to the focus of the statute.  They don't even

2   acknowledge that that's the law that your Honor has to apply

3   in analyzing this case.

4          Well, the focus of the Travel Act count is not just

5   travel for travel's sake.  It's travel to commit an illegal

6   act.  The illegal act is alleged to be a money laundering

7   conspiracy, which, of course, takes us back to all of these

8   actions that are alleged to have unfolded in connection with

9   a plan to bribe Indian officials in India in connection with

10  an Indian project so that the focus is India.

11         And interestingly, your Honor, and importantly,

12  under the clear language of *RJR*, it doesn't matter if some

13  things happened in the United States.  There can be things.

14  There can be a meeting with Gevorgyan in Seattle, and there

15  can be the fact that Lal evidently was in Chicago.  The

16  indictment doesn't say what he did in Chicago.  It doesn't

17  say he did anything, but he can be in Chicago, and Gevorgyan

18  can be in Seattle.  The key inquiry is not whether or not

19  there is anything about anybody being in the United States.

20         The inquiry is, what is the focus?  What is the

21  focus of the Travel Act statute?

22         And here, under what is pled, what is the focus of

23  the Travel Act statute in this indictment?  The focus is

24  traveling in order to engage in international money

25  laundering, which takes us right back to the scheme in India.

1           And, your Honor, the focus of this Travel Act count

2     is the bribery scheme in India.  It's not these incidental

3     things that they can say happened in the United States

4     without giving any detail.

5           The government also makes the suggestion that we

6     should simply just wait until trial to figure out

7     jurisdiction.

8           Your Honor, that's not what the cases do.  The

9     cases understand -- *RJR Nabisco*, *Bank Julius*, this *Hawit* case

10    out of New York, *Prevezon*, these cases make the

11    jurisdictional determinations prior to going through a whole

12    trial, and they do it based on the facts that are in the

13    indictment.  They don't wait for the end of the whole

14    proceeding to figure out whether or not there is

15    jurisdiction.  These are cases that are making the rulings

16    based on a motion to dismiss an indictment.  That's how these

17    cases arise.  They don't arise after trial, and we don't have

18    to wait.

19          And it makes sense because, why would there be a

20    necessity of devoting all of the time and resources that it

21    would take in having defendants brought to this courtroom

22    improperly if they shouldn't be here?

23          And FCPA.  The government discussion centers on one

24    just enormous myth, which is that the defendants' view of the

25    FCPA conspiracy is somehow that these defendants are just too

1   high-level.  We are just too high-level to be prosecuted
2   under FCPA, and that's what we are saying.  So if we were
3   low-level, it would be fine, but it's because we are
4   high-level.  It's just got nothing to do with what our
5   arguments are.

6       What the argument that the defense has made in the
7   briefs and made on Monday is that the FCPA statute itself
8   outlines three different categories of parties that are
9   subject to prosecution under the FCPA.

10      People who are foreigners, who don't act in the
11  United States, that's not one of the categories.  Just like
12  the foreign officials who might receive a bribe, they are not
13  in one of the categories.

14      So the question, what the court in *Hoskins* -- and
15  it's really on all fours with this.  It's not to say that
16  your Honor has to apply *Hoskins*, because it is a Connecticut
17  case.  But if your Honor read through what the *Hoskins* court
18  is saying, it goes through in great detail the legislative
19  history of the Foreign Corrupt Practices Act and all the
20  policy reasons why, under the reasoning that that court
21  applied, that you should not allow the government to extend
22  the parties to whom FCPA can apply by charging a conspiracy.
23  That's the reasoning of the *Castle* case, except in that
24  context, it's the foreign official who the court finds should
25  be excluded.

1          Understood in the context of the FCPA, that
2    actually makes sense, because although there could be a
3    reason that the United States might like to prosecute a
4    foreign official who takes a bribe or might like to prosecute
5    a foreigner who never acts in the United States in connection
6    with a corrupt payment, Congress made a decision that, while
7    we might like to do that, we have this issue of the
8    presumption against extraterritorial application of U.S. law.

9          So while we might like to do that, Congress engaged
10   in a balancing act and carefully chose not to cover these
11   parties.  So it's the reasoning of *Hoskins* and of *Castle* that
12   the executive branch ought not broaden the categories of
13   parties that Congress chose to include in the statute by
14   charging a conspiracy.  That's what's at issue.

15         The *Pino-Perez* case that the government discussed,
16   I mean, I don't think it's to the contrary.  It doesn't
17   happen to be a case that analyzed anything under FCPA, so
18   it's not directly on point.  But I don't think it's to the
19   contrary.

20         Three points.

21         Obviously, one, kingpin statute is very different
22   from FCPA, and the concerns that govern the kingpin statute
23   are separate.  When your Honor reads *Pino-Perez* in connection
24   with these proceedings, you will see that the concern there
25   was, if you are charging someone with something under, like,

1   enhancing their penalties, should you have rather done that
2   as a separate count?  Should it be under the sentencing
3   guidelines?  There is a whole nother inquiry in this *Amen*
4   case and the *Pino-Perez* case we are getting into that really
5   don't have a lot of applicability to the things your Honor is
6   deciding in this case.

7              Second, listening to what the government
8   prosecutors' argument was about FCPA, it's not entirely clear
9   to me that, even under the formulation from *Pino-Perez*, that
10  these defendants wouldn't be necessary parties, because they
11  are saying, well, somebody who receives a bribe is a
12  necessary party.  But, of course, without the defendants,
13  there wouldn't be anybody that would have been alleged to
14  have paid it.

15             So I think even under this analysis of *Pino-Perez*,
16  it still wouldn't -- it wouldn't change the analysis that
17  they shouldn't be able to be prosecuted.

18             And lastly, *Pino-Perez*.  The holding is actually
19  that if a crime necessarily involves one or more others, then
20  the legislature didn't mean to involve the others.  But I
21  think that applies to the formulation that we have stated,
22  because domestic -- U.S. citizens who act abroad and foreign
23  officials are not covered as parties, and so under this
24  analysis, they wouldn't be subject to FCPA.

25             This conclusion is buttressed by the legal

1    principles from these Supreme Court cases on not extending

2    extraterritorial application of U.S. law, that if a statute

3    is given some -- just some, and it's outlined -- some

4    extraterritorial application, that when courts interpret the

5    scope of that extraterritorial application, they should

6    restrict the statute to its scope.

7              I think that makes sense, and it also -- it makes

8    sense, and it dovetails with the policy concerns that your

9    Honor is going to have to apply in this case, the very

10   serious policy concerns that have to do with not extending

11   U.S. law and not making the United States the policemen of

12   the entire world, because the Supreme Court said that we are

13   not.  And I think your Honor is going -- I am sure you will

14   very carefully analyze the issue as to whether or not what

15   the government is asking isn't, as we say, asking you, your

16   Honor, to go well beyond the law.

17             Finally, in due process, I don't have -- the due

18   process analysis necessarily sort of repeats a great deal of

19   the analysis that applies to the other categories, because we

20   are just discussing what contexts occur with United States.

21             But just one point.  The government -- without

22   mentioning a case, the government just says, well, United

23   States Supreme Court just generally -- I don't know which

24   case they mean -- they say the United States Supreme Court

25   made a decision that aliens don't have due process rights.

1    So, your Honor, when we -- as you are looking at

2    this -- it's at Page 37 in the defense reply in Footnote 25.

3    I mean, there is two cases that I think that the government

4    could be referring to.

5    One is a case in which a resident alien was ordered

6    removed from the United States and held at an INS detention

7    facility, and they were trying to figure out, did that person

8    have rights?  But that person didn't even have a case in the

9    United States.

10    And the other is even more unusual, this *Johnson v.*

11    *Eisentrager*.  There, it was an alien who -- the alien, who

12    they found had no due process rights, was actually a German

13    individual who was found to be a national enemy to the United

14    States after World War II.  And in military proceedings, this

15    person was asking to have due process rights.  And one of the

16    bases -- the court said, well, we can't give you due process

17    rights, because U.S. soldiers, who subject themselves to the

18    military tribunal, they don't have due process rights.  So it

19    would be very unjust to give this German alien, who was

20    basically engaging in warfare against the U.S. after the

21    treatise, more rights than U.S. soldiers.

22    So these are unusual cases.  They don't stand for

23    the principle that these foreign defendants don't have due

24    process rights.

25    If we have any question about that, you can look no

1    farther than the *Hijazi* case, because in *Hijazi* the Seventh

2    Circuit had no problem analyzing that those defendants had --

3    that that defendant had a due process right.  That defendant

4    was a foreign national, who was outside the U.S., and indeed

5    he wasn't alleging all these other things that we are talking

6    about, about RICO and extraterritorial jurisdiction.  He was

7    really simply charging that what had happened was a violation

8    of his due process rights.

9            He, by the way -- and, yes, the government was

10   accurate.  I'm sorry that I didn't have the answer for your

11   Honor the other day.  Eventually there was found to be

12   jurisdiction, but the defendant in *Hijazi,* he actually

13   engaged in a fraud scheme in which the United States

14   Government was overbilled by $3.5 million because of his

15   fraud scheme, directly out of the coffers of the

16   U.S. government, in connection with supplying tanks in the

17   war effort in Kuwait.

18           So I think the Seventh Circuit case *Hijazi,* in

19   analyzing due process, what the court asked was, how much is

20   enough?  How much is enough in terms of the defendant's

21   connection with the United States?

22           And I think that this is a formulation not just for

23   due process, your Honor, but a formulation for all of the

24   determinations that your Honor has to make involving the

25   arguments that we have made on Monday, today, and in our

1  briefs.

2  And we would submit to your Honor that when the

3  focus of an indictment is a bribery scheme of Indian

4  officials in India in connection with a mining project in

5  India, the answer to that question is that incidental travel,

6  meetings, phone, and even meetings with some company that

7  might have bought something but didn't have to are not

8  critical to the offense charged in the indictment.  And the

9  answer is that, under the law of the Seventh Circuit and the

10  Supreme Court, it's not enough.

11  THE COURT:  Thank you.

12  Mr. Bhachu?

13  MR. BHACHU:  Judge, is it all right for me to

14  proceed now?

15  THE COURT:  Sure.

16  MR. BHACHU:  Okay.  Thank you, Judge.

17  Your Honor, maybe just starting with ripeness first

18  of all.

19  There was some discussion about how it was the

20  sensibility, at least for some attorneys in Austria, that

21  perhaps the Spanish appeal would be resolved in two to four

22  months from now.

23  The one thing I would say in that regard is, we

24  filed our appeal from the initial decision in 2015, and it

25  was decided at the outset of 2017.

1           THE COURT:  Right.

2           MR. BHACHU:  Now, the one kind of kernel, I guess,

3    there in relation to our case is that I believe perhaps after

4    that appeal was filed on our behalf by the Austrian

5    government, Mr. Firtash then appealed to the Austrian

6    Constitutional Court and argued that the extradition treaty

7    between the United States and Austria had unconstitutional

8    provisions in it that were unconstitutional under Austrian

9    law.

10          That separate appeal took precedence over the

11   extradition appeal in our case.

12          THE COURT:  Over your appeal.

13          MR. BHACHU:  Correct.  Correct.

14          So there was -- that all goes to show that when one

15   tries to make a prediction about how quickly something is

16   going to happen in Austria, it may not actually turn out that

17   way.

18          With regard to the Spanish appeal, what I would

19   note is, there is a lot of ifs in Mr. Webb's view.

20          First of all, we have to decide whether or not --

21   not we.  The Austrian courts have to decide whether or not

22   they are going to grant extradition to Spain and overturn

23   that lower court decision.  If that happens, then it's going

24   to be up to the Minister of Justice, as we point out, to

25   decide which extradition proceeding will be given precedence,

1   the Spanish one or the American one.

2           And of course, there is still the pending

3   proceeding in the Supreme Court.  If the Supreme Court

4   requests briefing on that issue, that obviously will

5   complicate things.  And I can't imagine that there would be

6   any decision at all until both of those proceedings are at

7   their conclusion.

8           So obviously nothing is happening imminently, as

9   was suggested.  I understand counsel, at the time, did not

10  know about the perfection of that appeal in Austria.  Our

11  point would still kind of hold, Judge.

12          To address one of your comments, we do have a

13  concern about having a ruling here, because it just adds an

14  additional element of uncertainty to what's going on in

15  Austria.

16          In one case, if it's adverse to the defendant, then

17  I think there is, respectfully, still a fair chance that, if

18  he thinks all his options are exhausted, that at that point

19  he will decide to forego a $174 million bond rather than come

20  to the United States.

21          But the other issue is confusion, in the sense of,

22  if there are pending proceedings in Austria, if there is an

23  adverse ruling in this court, then that may not be the final

24  word.  And yet the Austrian courts will then wonder what's

25  going on.  What do we do in light of that ruling, et cetera?

1          I mean, there is mention, just as an example, to

2     the *Hoskins* case, obviously.  That's a case that is on appeal

3     in the Second Circuit.  There could be additional proceedings

4     here.

5          That just kind of confuses the matter further when

6     we have got an appeal in one court relating to Spain.  We

7     have a proceeding before the Austrian Supreme Court.

8          What's not mentioned is that counsel in Austria for

9     Mr. Firtash has also assured that they will appeal to the

10    European Court of Human Rights.  That will take additional

11    time.

12         What I also understand in situations like that is,

13    it's not uncommon for a defendant, like Mr. Firtash, to ask

14    the European Court of Human Rights to issue a request -- or a

15    directive to a state to take provisional measures to prevent

16    extradition.  I don't pretend to understand the complexities

17    of that situation.

18         But I do know also, from what I have been told,

19    that Mr. Firtash has asked that Mr. Firtash not be extradited

20    before at least the proceedings in the Austrian Supreme Court

21    are done.

22         So all of that is to say that there is a lot of

23    uncertainty here, and I think that a decision in this court

24    might just breed additional uncertainty, if it's made before

25    Mr. Firtash returns.

1    Moving to the issues that were talked about with
2    regard to venue.

3    What I would like to point out -- and I actually
4    have two cases, also, I think that are additional authority
5    to respond to this argument that's been made by Mr. Firtash.

6    The first thing that was raised today was -- or one
7    of the things that was raised was this citation to the *Bohle*
8    case.

9    Let me just talk briefly about that *Bohle* case so
10   that your Honor knows what that case was about.  I went back
11   and looked at it after it was mentioned as being on point in
12   this case.

13   The *Bohle* case was a case of aircraft piracy where,
14   as I understand it, the defendant actually boarded a plane in
15   Florida -- or last was in the United States, I believe in
16   Florida, and engaged in aircraft piracy.

17   When he was returned, I think, by Canadian law
18   enforcement officials, his port of entry into the United
19   States was New York.

20   He was indicted in Indiana.  The allegation in the
21   indictment that related -- well, the only allegation in the
22   indictment that related to Indiana was the fact that he was a
23   resident of Indiana, not that he had committed the crime in
24   Indiana.

25   That was the issue that really was confronting the

1   court.  In terms of an allegation of the commission of the

2   crime, there is a jurisdictional or a venue provision that

3   permits, in certain cases, where an offense is committed

4   outside of any district, that the district where the

5   defendant is first returned may suffice to satisfy the venue

6   statute.

7          So what we have here is something very different.

8   We actually allege in our indictment that the crime was

9   committed in the Northern District of Illinois and elsewhere.

10          In that regard, I point the Court's attention to

11   *United States v. Lowrence*, 543 Federal Appendix 564.  And it

12   cites in that case *United States v. Knox,* 540 F.3d 708, and

13   it's a pinpoint cite to 713, 714.

14          In *United States v. Lowrence* the defendant

15   challenged venue here.  And it says, "Lawrence apparently

16   believes the indictment fails to allege venue over either

17   crime and that, consequently, he is actually innocent."

18          And then the court says, "Both counts of conviction

19   allege, however, that the crime was committed in the Northern

20   District of Illinois and elsewhere, and that allegation is

21   adequate to allege venue."

22          So we have -- and they cite the *United States v.*

23   *Knox* case, which has a similar sort of discussion.

24   Principles are slightly different in that case.  In one count

25   of the indictment, it was a count where the allegation said

1    the crime occurred in the Ivory Coast, or Côte d'Ivoire, I

2    think, is maybe how it was referred to in the case, which is

3    in Africa.  That was a false statement case.  There actually

4    is a basis to allege venue in that situation, which we won't

5    get into.

6          But the other count alleged that the crime occurred

7    both in this district and another district.  I think it said

8    in the Eastern District of Missouri and the Northern District

9    of Illinois.

10         And then the court says, "Therefore, unlike

11   Count III that only mentioned Côte d'Ivoire, we can't say

12   that any potential venue defect presented itself on the face

13   of the indictment."

14         So under those cases, as well as the *Engle* case,

15   which is cited by the Seventh Circuit as well -- that's a

16   Fourth Circuit case -- it's clear that all we have to do in

17   an indictment is allege that venue -- that the crime occurred

18   in this district, as we have done, and elsewhere as to each

19   count, and that is satisfactory under guiding Seventh Circuit

20   precedent to establish venue.

21         There was obviously some talk about my discussion

22   about certain pieces of evidence, but I think that's only to

23   show that -- here is the thing.

24         We allege, as we are required to, in the indictment

25   that the crime occurred in the Northern District of Illinois.

1    We do allege that acts were taken in this district as well.
2    We are not required to set out in chapter and verse in an
3    indictment what actually happened in this district.  That's
4    exactly what the Seventh Circuit has said on multiple
5    occasions.

6         So there is not a different rule in this case
7    because of the parties involved or the profile of the case or
8    anything like that.  It's the same rule that applies in all
9    other cases, and that's what the Seventh Circuit said.

10        We also pointed out, as we did before, about 3237,
11   which talks about the fact that if there is travel from a
12   district, that's a substantial -- that's a basis upon which
13   to establish venue as well.

14        With regard to the effects that were discussed,
15   again, we are not required to plead effect in the district.
16   What we are able to do is bring a case in a district where
17   the proof will show an effect on commerce would have
18   occurred.

19        The Hobbs Act cases talk about effect on commerce
20   being an element of the offense.  An effect on commerce is an
21   element of the racketeering offense as well.

22        So, so long as we are able to prove at trial that
23   there was an effect on commerce in this district or would
24   have been an effect on commerce in this district, we satisfy
25   our element of proof.

1       Of course, the idea that Company A -- the effort to

2   have Company A engage in a contract where they would receive

3   a massive amount of goods in a project that was slated to

4   generate $500 million in revenue yearly, the notion that

5   there is no effect on commerce in this district, where

6   Company A is based in this district -- you fairly read the

7   allegations about Company A being based in this district and

8   entering into a contract, those are the types of things that

9   you talk about as having effect in this district.

10      Of course, we are not restricted to our proof in

11  the indictment as to what other effects on commerce might

12  have been had, for example, to the extent we have employees

13  or representatives of Company A taking acts either in this

14  district or elsewhere, or traveling elsewhere to do so in aid

15  of the charge.

16      With regard to another point that was made, and

17  touched on, again, about these guys haven't been here,

18  et cetera, we have cases that we cite in our brief, Judge,

19  that specify for basically the better part of 200 years that

20  there is no requirement under the law that you actually set

21  foot in a district in order for venue to be proper there.

22      There is the *Hyde* case from the Supreme Court --

23  these are all laid out in some detail -- as well as another

24  case more recent that discusses this notion that there is

25  basically no proof -- or no requirement whatsoever that a

1   particular defendant set forth -- or stepped foot in a

2   district in order for venue to be proper as to that defendant

3   where a conspiracy is charged.  I just point the Court to

4   those cases.

5          With regard to the arguments that Ms. Gurland

6   addressed, in terms of the arguments that related to

7   extraterritoriality, Ms. Gurland advertised *RJR Nabisco* as a

8   game changer, if you will.  I would point out that the result

9   that was had in the Supreme Court was a result that was the

10  one sought by the United States because it filed a brief in

11  that case.  So it wasn't some sort of game changer that was

12  adverse to the United States.  It's the result we actually

13  asked for and received.

14         Foreign enterprises are covered in that case.  So I

15  just want to make it clear that -- what was really happening

16  there.

17         I think that the other thing is that this notion of

18  we haven't gone through any extraterritorial jurisdiction

19  analysis, we filed a 100-page brief.  I'll let your Honor

20  decide whether or not we managed to do that.

21         I do think that what is clear here is that we

22  alleged the last two applications of the Travel Act on the

23  face of the indictment.  If we are sticking to the

24  indictment, as has been asked, then there is no basis to

25  think that we haven't alleged domestic applications of both

1   statutes, both in terms of the Travel Act, because we simply

2   say somebody traveled from Point A to Point B in the United

3   States and then took an act in furtherance.  I can't imagine

4   how you could read that as being an extraterritorial

5   application of the statute.

6           And then with respect to Section 1956, we actually

7   talk again and again about money coming into the United

8   States, money going out of the United States.

9           There was also a reference to the *Bank Julius* case

10  and some notion that it didn't support our position.  I

11  invite the Court to read that case.  I actually, in the

12  miracles of modern technology, pulled it up on my telephone

13  here.  We are not allowed to use a Westlaw application on our

14  government phones, I am happy to say.

15          So it says here that claimants maintain -- I am

16  reading from the case itself.

17          "Claimants maintain that because United States

18  institutions necessarily must be used to convert foreign

19  currency into United States currency, the money had to go

20  through a bank in the United States; but, according to the

21  claimants, such a transfer through U.S. banks is an

22  insufficient basis to provide jurisdiction in this court.

23          "It follows, they say, that the United States

24  cannot bring actions against any criminal proceeds that are

25  thus converted.  In fact, the converse is true.

1    "If, as claimants assert, United States currency

2    has been the bedrock of international trading and commerce,

3    then Congress was justified in attempting to oversee the use

4    of United States financial institutions and in seeking to

5    prevent their use as a clearinghouse for criminals.

6    "At oral argument, claimants suggested that such an

7    assertion would make the United States the policeman of the

8    world," which, as I take an aside, that was made an at

9    argument here today.

10    What the judge said -- I think it was Judge

11    Friedman from the District of Columbia -- said, "In fact, it

12    only makes the United States government the police of

13    criminal conduct that takes place, at least in part, in this

14    country."

15    So I think that case entirely refutes the argument

16    that's made by the defendants in regard to the application of

17    the money laundering statute, and I think they have sorely

18    misread that case.

19    I think we have also talked about before -- I am

20    not going to talk about again -- the fact that the

21    transactions do take place, in part, in the United States.

22    That's what the allegations is in the indictment.  If we are

23    not going to behind the indictment, as is suggested, then

24    there is no reason to think that we haven't properly alleged

25    a crime that takes place, in part, in the United States.

1   Therefore, however the crime is characterized, is within the

2   bounds that the Supreme Court -- the United States Supreme

3   Court has set.

4          With regard to the due process rights argument, I

5   don't think there is much I really need to add there.  The

6   claim that this crime was incidental and the activity was

7   incidental, again, is really an argument that's best

8   presented at trial.

9          The fact of the matter is -- and I was talking

10  about some of the evidence in this case that might come out

11  at trial.  Obviously, Ms. Gurland and Mr. Webb and their

12  colleagues, they don't have the benefit of any of the

13  evidence that we have really kind of assembled in this case.

14  They, of course, I am sure, have read a couple of affidavits

15  that were submitted in the Austrian court proceedings.  But

16  we have tens of thousands of pages of discovery in this case.

17  We have thousands of interceptions in this case.  Of course,

18  we are not going to play them all.

19         But they certainly don't have a full grasp of

20  everything that was going on here in the United States.  Nor

21  have we had an opportunity to fully set that out, because an

22  indictment is really not the place to do that in a situation

23  like this.

24         We have made the allegations that we need to with

25  regard to our case, and we have properly alleged crimes that

1   are both properly set forth or brought in this district that

2   are not extraterritorial in application.

3            There were some arguments made with regard to the

4   FCPA.  If your Honor wishes to hear anything or has a

5   question about that, my colleague from the fraud section,

6   Mr. Cestaro, is on the phone and would be happy to address

7   any issues your Honor may have there.

8            Otherwise, we would ask for the Court, as we said

9   before, to defer ruling in light of the fact that the

10  Austrian proceedings are still ongoing and, in the

11  alternative, to deny the motion to dismiss.

12           THE COURT:  Well, what --

13           MR. KAHN (telephonically):  Good -- sorry.  Go

14  ahead.

15           THE COURT:  Go ahead.

16           MR. KAHN:  I apologize, your Honor.  This is

17  actually Daniel Khan.  Mr. Cestaro didn't introduce me,

18  because I wasn't in the room when he introduced himself.  We

19  didn't want to interrupt again.

20           If it's okay, I would just address a couple of the

21  points that defense counsel raised.

22           THE COURT:  Okay.

23           MR. KAHN:  So, first of all, thank you for letting

24  us appear telephonically.  We certainly appreciate that.

25           I will be very brief here, your Honor.  Just a few

1    points, taking the arguments in order.

2            Defense counsel made the point that foreigners who

3    act abroad and never step foot in the United States are not

4    covered by the FCPA.  That's simply incorrect.

5            The FCPA covers domestic concerns, as well as

6    officers, employees, and agents of domestic concerns, as well

7    as issuers, U.S. issuers, so foreign companies that issue

8    stock on the U.S. exchange and employees and agents of those

9    issuers.

10           So there is no question -- and even the *Hoskins*

11   court and no court has ever held that a foreign national

12   agent who never steps foot in the United States couldn't be

13   covered under the FCPA.  It's very clear, your Honor, that a

14   foreign national agent who never steps foot in the United

15   States could be prosecuted and convicted under the FCPA, and,

16   in fact, it has happened before.

17           So the difference here is the difference between a

18   foreign national agent and a foreign national nonagent.  That

19   difference does come down to the element of control.  Is the

20   foreign national individual covered by -- controlled by the

21   domestic concern?

22           So despite the fact that defense counsel said that

23   this doesn't come down to whether or not they were too

24   high-level, that is, in fact, the very issue that this comes

25   down to.

1    So again, the fact that the defendants here weren't
2    low-level enough to be controlled by the domestic concern
3    such that they would be considered agents of the domestic
4    concern, that is the issue.  And that's the issue at hand
5    here.

6    So it's not really an issue of extraterritoriality.
7    Defense counsel raised the point that extraterritoriality
8    demands that we read and construe the FCPA in a way such that
9    he can never be prosecuted.  That's, again, a misreading of
10   extraterritoriality and the argument at issue here.

11   A foreign national agent who never steps foot in
12   the United States could be covered.  So if the defendant were
13   lower-level and engaged in the exact same conduct, we could
14   unquestionably cover him under the direct prohibitions of the
15   FCPA.

16   So the argument boils down to not a matter of
17   geographical scope, but rather the status and stature of the
18   defendant.  And that's very clearly a question of *Gebardi*.
19   It's not a question of extraterritoriality.

20   Staying on extraterritoriality for a minute, there
21   is also no question that the Foreign Corrupt Practices Act,
22   which prescribes conduct relating to the payment of bribes to
23   foreign officials to secure business in that foreign country,
24   applies extraterritorially.

25   So again, we take the position that this is not an

1   extraterritoriality issue.  But if your Court were to go down

2   that road, we think that there is no question that the FCPA

3   does apply extraterritorially.

4           And also very clearly in this case, there is a

5   domestic application of the statute.  As has just been

6   pointed out, there is 200 years of case law that makes clear

7   that where we are talking about a conspiracy, where acts take

8   place in the United States, a defendant, a foreign national

9   defendant doesn't need to come into the United States and

10  take part in the United States.  They are guilty if there are

11  overt acts and acts in the United States in furtherance of

12  the conspiracy.  And that is what we have here.

13          The last point I will make is, with respect to

14  *Pino-Perez*, *Pino-Perez*, your Honor, rejected the exact

15  argument that defense counsel is making here.

16          In *Amen*, the Second Circuit case, did not.  That is

17  the case that the *Hoskins* court relied on.  So *Pino-Perez*, I

18  think, is directly applicable here.

19          And the analysis that defense counsel said that the

20  necessary party rule would apply here because the defendant

21  was necessary to this bribe scheme, that misses the point,

22  your Honor.

23          The necessary party argument that was espoused in

24  *Gebardi v. United States* and then again laid out and argued

25  in *Pino-Perez* and rejected was not whether the particular

1   defendant was necessary to the specific statute charged or

2   the specific violations charged in any particular case.  The

3   question is whether that class of defendant is a necessary

4   party to every single violation of that law.

5            So in *Gebardi*, they were talking about the Mann

6   Act.  And under the Mann Act, it was a man transporting a

7   woman at that point in time.

8            So there was no question that in order to violate

9   the Mann Act, there had to be the transportation of a woman

10  in every single violation.  And the fact that Congress

11  clearly understood that, they must have been thinking about

12  that woman when they came up with the Mann Act, because the

13  exact conduct that they are prescribing is the transportation

14  of that woman.

15           And the fact that they decided not to allow

16  prosecution of that woman through the substantive statute

17  meant that they did not intend to have anyone get around that

18  through conspiracy.

19           And that was the exact analysis that the Fifth

20  Circuit undertook in *United States v. Castle* under the FCPA.

21  There are bribe payers and there are bribe recipients.  And

22  clearly both sides, bribe payers and bribe recipients, are

23  necessary to every FCPA violation.  And yet Congress chose to

24  specifically prohibit the bribe-paying side but not the

25  bribe-recipient side.

1               Here the defendant's argument is that he is a

2    foreign national nonagent.  There is no indication in the

3    statute and there is no indication in the legislative history

4    that Congress was thinking of a foreign national nonagent.

5    There is certainly no suggestion that a foreign national

6    nonagent is necessary to every FCPA violation.

7               The fact that he is higher level than an agent

8    would be, there is no indication in legislative history that

9    that is what Congress was thinking of or trying to immunize

10   such a person.

11              To the contrary, in legislative history, Congress

12   was concerned about scapegoating people and, in fact,

13   expressed a concern that by allowing the prosecution of

14   agents, that perhaps they would be used as scapegoats.  They

15   did not want that to happen.

16              So, if anything, your Honor, there is indication in

17   the legislative history that the defendant is the exact type

18   of person that Congress would want to be allowed to have

19   prosecuted.

20              Unless your Honor has any other questions, we don't

21   need to make any further comments on defense counsel's

22   argument on the FCPA.

23              MR. BHACHU:  The only thing I would add, Judge, is

24   that Mr. Robell wished to be present, but he actually had a

25   conflict with getting on an international flight, and

1    Mr. Kahn and his colleague kindly stepped in for him.

2                 THE COURT:  No problem.

3                 Thank you very much.

4                 MR. WEBB:  Your Honor, could I just ask one

5    question very briefly?

6                 Thank you for hearing us.

7                 They cited two cases that we didn't have notice of.

8    I am not -- can I just ask leave that if I -- I am going to

9    review the cases.  I don't think they overruled *Bohle,* but I

10   want to look at them.

11                Can I have leave, within five days, to file a brief

12   that's under five pages, if I feel it's necessary?

13                THE COURT:  That's fine.

14                I think what Mr. Bhachu said is that *Bohle* relied

15   on two other cases.  I'm not sure.  He is talking about two

16   cases that relate to *Bohle*.  That would be fine.

17                Folks, I am so overdue.  I have to get out of here.

18                MR. WEBB:  Thank you very much.

19                MR. BHACHU:  And may we also file something as

20   well?

21                THE COURT:  Sure.

22                MR. BHACHU:  Thank you, Judge.

23                MR. KAHN:  Thank you, your Honor.

24            (An adjournment was taken at 11:50 a.m.)

25

1                              *    *    *    *    *

2      I certify that the foregoing is a correct transcript from the
       record of proceedings in the above-entitled matter.
3

4      /s/ Frances Ward                            September 18, 2017.
       Official Court Reporter
5      F/j

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25